CHRIS BAKER, State Bar No. 181557
cbaker@bakerlp.com
DEBORAH SCHWARTZ, State Bar No. 208934
dschwartz@bakerlp.com
BAKER DOLINKO & SCHWARTZ, P.C.
220 Montgomery Street, Suite 1094
San Francisco, CA 94104
Telephone: (415) 433-1064
Fax: (415) 422-9966

Attorneys for Plaintiff
ANDREA HULL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA HULL, an individual,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>EPIC SYSTEMS CORPORATION, a Wisconsin corporation; BOOST, INC., a Wisconsin corporation,<br><br>　　　　Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>1. Violation of Bus. & Prof. Code § 16600.5 (Employment Restraints);<br>2. Violation of Bus. & Prof. Code §§ 16600, 16600.1, 16600.5 (Customer-Contract Restraints);<br>3. Unfair Competition (Bus. & Prof. Code § 17200 et seq.); and<br>4. Declaratory Judgment (28 U.S.C. §§ 2201, 2202) |

Plaintiff Andrea Hull alleges as follows:

**INTRODUCTION**

1.　　Since 1872, California law has guaranteed every person the right to pursue any lawful profession, trade, or business. Business and Professions Code section 16600 provides that, except as otherwise permitted by statute, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The California Supreme Court has confirmed that this prohibition is absolute in the employment

context: there is no "narrow restraint" exception, and covenants not to compete and covenants not to solicit customers are void no matter how reasonable an employer believes them to be. *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937.

2.      In 2023, the Legislature reinforced this policy. Senate Bill 699 added Business and Professions Code section 16600.5, which provides that any contract void under section 16600 is unenforceable "regardless of where and when the contract was signed," forbids an employer or former employer from attempting to enforce such a contract "regardless of whether the contract was signed and the employment was maintained outside of California," declares that an employer who enters into or attempts to enforce such a contract "commits a civil violation," and gives employees, former employees, and prospective employees a private right of action for injunctive relief and actual damages, with mandatory attorneys' fees and costs to a prevailing employee. Assembly Bill 1076 added section 16600.1, which makes it unlawful to include a noncompete clause in an employment contract or to require an employee to enter a noncompete agreement, and required employers to notify current and former California employees in individualized writings that any such clauses in their agreements are void. AB 1076 also amended section 16600 itself to provide that the statute reaches restraints "no matter how narrowly tailored" (§ 16600, subd. (b)(1)) and that it is "not limited to contracts where the person being restrained is a party to the contract" (§ 16600, subd. (b)(2)).

3.      Defendant Epic Systems Corporation ("Epic") is the dominant vendor of electronic health record ("EHR") software in the United States. Epic, directly and through its wholly owned staffing subsidiary, Defendant Boost, Inc. ("Boost"), requires its California-based employees to sign a Wisconsin-law form agreement containing a one-year covenant not to compete that bars former employees from working for any "Direct Competitor" on an Epic-controlled list (including Amazon, Apple, Google, Meta, Microsoft, Oracle Health, and Salesforce); from establishing or aiding any new business that overlaps with Epic's products; from soliciting Epic customers or prospects for competitive purposes; from being employed by any Epic customer or prospective customer in any role that involves Epic software; and from working for Epic's consultants and "Cooperative Partners" in overlapping healthcare software or services work.

- 2 -

COMPLAINT

Because Epic's customers include most significant health systems in the United States, the covenant operates to exclude former Epic employees from virtually the entire health-information-technology industry in which they built their careers.

4. Epic backstops these void covenants with restraints at the other end of the labor market: provisions in its customer and partner contracts — including, on information and belief, no-hire, no-poach, and 12-month "cooling off" provisions — that restrict Epic's customers from hiring or using former Epic employees no matter what the employees' own agreements say. Epic's human resources department put it plainly, in writing: "customer contracts often include provisions related to hiring, which would still apply to those organizations." And Epic polices the gate itself: it controls the "UserWeb" credentials, certifications, training, and conference access that anyone working with Epic's platforms needs, and it denies those credentials to recent former employees — while offering them to virtually everyone else — as a means of enforcing its restraints.

5. Epic does not treat its competition restraints as dead letters. It enforces them — selectively, and as an instrument of loyalty. Epic maintains a waiver program under which it will excuse its noncompete for a departing employee who has served at least seven years at Epic and three years at Boost and who remains for a year at the Epic customer seeking to hire them. The restraints, in other words, are not calibrated to protect trade secrets; they are calibrated to keep employees and customers in the fold.

6. Plaintiff Andrea Hull is a California resident, living in Concord in the San Francisco Bay Area, who devoted approximately eleven and a half years of her career to the Epic Group, most recently working remotely from Concord for Boost. In March 2026, she left Boost and joined Abbott Diabetes Care ("Abbott") as an EHR Implementation Manager — a customer-side role developing the strategy to scale Abbott's continuous glucose monitoring ("CGM") device integration with Epic's platforms, including "Epic Aura," across more than 400 health systems. The role *advances* the adoption of Epic's own products. Abbott's legal department vetted the hire before extending the offer.

COMPLAINT

7.    Within weeks, Epic denied Ms. Hull the UserWeb credentials her job at Abbott requires — credentials needed for conference registration and for access to Epic technical documentation — citing a one-year "cooling off" period, and made its position clear to Abbott: as an Abbott program manager relayed it in writing, "we were informed former Epic employees should not be working on Epic direct, related work for 12 months." Abbott — dependent on its commercial relationship with Epic — reacted exactly as Epic intended. It removed Ms. Hull from scheduled customer trips, pulled her from Epic's XGM conference, directed her not to engage with Epic-affiliated health systems at Becker's, an industry conference she was actively supporting, and excluded her from certain internal and external meetings. Career advancement opportunities outlined in her first weeks have been delayed or lost. Those restrictions remain in place today.

8.    When Ms. Hull asked Epic's human resources department whether an updated employee agreement existed that complied with California law, Epic confirmed in writing that no updated agreement exists and that the agreement she signed remains the applicable one — and pointed to the hiring restrictions in Epic's customer contracts. Each of the restraints described above — the covenant not to compete, the customer and employee nonsolicitation provisions, the de facto restraints embedded in Epic's perpetual confidentiality and return-of-property provisions, the Wisconsin choice-of-law and forum provisions, the no-hire, no-poach, and "cooling off" provisions in Epic's customer and partner contracts, and the credential denials used to enforce them — is void or unlawful under California law, including Business and Professions Code sections 16600, 16600.1, and 16600.5, the Unfair Competition Law, and the common law right to fair procedure.

9.    The complaint seeks declaratory and injunctive relief, including public injunctive relief, consistent with California's unfair competition law. She asks the Court to declare these provisions void, to enjoin Defendants from enforcing or attempting to enforce them — against her and against every other California-resident former employee of the Epic Group — and to award her reasonable attorneys' fees and costs as provided by statute. She does not seek damages in this

- 4 -

COMPLAINT

action. The object of this Complaint is not compensation; it is the freedom of California workers to practice their professions.

**PARTIES**

10.    Plaintiff Andrea Hull is an individual who resides and is domiciled in Concord, Contra Costa County, California, and at all relevant times has primarily resided and worked in California. Ms. Hull is a former employee of Epic and Boost. She is currently employed by Abbott as an EHR Implementation Manager with Abbott Diabetes Care, based in Alameda, California.

11.    Defendant Epic Systems Corporation is a corporation organized under the laws of Wisconsin with its principal place of business in Verona, Wisconsin, and is therefore a citizen of Wisconsin. Epic develops, markets, licenses, and supports EHR software and related implementation services used by health systems throughout the United States, including throughout California. Epic transacts substantial business in California, licenses its software to numerous California health systems, and employs California residents, including remote employees who reside and work in California.

12.    Defendant Boost, Inc. is, on information and belief, a corporation organized under the laws of Wisconsin with its principal place of business in Verona, Wisconsin, and is therefore a citizen of Wisconsin. Boost is a wholly owned subsidiary of Epic. Boost is in the business, as a subcontractor to Epic or other companies in the "Epic Group," of providing staff to fill implementation-team roles — typically on the customer side — and to take on special projects related to customers' use of Epic software. Boost employs remote employees who reside and work in California.

13.    At all relevant times, Epic and Boost operated as an integrated enterprise and/or as joint employers of Ms. Hull and other California-based employees. Among other things: Boost is wholly owned by Epic; the Boost employment agreement is written for the benefit of the entire "Epic Group" and names Epic as an intended third-party beneficiary entitled to enforce it; Epic's policies and procedures manual (the "Redbook") governs Boost employees; exceptions to the covenant not to compete may be granted only by "an Epic HR director"; Boost employees sign a

- 5 -

Mutual Arbitration Agreement directly with "Epic Systems Corporation, together with its related and affiliated companies"; and Epic's human resources department administers and enforces the Boost agreement, as it did with respect to Ms. Hull. Epic and Boost are referred to collectively as "Epic" or "Defendants" except where the distinction matters.

14.     The true names and capacities of Defendants sued as Does 1 through 10 are unknown to Ms. Hull, who will amend this Complaint to allege their true names and capacities when ascertained. On information and belief, each Doe defendant is an affiliate, subsidiary, agent, or co-conspirator of Epic or Boost, is responsible in some manner for the conduct alleged herein, and no Doe defendant is a citizen of California.

15.     At all relevant times, each Defendant acted as the agent, alter ego, joint venturer, co-conspirator, and/or aider and abettor of each other Defendant, and acted within the course and scope of that relationship with the knowledge, consent, approval, and ratification of each other Defendant.

**JURISDICTION AND VENUE**

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Ms. Hull is a citizen of California; Epic and Boost are citizens of Wisconsin; and complete diversity exists. The amount in controversy exceeds $75,000, exclusive of interest and costs. In an action for injunctive and declaratory relief, the amount in controversy is measured by the value of the object of the litigation. The object of this litigation is Ms. Hull's right to perform her profession free of Defendants' restraints — during the restraint period and beyond — and the value of that right, to either party, plainly exceeds the jurisdictional threshold, as do the mandatory statutory attorneys' fees recoverable under Business and Professions Code section 16600.5, subdivision (e)(2).

17.     This Court has personal jurisdiction over Defendants. Defendants transact substantial business in California; employed Ms. Hull, knowing that she resided and worked in California; directed the enforcement conduct alleged herein at a California resident and her California employer; and have purposefully availed themselves of the benefits of the California market, including by licensing software and selling implementation services to California health systems.

COMPLAINT

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District: Ms. Hull resides in Contra Costa County, within this District, and worked for Defendants remotely from her home in this District; her employer is based in Alameda County; and Defendants directed their enforcement conduct into this District.

19. **Intradistrict Assignment.** Assignment to the San Francisco or Oakland Division is proper under Civil Local Rule 3-2(c) and (d) because a substantial part of the events giving rise to the claims occurred in the Counties of Contra Costa and Alameda, from which civil actions are assigned to the San Francisco Division or the Oakland Division.

20. The Wisconsin choice-of-law and forum provisions in Ms. Hull's form employment agreement do not affect jurisdiction, venue, or governing law. Under Business and Professions Code section 16600.5, subdivisions (a) and (b), the void restraints are unenforceable, and may not be the subject of enforcement attempts, regardless of where and when the contract was signed. In addition, the agreement was presented to Ms. Hull as a standard-form condition of employment after January 1, 2017, and she was not individually represented by counsel in negotiating its terms; under Labor Code section 925, any provision requiring adjudication outside California or depriving her of the substantive protection of California law is voidable by her, and Ms. Hull hereby voids those provisions. Under Labor Code section 925(b), this controversy is to be adjudicated in California under California law.

FACTUAL ALLEGATIONS

**A.      California's Settled Public Policy Against Restraints on Employee Mobility**

21. Business and Professions Code section 16600, subdivision (a), provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Subdivision (b)(1), added by Assembly Bill 1076 effective January 1, 2024, directs that the section "shall be read broadly, in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in

- 7 -

this chapter." Subdivision (b)(2) provides that the section "shall not be limited to contracts where the person being restrained is a party to the contract." None of the statutory exceptions — which concern the sale or dissolution of businesses and ownership interests — applies here.

22.     Business and Professions Code section 16600.1, subdivision (a), makes it "unlawful to include a noncompete clause in an employment contract, or to require an employee to enter a noncompete agreement, that does not satisfy an exception in this chapter." Subdivision (b) required employers, by February 14, 2024, to provide individualized written notice to current employees, and to former employees employed after January 1, 2022, whose contracts include a noncompete clause, that the noncompete clause is void. Subdivision (c) provides that a violation of section 16600.1 "constitutes an act of unfair competition" under the Unfair Competition Law, Business and Professions Code section 17200 et seq.

23.     Business and Professions Code section 16600.5 provides that any contract that is void under the chapter "is unenforceable regardless of where and when the contract was signed" (subd. (a)); that an employer or former employer "shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California" (subd. (b)); that an employer "shall not enter into a contract with an employee or prospective employee that includes a provision that is void under this chapter" (subd. (c)); and that an employer that enters into such a contract or attempts to enforce it "commits a civil violation" (subd. (d)). Subdivision (e) authorizes an employee, former employee, or prospective employee to bring a private action for injunctive relief or the recovery of actual damages, or both, and entitles a prevailing employee to recover reasonable attorneys' fees and costs.

24.     California courts have long applied these protections to California employees notwithstanding out-of-state employers and out-of-state choice-of-law provisions. (*Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881.) California courts have likewise held that contractual provisions that nominally protect "confidential information" but in operation prevent a former employee from using the general skills, knowledge, and acquaintances acquired during employment function as void restraints of trade. (*Dowell v. Biosense Webster, Inc.* (2009)

- 8 -

179 Cal.App.4th 564; *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923.) And California courts refuse to enforce no-hire provisions in contracts between companies where, as applied, they restrain employee mobility. (*VL Systems, Inc. v. Unisen, Inc.* (2007) 152 Cal.App.4th 708.)

### B.    Epic, Boost, and Ms. Hull's Employment

25.    Epic is the largest EHR vendor in the United States. Its software manages the medical records of a majority of Americans, and its customers include most large health systems in the country, including throughout California. Companies across the health-care economy — medical-device manufacturers, digital-health companies, payers, and consultancies — must work with and around Epic's platforms, and they hire experienced Epic-trained professionals to do so.

26.    Boost is Epic's remote-staffing arm. Boost employees work remotely from anywhere in the contiguous United States, are staffed onto Epic customer projects, and perform customer-side implementation work — system build, testing, training, and project and program management — under the Epic umbrella.

27.    Ms. Hull devoted approximately eleven and a half years of her career to the Epic Group, rising through positions of increasing trust across three countries. She joined Epic in Madison, Wisconsin in 2014, shortly after earning her law degree from the University of Wisconsin. As a Project Manager (Madison, 2014–2016), she led enterprise testing for multi-hospital EHR implementations. As an Implementation Director (Madison, 2016–2018), she delivered add-on EHR implementation projects. As a Boost Consultant (Denver, 2018–2020), she co-designed the enterprise training and operational-readiness program for an implementation serving more than 200,000 users across multiple states. As Contract Manager (Trondheim, Norway, 2020–2022), she managed implementation and development compliance for a first-in-country contract and provided strategy support to Legal, Development, and Implementation leadership in negotiations. And as the first international public policy team member (Bristol, England, 2022–2025), she represented Epic itself before government stakeholders and trade associations in multiple jurisdictions, and co-founded a global policy council with Epic customer representatives from 13 countries.

- 9 -
COMPLAINT

28.     Returning to the United States as a Boost Consultant working from Concord, California, Ms. Hull designed enterprise transformation and change-management programs for healthcare organizations spanning more than 80 sites. Everything in that career — the certifications, the product fluency, the customer relationships, the implementation methods — is professional skill, knowledge, and experience built over more than a decade within the Epic Group. It is precisely the general human capital that California law guarantees a former employee the right to carry into her next position. And it is the professional foundation that Defendants' covenants, customer-contract restraints, and credential denials now render largely unusable in the occupation to which she has devoted her career.

29.     By memorandum dated June 13, 2025, Epic extended Ms. Hull a Boost transfer offer expressly "based on your proposed move to San Francisco, CA with a Boost start date of 8/4/2025." Epic and Boost thus knew, before Ms. Hull signed anything, that she would reside and work in California.

30.     On June 19, 2025, as a standard-form, take-it-or-leave-it condition of her transfer, Ms. Hull signed Boost's paperwork: an Employment Agreement, an Employee Data Confidentiality Policy, a Mutual Arbitration Agreement with Epic, and a Boost Technology Payment Agreement (collectively, the "Boost Agreement"). Epic's transfer memorandum told Ms. Hull that her transfer compensation "isn't something we negotiate." A true and correct copy of the Boost Agreement is attached as Exhibit A and incorporated by reference.

31.     Ms. Hull began her Boost role on or about July 7, 2025, and at all times thereafter worked for Defendants primarily remotely from her home in Concord, California. Defendants withheld California state income taxes from her wages.

### C.     The Void Restraints in the Boost Agreement

32.     Section 4 of the Employment Agreement, titled "Covenant Not to Compete and Additional Restrictions," applies to any employee who has been certified in Epic software, has held a role requiring certification, has had a login to an Epic customer production system or supporting infrastructure, is involved in sales, or has held a director-level title. For such employees — including Ms. Hull — Section 4 imposes four separate restraints "during your

- 10 -

employment with Boost, and for a period of one year after," unless the employee obtains "a written exception from an Epic HR director":

(a) *Direct Competitors.* The employee may not be "employed or engaged by, whether as an employee, officer, partner, director, consultant or otherwise," or hold more than a one-percent ownership interest in, "any Direct Competitor of the Epic Group." The "Direct Competitors" are listed on an Epic-controlled Annex 1 "as updated by the Epic Group from time to time," and include Amazon, Apple, Google/Alphabet, Meta/Facebook, Microsoft, Oracle Health, Salesforce, athenahealth, MEDITECH, NextGen Healthcare, Palantir, and more than a dozen other companies.

(b) *New Business Enterprise.* The employee may not "establish or aid others in establishing any new business enterprise or a new area of business for an existing business enterprise" involving any product that "overlaps with the Epic Group's."

(c) *Customer Contact.* The employee may not contact any Epic Group customer or "Active Prospective Customer" with whom the employee had contact during her last two years of employment, for the purpose of selling competitive products or services or dissuading them from doing business with the Epic Group.

(d) *Employment with Customers, Consultants and Cooperative Partners.* The employee may not "[b]e employed or engaged by, directly or indirectly including as a Consultant, any Epic Group customer or Active Prospective Customer in a role that involves Epic software," and may not be employed by any "Consultant or Cooperative Partner" listed on an Epic-controlled Annex 2 — including Accenture, Deloitte, Huron, IBM/Kyndryl, Optum, R1, and any organization that has entered into a "'Member Services', 'Pal', 'Partner', or similar cooperative agreement with Epic" — in work involving overlapping healthcare software or services.

33.   Because Epic's customers include most significant health systems in the United States, and because Annexes 1 and 2 sweep in the largest technology and consulting companies in

the world and may be unilaterally "updated" by Epic "from time to time," Section 4 operates as an industry-wide exclusion: for one year, a former Epic employee may not work in the field in which she has built her career — including, as applied to Ms. Hull, in a *customer-side role that supports Epic's own platform*. Section 4 and its annexes purport to limit certain of these restrictions to "healthcare software and services activities" and to products or services serving "substantially similar functions" as Epic's. Those limitations change nothing: section 16600, subdivision (b)(1), voids employment noncompetes "no matter how narrowly tailored."

34.    Section 2 of the Employment Agreement ("Confidentiality") and the Employee Data Confidentiality Policy impose perpetual nondisclosure and non-use obligations — "[d]uring this Agreement and thereafter" — over categories of information defined so broadly that they encompass the general skills, knowledge, and professional acquaintances Ms. Hull acquired through her employment and through ordinary participation in the industry, including "customer and prospect lists and identities," "identities and talents of specific Epic Group employees," "financial information about the Epic Group, its employees or its current or prospective customers," "company records," "internal discussions or strategies relating to competitors," and "other sensitive information . . . identified by the Epic Group as confidential." Section 5 ("Return of Property") reinforces these restraints by requiring the surrender of all materials "regarding" broad categories of information, with no temporal or subject-matter limit. To the extent these provisions restrain Ms. Hull from practicing her profession, they are void restraints of trade.

35.    Section 7 of the Employment Agreement ("Irreparable Harm") declares that Epic is "an intended third-party beneficiary" of the agreement, pre-authorizes Boost and Epic to seek injunctive relief, and entitles Boost and/or Epic — but not the employee — to recover "actual attorneys' fees and costs" in any successful enforcement action. The provision is designed to intimidate employees out of exercising their rights under California law.

36.    Section 8 of the Employment Agreement provides that the agreement "is to be interpreted in accordance with the laws of the State of Wisconsin," and the Mutual Arbitration Agreement likewise provides that it "shall be governed under" the Federal Arbitration Act "and the laws of the State of Wisconsin" and requires, "[a]bsent extraordinary circumstances," that any

COMPLAINT

arbitration hearing be conducted on Epic's Verona, Wisconsin campus. As applied to a California-resident employee, these provisions violate Labor Code section 925 and are voidable at the employee's election.

37.    The Boost Agreement contains no California carve-out, no acknowledgment that Business and Professions Code section 16600 renders its restrictive covenants void as to California employees, and no notice of any kind regarding employees' rights under California law.

38.    Epic knows exactly what California law requires — and imposes these terms on California employees anyway. In September 2025, Epic issued Ms. Hull a stock offer conditioned on an *extension of her noncompete period to two years*. Within a short period, Epic voided that offer and reissued it to California employees *with the noncompete terms removed* — a concession that such terms cannot lawfully be imposed on California employees. Yet Epic left the one-year covenant in the Boost Agreement untouched and, as alleged below, affirmatively enforced it against Ms. Hull in 2026. On information and belief, Ms. Hull's earlier Epic Group employment agreements contained materially similar restrictive covenants, and Defendants never provided her — or, on information and belief, other California employees — the individualized written notice required by Business and Professions Code section 16600.1, subdivision (b). To this day, Defendants have never notified Ms. Hull that any of their restrictive covenants is void.

39.    Epic's restraints are also selectively enforced. On information and belief, Epic maintains a waiver program under which Epic will excuse the noncompete for an employee who has worked at least seven years at Epic and at least three years in Boost and who then remains for a year at the Epic customer that wishes to hire them. The program rewards employees for remaining in the Epic fold and rewards customers for waiting at Epic's pleasure; it operates as an employee-retention and customer-loyalty mechanism. Epic's discretionary, loyalty-based waiver practice confirms that Section 4 is not reasonably necessary to protect trade secrets or any other legitimate interest. It is a naked restraint, enforced when — and only when — restraint serves Epic's commercial interests.

COMPLAINT

### D.     Ms. Hull Joins Abbott, and Epic Enforces Its Void Restraints

40.     Defendants' restraints shaped Ms. Hull's job search before she ever applied to Abbott. Between approximately November 2025 and February 2026, while still employed by Boost, Ms. Hull searched for her next position, reviewing postings at California health systems and healthcare companies. She understood — from the Boost Agreement, from Epic's known enforcement practices, and from the hiring restrictions Epic imposes on its customers — that employers running Epic were, as a practical matter, closed to her. She therefore declined to pursue Epic IT manager- and director-level roles at Bay Area health systems that run Epic, including Stanford, UCSF, John Muir Health, the San Francisco Department of Public Health, and Adventist Health — the last of which was actively installing Epic and regularly posting positions suited to her experience. She likewise declined to apply to Epic-affiliated consulting firms — including Accenture, Deloitte, Optum, and KPMG — even though those firms had open positions matching her skills, because, as Epic-affiliated consultancies, they could not be expected to defy Epic's restraints; three of them (Accenture, Deloitte, and Optum) are expressly named on Epic's Annex 2. On information and belief, each of these health systems and consulting firms is an Epic customer or partner subject to the no-hire, no-poach, and "cooling off" provisions alleged in this Complaint.

41.     The restraints steered even the choice Ms. Hull ultimately made. She knew Abbott was an Epic customer — but as a medical-device maker rather than a health system, Abbott had a limited scope of Epic integrations, stood tangent to core healthcare information technology, and offered the potential for longer-term growth outside Epic's reach. She reasoned that she could find a role at Abbott that did not involve Epic or, if her role did touch Epic, that Abbott was a large enough organization to push back against an unlawful noncompete asserted against a California employee. Ms. Hull thus selected her employer not on professional opportunity alone, but on her prediction of where Epic's restraints would not follow her. Epic's enforcement conduct proved even that careful prediction wrong.

42.     In February 2026, Ms. Hull interviewed with Abbott Diabetes Care for the role of EHR Implementation Manager. The role focuses on the strategic vision to scale Abbott's CGM

- 14 -

device integration with Epic's platforms — including Epic Aura, Epic's own product — across more than 400 health systems, interfacing with health systems to reduce integration friction and representing Abbott at industry conferences. The work is customer-side work that *advances* the adoption of Abbott's CGM products through EHR-enabled solutions, like Epic's products; Abbott is not a competitor of Epic, and nothing about the role involves competing with Epic in any way. Abbott extended Ms. Hull an offer, and Abbott's recruiter confirmed that Abbott's legal department had vetted the hire as permissible. Ms. Hull resigned from Boost and began work at Abbott on March 23, 2026. In her first week, Abbott added her to customer trips and upcoming industry conferences, and within weeks her manager outlined routes for her career advancement at Abbott.

43.     In April 2026, Ms. Hull applied for an Epic "UserWeb" account — the individual credential required for registering for and attending Epic's XGM and UGM conferences as an exhibitor and session attendee, and for access to the technical documentation that anyone working with Epic's platforms requires. Epic's response reported that her application had matched the name of a former Epic employee and asked her to confirm whether she had worked for Epic; when she confirmed that she had, Epic denied the application in writing, citing a one-year "cooling off" period for former employees and inviting her to reapply at the end of the 12-month period following her departure.

44.     Abbott contacted Epic to request an exception. On April 7, 2026, an Abbott program manager relayed Epic's final position by email: Ms. Hull's UserWeb access was denied for one year, and, as the program manager reported, "we were informed former Epic employees should not be working on Epic direct, related work for 12 months."

45.     On information and belief, an Epic director told Abbott personnel, in substance: "you should have told me when you saw her resume . . . I could have told you about all these considerations" — confirming that Epic expects its customers to screen their hiring decisions against Epic's restraints, and that Epic regards its restraints as governing whom its customers may employ and how.

46. Epic's communications had their intended effect. Out of concern for preserving its business relationship with Epic, Abbott removed Ms. Hull from several scheduled customer trips; removed her from Epic's XGM conference; directed her not to engage with Epic-affiliated health systems at an industry conference she was actively supporting at the Abbott booth; and removed her from, or did not permit her to join, certain internal and external meetings, conversations, and status reports relating to Epic. The Epic-facing career advancement opportunities outlined in her first weeks have been delayed by months or lost entirely, and Ms. Hull is not performing the core Epic-strategy function she was hired to perform.

47. In mid-April 2026, Ms. Hull raised concerns with her director about California employees' rights regarding noncompete enforcement. Abbott began an internal investigation and requested a copy of her Boost employee agreement.

48. At the end of April 2026, Ms. Hull emailed Epic's human resources department and asked whether an updated employee agreement existed that reflected California law. Epic HR responded in writing that no updated agreement exists and that the agreement she signed remains the applicable one. Epic HR added, in writing: "customer contracts often include provisions related to hiring, which would still apply to those organizations."

49. From May 2026 to the present, the restrictions on Ms. Hull's work have remained in place. Following her April 2026 removal from conference participation and customer engagement, she remains excluded from customer trips and certain meetings that are core functions of her role, and her standing, advancement prospects, and professional relationships at Abbott and in the industry continue to deteriorate — all because Epic insists on enforcing restraints that California law declares void.

50. During the week of June 1, 2026, Abbott sent several employees to Minneapolis for a joint workshop with Epic representatives to discuss lessons learned from the parties' implementations and what would be done differently going forward. Abbott opted not to send Ms. Hull — whose role encompasses precisely that subject — because of the ongoing noncompete issue, and sent one of her peers instead. Ms. Hull did not receive even the notes from the meeting.

COMPLAINT

51.     The restrictions have not abated; they have deepened. From June 5 through June 8, 2026, Ms. Hull attended the American Diabetes Association's Scientific Sessions in New Orleans — a major industry event at which Abbott exhibits, and at which Ms. Hull's manager had told her, when she was hired, that she would staff Abbott's booth for its Epic-integration conversations. A few weeks before the conference, her manager instructed her not to have any conversations with any health system that uses Epic, and she was not staffed to work the booth; her role was reduced to mere attendee and observer. Because most large health systems run Epic, the instruction operated as a near-total bar on customer engagement. In the one substantive customer interaction she was permitted — covering a pre-existing relationship with a contact from a prominent Illinois health system — she was required to bring in a colleague to conduct the conversation while she took notes and handed the relationship to others to act upon: work she would ordinarily have performed herself. On information and belief, Abbott maintains records of the health systems that visited its booth and of the customer meetings arranged at the conference — the opportunities Ms. Hull was barred from pursuing.

52.     Ms. Hull's role has been hollowed out in the same way. She was hired onto Abbott's strategic partnerships team to drive the strategy for scaling Abbott's CGM integration with Epic across health systems. Instead: she was pulled from a planned trip to a health system in one state in her second week of employment; she was excluded from a planned engagement with a major health system in a second state; other health systems with whom she was to help engage have been handed to a colleague; and the key accounts she expected to support on site have been required to proceed without her. She has instead been assigned to perform work outside the core Epic-integration function she was hired to perform. That work concludes in late July 2026, and no one at Abbott has told Ms. Hull what she will be assigned next.  She has been relegated to nearly exclusively internal support work outside the core Epic-integration function she was hired to perform.

53.     The exclusions now extend even to training. Ms. Hull was told to sit out a half-day Epic "certification" session, a session Epic will lead to train Abbott's health-systems sales staff, that had been scheduled for the team's retreat in Boston on July 22, 2026. An Epic-certified

professional with more than a decade of Epic experience was thus barred from an Epic training session offered to her Abbott colleagues.

54.     As of the filing of this Complaint, the restrictions remain in place. Ms. Hull continues to be held out of customer trips and meetings; her assignments continue to fall outside the function she was hired to perform; and although, on information and belief, Abbott personnel have continued to seek workarounds and have pressed for the issue to be escalated to Epic, Epic has not withdrawn its position. Ms. Hull continues to be left out of calls and meetings involving Epic, has not been permitted to support any "go-live" with Abbott's health-system customers, and continues to document each exclusion as it occurs.

**E.      The No-Hire, No-Poach, and "Cooling Off" Provisions in Epic's Customer Contracts**

55.     On information and belief, Epic's standard customer contracts — including its agreements with Abbott and with health systems and other organizations throughout California — contain provisions restricting the customer from hiring, engaging, or staffing former Epic employees, including no-hire and no-poach provisions and 12-month "cooling off" periods. Epic's own human resources department confirmed as much in writing: "customer contracts often include provisions related to hiring, which would still apply to those organizations." The position Epic communicated to Abbott in April 2026 — relayed by an Abbott program manager as "we were informed former Epic employees should not be working on Epic direct, related work for 12 months" — and the Epic director's statement that Abbott "should have told" Epic when it saw Ms. Hull's resume, reflect the operation of these provisions, the Boost Agreement's covenants, or both.

56.     These customer-contract provisions restrain competition in the labor market for Epic-skilled professionals. They restrict whom Epic's customers may hire and what work former Epic employees may perform, suppress those employees' mobility, compensation, and professional opportunities, and accomplish indirectly precisely what Business and Professions Code section 16600 forbids Epic to accomplish directly: the exclusion of former Epic employees from working in their profession. Under section 16600, subdivision (b)(2), the statute's

prohibition is "not limited to contracts where the person being restrained is a party to the contract."

57.    The restraints' effect on Ms. Hull is concrete and twofold. First, her own employer has been told that former Epic employees should not be working on Epic-related work for 12 months, and it has restricted her duties accordingly. Second, as alleged in paragraphs 40 and 41, the restraints shaped her job search before she ever joined Abbott — closing an entire tier of positions in her profession in this District to her and steering her selection of employer to one she believed to be beyond the restraints' reach. On information and belief, these provisions operate the same way against every other recent California-resident former employee of the Epic Group.

**F.    Epic's Gatekeeping of UserWeb, Certifications, and Conference Access**

58.    Epic controls the practical gateway to the Epic-professional occupation. An individual "Service Account" on Epic's UserWeb is required for, among other things, registering for and attending Epic's XGM and UGM conferences, accessing Epic technical documentation, and maintaining Epic certifications through New Version Training and Continuing Epic Education. Epic certifications and current product knowledge are, as a practical matter, prerequisites to working in Epic-related health information technology — a field that spans, on information and belief, thousands of employers, including most major U.S. health systems and the vendors and consultancies that serve them. Epic is the sole source of these credentials and resources.

59.    UserWeb accounts are personal to the individual user, who accepts Epic's UserWeb Terms of Use upon registration and use. Epic's published Terms of Use (last updated July 14, 2025) reserve to Epic the right to terminate any user's access "without prior notice to you for any reason that Epic deems appropriate," and purport to impose Wisconsin law and exclusive Dane County, Wisconsin jurisdiction on every user while reserving to Epic alone the right to seek injunctive relief in any jurisdiction. The published Terms of Use contain no "cooling off" provision and no former-employee exclusion of any kind.

60.    To the contrary: Epic's own UserWeb registration form offers accounts to persons who have "previously been certified in an Epic application" but are "not currently affiliated with

an Epic customer or consulting firm," for certification maintenance. Epic thus holds UserWeb out to the general certified population — including unaffiliated former consultants — while denying it to recent former Epic employees specifically, pursuant to an unwritten "cooling off" policy that appears in no published terms. Ms. Hull, a certified Epic professional sponsored by an Epic-customer-affiliated employer, was denied the access Epic makes available to virtually everyone else, solely because she recently worked for Epic.

61.     On information and belief, Epic's denial of UserWeb credentials to recent former employees is a systematic practice — administered through automated screening of applications against Epic's former-employee records, as Ms. Hull's own application experience confirms — implemented to enforce the void covenants in Epic's employment agreements and the no-hire and "cooling off" provisions in its customer contracts, and it degrades former employees' ability to perform Epic-related work to the point of unemployability in their occupation during the restraint period.

**G.     Harm to Ms. Hull and to California-Resident Former Employees**

62.     As a direct and proximate result of Defendants' conduct, Ms. Hull has suffered and continues to suffer harm, including: exclusion from the core functions of the job she was hired to perform; removal from customer trips, conferences, and meetings essential to her performance and advancement; reassignment to work outside the function she was hired to perform; delay and loss of the career advancement opportunities outlined when she joined Abbott; damage to her professional reputation and standing with her employer and in the industry; impairment of the professional relationships, certifications, and skills on which her career depends; the exclusion of an entire tier of positions — Epic IT leadership roles at Bay Area health systems — from her job search; the steering of her choice of employer to companies she predicted would be beyond the reach of Defendants' restraints; lost compensation and employment benefits; and the ongoing, escalating risk that the restrictions Epic has imposed will cost Ms. Hull her position at Abbott altogether. Although Ms. Hull does not seek damages in this action, these injuries establish her standing and demonstrate the urgency of the equitable relief she seeks.

COMPLAINT

63.     This harm is irreparable and cannot be remedied by damages. Each week the "cooling off" period is enforced deprives Ms. Hull of professional opportunities, relationships, and momentum that cannot be recovered, and Epic's 12-month restraint will expire by its own terms in approximately March 2027 — meaning that absent prompt injunctive relief, Epic will have succeeded in enforcing a void restraint in full notwithstanding any later judgment. And the harm is not Ms. Hull's alone: on information and belief, Defendants impose the same form agreements on, and stand ready to enforce the same restraints against, every California-resident employee and former employee of the Epic Group.

**FIRST CLAIM FOR RELIEF**

**Violation of Business and Professions Code § 16600 *et seq.*  — Employment Restraints**

**(Against All Defendants)**

64.     Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

65.     Section 4 of the Employment Agreement — including each of its subdivisions (a) through (d) — is a contract provision by which Ms. Hull is restrained from engaging in a lawful profession, trade, or business, and is void under Business and Professions Code section 16600. Sections 2 and 5 of the Employment Agreement and the Employee Data Confidentiality Policy are likewise void under section 16600 to the extent they operate to restrain Ms. Hull from practicing her profession. No statutory exception applies.

66.     By entering into the Boost Agreement with Ms. Hull — a contract that includes provisions void under the chapter — Defendants violated Business and Professions Code section 16600.5, subdivision (c), and committed a civil violation under subdivision (d).

67.     By attempting to enforce those void provisions against Ms. Hull — including by denying her UserWeb credentials on the basis of a one-year "cooling off" period; by communicating to Abbott that former Epic employees should not be working on Epic-related work for 12 months; and by confirming to Ms. Hull in writing that the Boost Agreement remains the applicable one — Defendants violated section 16600.5, subdivision (b), and committed further civil violations under subdivision (d). The Wisconsin choice-of-law provision provides no

- 21 -

COMPLAINT

defense: under subdivisions (a) and (b), the void provisions are unenforceable, and may not be the subject of enforcement attempts, "regardless of where and when the contract was signed."

68.     As an employee and former employee, Ms. Hull is authorized by section 16600.5, subdivision (e)(1), to bring this private action for injunctive relief. Defendants' violations are ongoing and are causing irreparable harm — including by continuing to constrain which California employers Ms. Hull may work for and what work she may perform, as alleged in paragraphs 40, 41, and 57 — warranting preliminary and permanent injunctive relief barring Defendants from maintaining, invoking, or enforcing the void provisions against Ms. Hull and against any other California-resident employee or former employee subject to the same form provisions.

69.     Under section 16600.5, subdivision (e)(2), Ms. Hull is entitled to recover her reasonable attorneys' fees and costs as the prevailing employee.

## SECOND CLAIM FOR RELIEF

### Violation of Business and Professions Code §§ 16600, 16600.5 — Customer-Contract Employment Restraints

### (Against All Defendants)

70.     Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

71.     The no-hire, no-poach, and "cooling off" provisions in Defendants' customer contracts are contracts "by which anyone is restrained from engaging in a lawful profession, trade, or business" within the meaning of Business and Professions Code section 16600, subdivision (a). The persons restrained are Defendants' former employees, including Ms. Hull. Under section 16600, subdivision (b)(2), the statute's prohibition is "not limited to contracts where the person being restrained is a party to the contract"; that Ms. Hull never signed Epic's customer contracts is therefore no obstacle to their invalidity as applied to her. Because these provisions operate as restraints in the employment context — they restrict whom Epic's customers may hire and what work former Epic employees may perform — they are void under section 16600, subdivisions (a) and (b), no matter how they are tailored. The provisions operated

- 22 -

COMPLAINT

on Ms. Hull directly: as alleged in paragraphs 40 and 41, they closed an entire tier of California employers to her job search and steered her selection of employer to one she believed to be beyond their reach — a belief Defendants' enforcement conduct proved mistaken.

72.    By maintaining these provisions in its customer contracts and by invoking and applying them against Ms. Hull's employment — including through its communications to Abbott and its written warning to Ms. Hull that "customer contracts often include provisions related to hiring, which would still apply to those organizations" — Defendants have attempted to enforce contracts that are void under the chapter, in violation of Business and Professions Code section 16600.5, subdivision (b), and have committed civil violations under subdivision (d).

73.    Ms. Hull is entitled to a declaration that these provisions are void and unenforceable as applied to her and to California-resident former employees of Defendants; to preliminary and permanent injunctive relief barring Defendants from maintaining, invoking, applying, or enforcing them as to her and as to California-resident former employees; and to her reasonable attorneys' fees and costs under section 16600.5, subdivision (e)(2).

**THIRD CLAIM FOR RELIEF**

**Unfair Competition (Bus. & Prof. Code § 17200 *et seq*.)**

**(Against All Defendants)**

74.    Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

75.    Defendants' conduct constitutes unlawful business acts and practices within the meaning of Business and Professions Code section 17200, including: entering into and maintaining contracts containing provisions void under section 16600; including noncompete clauses in employment contracts and requiring employees to enter noncompete agreements in violation of section 16600.1, subdivision (a); failing to provide the individualized written notices required by section 16600.1, subdivision (b) — a violation that constitutes an act of unfair competition by operation of section 16600.1, subdivision (c); attempting to enforce void contracts in violation of section 16600.5; maintaining, invoking, and applying no-hire, no-poach, and "cooling off" provisions void under section 16600, subdivision (b)(2); requiring employees, as a

- 23 -

COMPLAINT

condition of employment, to agree in writing to terms Defendants know to be prohibited by law, in violation of Labor Code section 432.5; and excluding Ms. Hull from occupationally necessary credentials in violation of the common law right to fair procedure, as alleged in paragraphs 76 and 77.

76.    Under California common law, a private entity that controls access to a resource or affiliation practically necessary to the pursuit of an occupation may not exclude a person from it arbitrarily, or for reasons contrary to public policy, and must afford fair procedure. (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060; *Ezekial v. Winkley* (1977) 20 Cal.3d 267.) Epic controls such a resource. Individual UserWeb credentials — and the conference registration, technical documentation, and certification maintenance they gate — are practically necessary to pursue the occupation of an Epic-certified health-information-technology professional, an occupation practiced across thousands of employers. Epic is the sole source of these credentials and holds them out to the public of certified professionals, including persons unaffiliated with any Epic customer.

77.    Epic excluded Ms. Hull from this resource arbitrarily and for reasons contrary to the fundamental public policy of California: it denied her application pursuant to an unwritten "cooling off" policy that appears in no published terms, in order to enforce restraints that California law declares void, without disclosed criteria, without a meaningful opportunity to be heard, and while granting access to similarly situated certified professionals — indeed, while maintaining a discretionary waiver program that excuses the same restraints for employees and customers who demonstrate sufficient loyalty to Epic. Epic's violation of the common law right to fair procedure is an unlawful business practice under section 17200.

78.    Defendants' conduct is also unfair within the meaning of section 17200. Under *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, conduct is unfair where it threatens an incipient violation of an antitrust law, or violates the policy or spirit of those laws, or otherwise significantly threatens or harms competition. Defendants' denial of UserWeb credentials and conference access to recent former employees — implemented to enforce void restraints and coordinated with the hiring restrictions in Defendants' customer

COMPLAINT

contracts — violates the policy and spirit of Business and Professions Code sections 16600 and 16720 and significantly harms competition in the labor market for Epic-skilled professionals, even to the extent any individual denial is recast as unilateral conduct. Defendants' conduct further offends the established public policies of this State embodied in sections 16600 through 16600.5, and its gravity — the exclusion of California workers from their professions — vastly outweighs any utility, of which there is none.

79.     Ms. Hull has suffered injury in fact and lost money or property as a result of Defendants' unfair competition, including lost compensation, benefits, and professional opportunities — among them the Epic IT leadership positions at California health systems that she was deterred from pursuing, as alleged in paragraphs 40 and 41. She nonetheless seeks no restitution and no damages in this action; she seeks only injunctive and declaratory relief, and her attorneys' fees and costs as permitted by law.

80.     Ms. Hull seeks injunctive relief under section 17203, including orders: enjoining Defendants from enforcing or attempting to enforce the void provisions against Ms. Hull or any other California-resident employee or former employee; requiring Defendants to withdraw, in writing, their statements to Abbott regarding restrictions on Ms. Hull's work; enjoining Defendants from denying Ms. Hull UserWeb credentials, conference access, or certification maintenance on the basis of her former employment or any "cooling off" period; enjoining Defendants from maintaining, invoking, or applying customer-contract no-hire, no-poach, or "cooling off" provisions as to California-resident former employees; and requiring Defendants to provide the written notices mandated by section 16600.1, subdivision (b). The injunctive relief sought is, in substantial part, public injunctive relief: it would prohibit acts that threaten future injury to the general public of California workers, and its primary beneficiaries are the California-resident employees and former employees of the Epic Group at large, not Ms. Hull alone. (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945.)

///

///

///

COMPLAINT

## FOURTH CLAIM FOR RELIEF

### Declaratory Judgment (28 U.S.C. §§ 2201, 2202)

### (Against All Defendants)

81.     Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

82.     An actual and justiciable controversy exists between Ms. Hull and Defendants within the meaning of 28 U.S.C. § 2201. Ms. Hull contends, and Defendants dispute, that the restrictive provisions of the Boost Agreement, the hiring restrictions in Defendants' customer contracts, and Defendants' "cooling off" credential-denial practices are void, unenforceable, and unlawful as to her under California law. Defendants' enforcement actions are ongoing, the restrictions on Ms. Hull's employment remain in place, and Defendants have confirmed in writing that they consider the Boost Agreement fully applicable to her.

83.     Ms. Hull is entitled to a judicial declaration that: (a) Section 4 of the Employment Agreement, and each of its subdivisions, is void under Business and Professions Code section 16600 and unenforceable against her; (b) Sections 2 and 5 of the Employment Agreement and the Employee Data Confidentiality Policy are void and unenforceable to the extent they restrain her from engaging in her lawful profession; (c) the one-year "cooling off" period Defendants have invoked against her is void and unenforceable; (d) any no-hire, no-poach, or "cooling off" provision in Defendants' customer contracts is void, unenforceable, and unlawful as applied to her and to California-resident former employees of Defendants; (e) the Wisconsin choice-of-law and forum provisions of the Boost Agreement are void as to her under Labor Code section 925, and California law governs; (f) Section 7's one-way attorneys'-fee provision is unenforceable against her and, in any event, reciprocal under Civil Code section 1717; and (g) Defendants may not deny her UserWeb credentials, conference access, certification maintenance, or any other ordinary business credential or access on the basis of the void provisions or any "cooling off" period.

///

///

- 26 -

## PRAYER FOR RELIEF

WHEREFORE, Ms. Hull prays for judgment against Defendants, and each of them, as follows:

1. For the judicial declarations set forth above;

2. For preliminary and permanent injunctions: (a) enjoining Defendants from enforcing or attempting to enforce Section 4 of the Employment Agreement, the "cooling off" period, or any other void restraint against Ms. Hull or any other California-resident employee or former employee; (b) enjoining Defendants from representing to Abbott or any other person that Ms. Hull is subject to any noncompete, nonsolicitation, "cooling off," or hiring restriction; (c) requiring Defendants to withdraw and correct, in writing, their prior statements to Abbott regarding restrictions on Ms. Hull's work; (d) enjoining Defendants from denying Ms. Hull UserWeb credentials, conference access, certification maintenance, or other ordinary business access on the basis of the void provisions or any "cooling off" period, and requiring Defendants to process her UserWeb application on lawful, nonarbitrary criteria; (e) enjoining Defendants from maintaining, invoking, applying, or enforcing any customer-contract no-hire, no-poach, or "cooling off" provision as to Ms. Hull or any other California-resident former employee; and (f) requiring Defendants to provide the individualized written notices mandated by Business and Professions Code section 16600.1, subdivision (b);

3. For reasonable attorneys' fees pursuant to Business and Professions Code section 16600.5, subdivision (e)(2), and Code of Civil Procedure section 1021.5;

4. For costs of suit; and

5. For such other and further relief as the Court deems just and proper.

Dated: July 24, 2026                    BAKER DOLINKO & SCHWARTZ, P.C.


By:    --------------------S----------------------------
            Chris Baker
            Attorneys for Plaintiff
            ANDREA HUL

COMPLAINT