CHRIS BAKER, State Bar No. 181557
cbaker@bakerlp.com
DEBORAH SCHWARTZ, State Bar No. 208934
dschwartz@bakerlp.com
BAKER DOLINKO & SCHWARTZ, P.C.
220 Montgomery Street, Suite 1094
San Francisco, CA 94104
Telephone: (415) 810-9486

Attorneys for Plaintiff
ANDREA HULL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREA HULL, an individual,

Plaintiff,

v.

EPIC SYSTEMS CORPORATION, a Wisconsin corporation; BOOST, INC., a Wisconsin corporation,

Defendants.

Case No. 4:26-cv-07702-AMO

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CIVIL PENALTIES**

1. Violation of Bus. & Prof. Code §§ 16600, 16600.1, 16600.5 (Employee-Side Restraints);
2. Violation of Bus. & Prof. Code §§ 16600, 16600.5 (Employer-Side Restraints);
3. Unfair Competition (Bus. & Prof. Code § 17200 et seq.);
4. Declaratory Judgment (28 U.S.C. §§ 2201, 2202);
5. PAGA (Lab. Code § 2698 et seq.) — Lab. Code § 432.5;
6. PAGA — Lab. Code §§ 232, 232.5, 1102.5, 1197.5;
7. PAGA — Lab. Code §§ 2870–2872; and
8. PAGA — Lab. Code §§ 925, 2698 et seq.

Plaintiff Andrea Hull alleges as follows:

## INTRODUCTION

1. Since 1872, California law has guaranteed every person the right to pursue any lawful profession, trade, or business. Business and Professions Code section 16600 provides that, except as otherwise permitted by statute, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The California Supreme Court has confirmed that this prohibition is absolute in the employment context: there is no "narrow restraint" exception, and covenants not to compete and covenants not to solicit customers are void no matter how reasonable an employer believes them to be. Edwards v. Arthur Andersen LLP (2008) 44 Cal.4th 937.

2. In 2023, the Legislature reinforced this policy. Senate Bill 699 added Business and Professions Code section 16600.5, which provides that any contract void under section 16600 is unenforceable "regardless of where and when the contract was signed," forbids an employer or former employer from attempting to enforce such a contract "regardless of whether the contract was signed and the employment was maintained outside of California," declares that an employer who enters into or attempts to enforce such a contract "commits a civil violation," and gives employees, former employees, and prospective employees a private right of action for injunctive relief and actual damages, with mandatory attorneys' fees and costs to a prevailing employee. Assembly Bill 1076 added section 16600.1, which makes it unlawful to include a noncompete clause in an employment contract or to require an employee to enter a noncompete agreement, and required employers to notify current and former California employees in individualized writings that any such clauses in their agreements are void. AB 1076 also amended section 16600 itself to provide that the statute reaches restraints "no matter how narrowly tailored" (§ 16600, subd. (b)(1)) and that it is "not limited to contracts where the person being restrained from engaging in a lawful profession, trade, or business is a party to the contract" (§ 16600, subd. (c)).

3. Defendant Epic Systems Corporation ("Epic") is the dominant vendor of electronic health record ("EHR") software in the United States. Epic, directly and through its wholly owned staffing subsidiary, Defendant Boost, Inc. ("Boost"), requires its California-based employees to sign a Wisconsin-law form agreement containing a one-year covenant not to compete that bars

former employees from working for any “Direct Competitor” on an Epic-controlled list (including Amazon, Apple, Google, Meta, Microsoft, Oracle Health, and Salesforce); from establishing or aiding any new business that overlaps with Epic’s products; from soliciting Epic customers or prospects for competitive purposes; from being employed by any Epic customer or prospective customer in any role that involves Epic software; and from working for Epic’s consultants and “Cooperative Partners” in overlapping healthcare software or services work. Because Epic’s customers include most significant health systems in the United States, the covenant operates to exclude former Epic employees from virtually the entire health-information-technology industry in which they built their careers.

4. Epic backstops these void covenants with restraints at the other end of the labor market: provisions in its customer and partner contracts — including, on information and belief, no-hire, no-poach, and 12-month “cooling off” provisions — that restrict Epic’s customers from hiring or using former Epic employees no matter what the employees’ own agreements say. Epic’s human resources department put it plainly, in writing: “customer contracts often include provisions related to hiring, which would still apply to those organizations.” And Epic polices the gate itself: it controls the “UserWeb” credentials, certifications, training, and conference access that anyone working with Epic’s platforms needs, and it denies those credentials to recent former employees — while offering them to virtually everyone else — as a means of enforcing its restraints.

5. Epic does not treat its competition restraints as dead letters. It enforces them — selectively, and as an instrument of loyalty. Epic maintains a waiver program under which it will excuse its noncompete for a departing employee who has served at least seven years at Epic and three years at Boost and who remains for a year at the Epic customer seeking to hire them. The restraints, in other words, are not calibrated to protect trade secrets; they are calibrated to keep employees and customers in the fold.

6. Plaintiff Andrea Hull is a California resident, living in Concord in the San Francisco Bay Area, who devoted approximately eleven and a half years of her career to the Epic Group, most recently working remotely from Concord for Boost. In March 2026, she left Boost

and joined Abbott Diabetes Care ("Abbott") as an EHR Implementation Manager — a customer-side role developing the strategy to scale Abbott's continuous glucose monitoring ("CGM") device integration with Epic's platforms, including "Epic Aura," across more than 400 health systems. The role advances the adoption of Epic's own products. Abbott's legal department vetted the hire before extending the offer.

7. Within weeks, Epic denied Ms. Hull the UserWeb credentials her job at Abbott requires — credentials needed for conference registration and for access to Epic technical documentation — citing a one-year "cooling off" period, and made its position clear to Abbott: as an Abbott program manager relayed it in writing, "we were informed former Epic employees should not be working on Epic direct, related work for 12 months." Abbott — dependent on its commercial relationship with Epic — reacted exactly as Epic intended. It removed Ms. Hull from scheduled customer trips, pulled her from Epic's XGM conference, directed her not to engage with Epic-affiliated health systems at Becker's, an industry conference she was actively supporting, and excluded her from certain internal and external meetings. Career advancement opportunities outlined in her first weeks have been delayed or lost.

8. When Ms. Hull asked Epic's human resources department whether an updated employee agreement existed that complied with California law, Epic confirmed in writing that no updated agreement exists and that the agreement she signed remains the applicable one — and pointed to the hiring restrictions in Epic's customer contracts. Each of the restraints described above — the covenant not to compete, the customer and employee nonsolicitation provisions, the de facto restraints embedded in Epic's perpetual confidentiality and return-of-property provisions, the Wisconsin choice-of-law and forum provisions, the no-hire, no-poach, and "cooling off" provisions in Epic's customer and partner contracts, and the credential denials used to enforce them — is void or unlawful under California law, including Business and Professions Code sections 16600, 16600.1, and 16600.5, the Unfair Competition Law, and the common law right to fair procedure.

9. On June 10, 2026, Ms. Hull filed a notice under the Private Attorneys General Act ("PAGA") with the Labor and Workforce Development Agency ("LWDA") and served it by

certified mail on Defendants. The notice set out the facts and theories supporting her claims, including that Epic's employment restraints violate California law.

10. Epic continued to enforce its employment restraints against Ms. Hull, and it continued to deny her a UserWeb credential.

11. On July 24, 2026, Ms. Hull filed her original complaint in this Court.

12. On July 31, 2026, Epic emailed Ms. Hull directly, not through her counsel, to tell her that some, but not all, of the restraints in her employment agreements are void so long as she lives in California.

13. Epic continued to enforce its employment restraints against Ms. Hull through Abbott, and it continued to deny her a UserWeb credential.

14. On September 14, 2026, Epic's counsel informed Ms. Hull's counsel that Epic was "waiving" its restraints with respect to her Abbott employment and would permit her access to UserWeb, and asserted that her request for injunctive relief was therefore moot.

15. On September 18, 2026, Ms. Hull again applied for UserWeb credentials. Epic did not approve them until September 28, 2026.

16. On October 1, 2026, the day before the parties' Rule 26(f) conference, Epic's human resources department emailed Ms. Hull again, stating that Epic was "waiving" any no-hire, waiting-period, or similar restriction on her employment by any Epic customer in California, that it would not deny her UserWeb access at such a customer on the basis of those restrictions, and that she could establish Epic's waiver with any such customer by showing it the email.

17. Epic has not said that the remaining restraints in Ms. Hull's Boost agreement are void or waived. It has waived nothing in its contracts with its consultants and partners, nothing in its contracts with customers outside California, and nothing as to anyone but Ms. Hull.

18. Epic's limited, revocable waivers, made by letter and email, do not cure the harm Epic has caused, and continues to cause, to Ms. Hull, to the State, and to other aggrieved employees.

19. This First Amended Complaint seeks declaratory and injunctive relief, including public injunctive relief under the Unfair Competition Law, and civil penalties and injunctive

relief under PAGA on behalf of herself, the State of California, and all aggrieved employees. Ms. Hull asks the Court to declare Epic's employee-side and employer-side restraints illegal; to enjoin Defendants from enforcing or attempting to enforce them against her, against Abbott, and against any other person residing or working — whether virtually or physically or both — in California, any person seeking employment in California, any employer headquartered or incorporated in California, and any employer doing business in California with respect to that business; and to award her reasonable attorneys' fees and costs as provided by statute.

**PARTIES**

20. Plaintiff Andrea Hull is an individual who resides and is domiciled in Concord, Contra Costa County, California, and at all relevant times has primarily resided and worked in California. Ms. Hull is a former employee of Epic and Boost. She is currently employed by Abbott as an EHR Implementation Manager with Abbott Diabetes Care, based in Alameda, California. She brings the Fifth through Eighth Claims for Relief as an aggrieved employee under the Private Attorneys General Act, on behalf of the State of California and other current and former employees.

21. Defendant Epic Systems Corporation is a corporation organized under the laws of Wisconsin with its principal place of business in Verona, Wisconsin, and is therefore a citizen of Wisconsin. Epic develops, markets, licenses, and supports EHR software and related implementation services used by health systems throughout the United States, including throughout California. Epic transacts substantial business in California, licenses its software to numerous California health systems, and employs California residents, including remote employees who reside and work in California.

22. Defendant Boost, Inc. is, on information and belief, a corporation organized under the laws of Wisconsin with its principal place of business in Verona, Wisconsin, and is therefore a citizen of Wisconsin. Boost is a wholly owned subsidiary of Epic. Boost is in the business, as a subcontractor to Epic or other companies in the "Epic Group," of providing staff to fill implementation-team roles — typically on the customer side — and to take on special projects

related to customers' use of Epic software. Boost employs remote employees who reside and work in California.

23. At all relevant times, Epic and Boost operated as an integrated enterprise and/or as joint employers of Ms. Hull and other California-based employees. Among other things: Boost is wholly owned by Epic; the Boost employment agreement is written for the benefit of the entire "Epic Group" and names Epic as an intended third-party beneficiary entitled to enforce it; Epic's policies and procedures manual (the "Redbook") governs Boost employees; exceptions to the covenant not to compete may be granted only by "an Epic HR director"; Boost employees sign a Mutual Arbitration Agreement directly with "Epic Systems Corporation, together with its related and affiliated companies"; and Epic's human resources department administers and enforces the Boost agreement, as it did with respect to Ms. Hull. Epic and Boost are referred to collectively as "Epic" or "Defendants" except where the distinction matters.

24. The true names and capacities of Defendants sued as Does 1 through 10 are unknown to Ms. Hull, who will amend this Complaint to allege their true names and capacities when ascertained. On information and belief, each Doe defendant is an affiliate, subsidiary, agent, or co-conspirator of Epic or Boost, is responsible in some manner for the conduct alleged herein, and no Doe defendant is a citizen of California.

25. At all relevant times, each Defendant acted as the agent, alter ego, joint venturer, co-conspirator, and/or aider and abettor of each other Defendant, and acted within the course and scope of that relationship with the knowledge, consent, approval, and ratification of each other Defendant.

## JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Ms. Hull is a citizen of California; Epic and Boost are citizens of Wisconsin; and complete diversity exists. The amount in controversy exceeds $75,000, exclusive of interest and costs. Among other things, in an action for injunctive and declaratory relief, the amount in controversy is measured by the value of the object of the litigation. The object of this litigation is Ms. Hull's right to perform her profession free of Defendants' restraints — during the restraint period and beyond — and the

value of that right, to either party, exceeds the jurisdictional threshold, as do the mandatory statutory attorneys' fees recoverable under Business and Professions Code section 16600.5, subdivision (e)(2). The civil penalties sought on Ms. Hull's PAGA claims separately exceed the jurisdictional threshold.

27. This Court has personal jurisdiction over Defendants. Defendants transact substantial business in California; employed Ms. Hull, knowing that she resided and worked in California; directed the enforcement conduct alleged herein at a California resident and her California employer; and have purposefully availed themselves of the benefits of the California market, including by licensing software and selling implementation services to California health systems.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District: Ms. Hull resides in Contra Costa County, within this District, and worked for Defendants remotely from her home in this District; her employer is based in Alameda County; and Defendants directed their enforcement conduct into this District.

29. Intradistrict Assignment. This action was assigned to the San Francisco Division and reassigned to the Honorable Araceli Martínez-Olguín in the Oakland Division on July 28, 2026. Assignment to either division is proper under Civil Local Rule 3-2(c) and (d) because a substantial part of the events giving rise to the claims occurred in the Counties of Contra Costa and Alameda.

30. The Wisconsin choice-of-law and forum provisions in Ms. Hull's form employment agreement do not affect jurisdiction, venue, or governing law. Under Business and Professions Code section 16600.5, subdivisions (a) and (b), the void restraints are unenforceable, and may not be the subject of enforcement attempts, regardless of where and when the contract was signed. In addition, the agreement was presented to Ms. Hull as a standard-form condition of employment after January 1, 2017, and she was not individually represented by counsel in negotiating its terms; under Labor Code section 925, any provision requiring adjudication outside California or depriving her of the substantive protection of California law is voidable by her, and

Ms. Hull hereby voids those provisions. Under Labor Code section 925(b), this controversy is to be adjudicated in California under California law.

## FACTUAL ALLEGATIONS

### A. California's Settled Public Policy Against Restraints on Employee Mobility

31. Business and Professions Code section 16600, subdivision (a), provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Subdivision (b)(1), added by Assembly Bill 1076 effective January 1, 2024, directs that the section "shall be read broadly, in accordance with Edwards v. Arthur Andersen LLP (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter." Subdivision (c) provides that the section "shall not be limited to contracts where the person being restrained from engaging in a lawful profession, trade, or business is a party to the contract." None of the statutory exceptions — which concern the sale or dissolution of businesses and ownership interests — applies here.

32. Business and Professions Code section 16600.1, subdivision (a), makes it "unlawful to include a noncompete clause in an employment contract, or to require an employee to enter a noncompete agreement, that does not satisfy an exception in this chapter." Subdivision (b) required employers, by February 14, 2024, to provide individualized written notice to current employees, and to former employees employed after January 1, 2022, whose contracts include a noncompete clause, that the noncompete clause is void. Subdivision (c) provides that a violation of section 16600.1 "constitutes an act of unfair competition" under the Unfair Competition Law, Business and Professions Code section 17200 et seq.

33. Business and Professions Code section 16600.5 provides that any contract that is void under the chapter "is unenforceable regardless of where and when the contract was signed" (subd. (a)); that an employer or former employer "shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California" (subd. (b)); that an employer "shall not enter into a contract

with an employee or prospective employee that includes a provision that is void under this chapter" (subd. (c)); and that an employer that enters into such a contract or attempts to enforce it "commits a civil violation" (subd. (d)). Subdivision (e) authorizes an employee, former employee, or prospective employee to bring a private action for injunctive relief or the recovery of actual damages, or both, and entitles a prevailing employee to recover reasonable attorneys' fees and costs.

34. California courts have long applied these protections to California employees notwithstanding out-of-state employers and out-of-state choice-of-law provisions. (Application Group, Inc. v. Hunter Group, Inc. (1998) 61 Cal.App.4th 881.) California courts have likewise held that contractual provisions that nominally protect "confidential information" but in operation prevent a former employee from using the general skills, knowledge, and acquaintances acquired during employment function as void restraints of trade. (Dowell v. Biosense Webster, Inc. (2009) 179 Cal.App.4th 564; AMN Healthcare, Inc. v. Aya Healthcare Services, Inc. (2018) 28 Cal.App.5th 923.) And California courts refuse to enforce no-hire provisions in contracts between companies where, as applied, they restrain employee mobility. (VL Systems, Inc. v. Unisen, Inc. (2007) 152 Cal.App.4th 708.)

**B. Epic, Boost, and Ms. Hull's Employment**

35. Epic is the largest EHR vendor in the United States. Its software manages the medical records of a majority of Americans, and its customers include most large health systems in the country, including throughout California. Companies across the health-care economy — medical-device manufacturers, digital-health companies, payers, and consultancies — must work with and around Epic's platforms, and they hire experienced Epic-trained professionals to do so.

36. Boost is Epic's remote-staffing arm. Boost employees work remotely from anywhere in the contiguous United States, are staffed onto Epic customer projects, and perform customer-side implementation work — system build, testing, training, and project and program management — under the Epic umbrella.

37. Ms. Hull devoted approximately eleven and a half years of her career to the Epic Group, rising through positions of increasing trust across three countries. She joined Epic in

Madison, Wisconsin in 2014, shortly after earning her law degree from the University of Wisconsin. As a Project Manager (Madison, 2014–2016), she led enterprise testing for multi-hospital EHR implementations. As an Implementation Director (Madison, 2016–2018), she delivered add-on EHR implementation projects. As a Boost Consultant (Denver, 2018–2020), she co-designed the enterprise training and operational-readiness program for an implementation serving more than 200,000 users across multiple states. As Contract Manager (Trondheim, Norway, 2020–2022), she managed implementation and development compliance for a first-in-country contract and provided strategy support to Legal, Development, and Implementation leadership in negotiations. And as the first international public policy team member (Bristol, England, 2022–2025), she represented Epic itself before government stakeholders and trade associations in multiple jurisdictions, and co-founded a global policy council with Epic customer representatives from 13 countries.

38. Returning to the United States as a Boost Consultant working from Concord, California, Ms. Hull designed enterprise transformation and change-management programs for healthcare organizations spanning more than 80 sites. Everything in that career — the certifications, the product fluency, the customer relationships, the implementation methods — is professional skill, knowledge, and experience built over more than a decade within the Epic Group. It is precisely the general human capital that California law guarantees a former employee the right to carry into her next position. And it is the professional foundation that Defendants' covenants, customer-contract restraints, and credential denials now render largely unusable in the occupation to which she has devoted her career.

39. By memorandum dated June 13, 2025, Epic extended Ms. Hull a Boost transfer offer expressly "based on your proposed move to San Francisco, CA with a Boost start date of 8/4/2025." Epic and Boost thus knew, before Ms. Hull signed anything, that she would reside and work in California.

40. On June 19, 2025, as a standard-form, take-it-or-leave-it condition of her transfer, Ms. Hull signed Boost's paperwork: an Employment Agreement, an Employee Data Confidentiality Policy, a Mutual Arbitration Agreement with Epic, and a Boost Technology

Payment Agreement (collectively, the "Boost Agreement"). Epic's transfer memorandum told Ms. Hull that her transfer compensation "isn't something we negotiate." A true and correct copy of the Boost Agreement is attached as Exhibit A and incorporated by reference.

41. Ms. Hull began her Boost role on or about July 7, 2025, and at all times thereafter worked for Defendants primarily remotely from her home in Concord, California.

**C. The Void Restraints in the Epic Agreements**

42. Ms. Hull signed several distinct agreements containing identical or nearly identical employment restraints during the course of her employment with Epic (collectively, the "Epic Agreements"). Ms. Hull challenges all such agreements, including those required of her former coworkers, insofar as they are cumulative. They do not contain integration clauses.

43. Here, Ms. Hull uses her most recent Boost agreement, the Boost Agreement, as an exemplar.

44. The Boost Agreement, on its face, violates Business and Professions Code section 16600.1, which states: "It shall be unlawful to include a noncompete clause in an employment contract . . . ."

45. In violation of California law, Section 4 of the Boost Agreement, titled "Covenant Not to Compete and Additional Restrictions," applies to any employee who has been certified in Epic software, has held a role requiring certification, has had a login to an Epic customer production system or supporting infrastructure, is involved in sales, or has held a director-level title. For such employees — including Ms. Hull — Section 4 alone imposes the following restraints "during your employment with Boost, and for a period of one year after," unless the employee obtains "a written exception from an Epic HR director":

(a) The Competitor Non-Compete (entitled "Direct Competitors" in Epic's agreements). This states that an employee may not be "employed or engaged by, whether as an employee, officer, partner, director, consultant or otherwise," or hold more than a one-percent ownership interest in, "any Direct Competitor of the Epic Group." The "Direct Competitors" are listed on an Epic-controlled Annex 1 "as updated by the Epic Group from time to time," and include Amazon, Apple,

Google/Alphabet, Meta/Facebook, Microsoft, Oracle Health, Salesforce, athenahealth, MEDITECH, NextGen Healthcare, Palantir, and more than a dozen other companies.

(b) The Customer Non-Compete (entitled "Customer Contact" in the agreement). The employee may not contact any Epic Group customer or "Active Prospective Customer" with whom the employee had contact during her last two years of employment, for the purpose of selling competitive products or services or dissuading them from doing business with the Epic Group.

(c) The New Business Non-Compete (entitled "New Business Enterprise or Area of Business" in the agreement). The employee may not "establish or aid others in establishing any new business enterprise or a new area of business for an existing business enterprise" involving any product that "overlaps with the Epic Group's."

(d) The Business No-Solicitation Covenant (entitled "Employment with Customers, Consultants and Cooperative Partners" in the agreement). The employee may not "[b]e employed or engaged by, directly or indirectly including as a Consultant, any Epic Group customer or Active Prospective Customer in a role that involves Epic software," and may not be employed by any "Consultant or Cooperative Partner" listed on an Epic-controlled Annex 2 — including Accenture, Deloitte, Huron, IBM/Kyndryl, Optum, R1, and any organization that has entered into a "'Member Services', 'Pal', 'Partner', or similar cooperative agreement with Epic" — in work involving overlapping healthcare software or services.

(e) The Employee No-Solicitation Covenant (entitled "Non-interference with Employees" in the 2018 Boost Agreement). This provision contains a two-year prohibition on any attempt to persuade or influence an Epic employee to leave his or her Epic employment.

46. Because Epic's customers include most significant health systems in the United States, and because Annexes 1 and 2 sweep in the largest technology and consulting companies in the world and may be unilaterally "updated" by Epic "from time to time," Section 4 operates as

an industry-wide exclusion: for one year, a former Epic employee may not work in the field in which she has built her career — including, as applied to Ms. Hull, in a customer-side role that supports Epic's own platform. Section 4 and its annexes purport to limit certain of these restrictions to "healthcare software and services activities" and to products or services serving "substantially similar functions" as Epic's. Those limitations change nothing: section 16600, subdivision (b)(1), voids employment noncompetes "no matter how narrowly tailored."

47. Epic's employment agreements also contain perpetual nondisclosure and non-use obligations — "[d]uring this Agreement and thereafter" — over categories of information defined so broadly that they encompass the general skills, knowledge, and professional acquaintances Ms. Hull acquired through her employment and through ordinary participation in the industry, including "customer and prospect lists and identities," "identities and talents of specific Epic Group employees," "financial information about the Epic Group, its employees or its current or prospective customers," "company records," "internal discussions or strategies relating to competitors," and "other sensitive information . . . identified by the Epic Group as confidential." Section 5 ("Return of Property") reinforces these restraints by requiring the surrender of all materials "regarding" broad categories of information, with no temporal or subject-matter limit. None of these provisions is limited to trade secrets, and all of them, by their plain terms, encompass information about wages, working conditions, and reasonably suspected unlawful conduct. None contains a carve-out for the disclosure of wages, working conditions, or suspected violations of law. Because these provisions, at a minimum, partially restrain Ms. Hull from practicing her profession, they are void restraints of trade. They also violate numerous provisions of the Labor Code related to California's employee anti-gag rule.

48. Section 7 of the Employment Agreement ("Irreparable Harm") declares that Epic is "an intended third-party beneficiary" of the agreement, pre-authorizes Boost and Epic to seek injunctive relief, and entitles Boost and/or Epic — but not the employee — to recover "actual attorneys' fees and costs" in any successful enforcement action. The provision is designed to intimidate employees out of exercising their rights under California law.

49. Section 8 of the Employment Agreement provides that the agreement "is to be interpreted in accordance with the laws of the State of Wisconsin," and the Mutual Arbitration Agreement likewise provides that it "shall be governed under" the Federal Arbitration Act "and the laws of the State of Wisconsin" and requires, "[a]bsent extraordinary circumstances," that any arbitration hearing be conducted on Epic's Verona, Wisconsin campus. As applied to a California-resident employee, these provisions violate Labor Code section 925 and are voidable at the employee's election. Ms. Hull so elects.

50. Epic's agreements contain no California carve-out, no acknowledgment that Business and Professions Code section 16600 renders its restrictive covenants void as to California employees, and no notice of any kind regarding employees' rights under California law.

51. Epic knows exactly what California law requires — and imposes these terms on its employees anyway. In September 2025, Epic issued Ms. Hull a stock offer conditioned on an extension of her noncompete period to two years. Within a short period, Epic voided that offer and reissued it to California employees with the noncompete terms removed — a concession that such terms cannot lawfully be imposed on California employees.

52. Epic claims that, on September 30, 2025, Epic's human resources department emailed California-resident and soon-to-be-resident Epic employees that, "[b]ecause of California Assembly Bill 1076, these noncompete provisions are void and will not apply to you as long as you live in California. The rest of the provisions continue to apply." Ms. Hull has no record of receiving that email before Epic forwarded it to her on July 31, 2026. The email does not define the noncompete provisions to which the email refers, a problem insofar as Epic does not consistently identify its noncompetes as noncompetes.

53. Epic's restraints are also selectively enforced. On information and belief, Epic maintains a waiver program under which Epic will excuse the noncompete for an employee who has worked at least seven years at Epic and at least three years in Boost and who then remains for a year at the Epic customer that wishes to hire them. The program rewards employees for remaining in the Epic fold and rewards customers for waiting at Epic's pleasure; it operates as a

coerced employee-retention and customer-loyalty mechanism. Epic's discretionary, loyalty-based waiver practice confirms that Section 4 is not reasonably necessary to protect trade secrets or any other legitimate interest. It is a naked restraint, enforced when — and only when — restraint serves Epic's commercial interests.

**D. Ms. Hull Joins Abbott, and Epic Enforces Its Illegal Restraints**

54. Defendants' restraints shaped Ms. Hull's job search before she ever applied to Abbott. Between approximately November 2025 and February 2026, while still employed by Epic, Ms. Hull searched for her next position, reviewing postings at California health systems and healthcare companies. She understood — from the Boost Agreement, from Epic's known enforcement practices, and from the hiring restrictions Epic imposes on its customers — that employers running Epic were, as a practical matter, closed to her. She therefore declined to pursue Epic IT manager- and director-level roles at Bay Area health systems that run Epic, including Stanford, UCSF, John Muir Health, the San Francisco Department of Public Health, and Adventist Health — the last of which was actively installing Epic and regularly posting positions suited to her experience. She likewise declined to apply to Epic-affiliated consulting firms — including Accenture, Deloitte, Optum, and KPMG — even though those firms had open positions matching her skills, because, as Epic-affiliated consultancies, they could not be expected to defy Epic's restraints; three of them (Accenture, Deloitte, and Optum) are expressly named on Epic's Annex 2. On information and belief, each of these health systems and consulting firms is an Epic customer or partner subject to the no-hire, no-poach, and "cooling off" provisions alleged in this Complaint.

55. The restraints steered even the choice Ms. Hull ultimately made. She knew Abbott was an Epic customer — but as a medical-device maker rather than a health system, Abbott had a limited scope of Epic integrations, stood tangent to core healthcare information technology, and offered the potential for longer-term growth outside Epic's reach. She reasoned that she could find a role at Abbott that did not involve Epic or, if her role did touch Epic, that Abbott was a large enough organization to push back against an unlawful noncompete asserted against a California employee. Ms. Hull thus selected her employer not on professional opportunity alone,

but on her prediction of where Epic's restraints would not follow her. Epic's enforcement conduct proved even that careful prediction wrong.

56. In February 2026, Ms. Hull interviewed with Abbott Diabetes Care for the role of EHR Implementation Manager. The role focuses on the strategic vision to scale Abbott's CGM device integration with Epic's platforms — including Epic Aura, Epic's own product — across more than 400 health systems, interfacing with health systems to reduce integration friction and representing Abbott at industry conferences. The work is customer-side work that advances the adoption of Abbott's CGM products through EHR-enabled solutions, like Epic's products; Abbott is not a competitor of Epic, and nothing about the role involves competing with Epic in any way. Abbott extended Ms. Hull an offer, and Abbott's recruiter confirmed that Abbott's legal department had vetted the hire as permissible. Ms. Hull resigned from Boost and began work at Abbott on March 23, 2026. In her first week, Abbott added her to customer trips and upcoming industry conferences, and within weeks her manager outlined routes for her career advancement at Abbott.

57. In late March 2026, Ms. Hull applied for an Epic "UserWeb" account — the individual credential required for registering for and attending Epic's XGM and UGM conferences as an exhibitor and session attendee, and for access to the technical documentation that anyone working with Epic's platforms requires. Epic's response reported that her application had matched the name of a former Epic employee and asked her to confirm whether she had worked for Epic; when she confirmed that she had, Epic denied the application in writing on March 31, 2026, telling her that she would "need to wait 12 months before gaining access to the UserWeb" and could "reach back out to us when your waiting period is up." The twelve-month "waiting period" appears in no agreement Ms. Hull signed (as opposed to Epic's employer-side employment restraints).

58. Abbott contacted Epic to request an exception. On April 7, 2026, an Abbott program manager relayed Epic's final position by email: Ms. Hull's UserWeb access was denied for one year, and, as the program manager reported, "we were informed former Epic employees should not be working on Epic direct, related work for 12 months."

59. On information and belief, an Epic director told Abbott personnel, in substance: "you should have told me when you saw her resume . . . I could have told you about all these considerations" — confirming that Epic expects its customers to screen their hiring decisions against Epic's restraints, and that Epic regards its restraints as governing whom its customers may employ and how.

60. Epic's communications had their intended effect. Out of concern for preserving its business relationship with Epic (and because Ms. Hull could not access UserWeb), Abbott removed Ms. Hull from several scheduled customer trips; removed her from Epic's XGM conference; directed her not to engage with Epic-affiliated health systems at an industry conference she was actively supporting at the Abbott booth; and removed her from, or did not permit her to join, certain internal and external meetings, conversations, and status reports relating to Epic. The Epic-facing career advancement opportunities outlined in her first weeks have been delayed by months or lost entirely, and Ms. Hull is not performing the core Epic-strategy function she was hired to perform.

61. In mid-April 2026, Ms. Hull raised concerns with her director about California employees' rights regarding noncompete enforcement. Abbott began an internal investigation and requested a copy of her Boost employee agreement.

62. At the end of April 2026, Ms. Hull emailed Epic's human resources department and asked whether an updated employee agreement existed that reflected California law. Epic HR responded in writing that no updated agreement exists and that the agreement she signed remains the applicable one. Epic HR added, in writing: "customer contracts often include provisions related to hiring, which would still apply to those organizations."

63. From May 2026 until at least September 28, 2026, the restrictions on Ms. Hull's work remained in place. Following her April 2026 removal from conference participation and customer engagement, she remained excluded from customer trips and certain meetings that are core functions of her role, and her standing, advancement prospects, and professional relationships at Abbott and in the industry deteriorated — all because Epic insists on enforcing restraints that California law declares void.

64. During the week of June 1, 2026, Abbott sent several employees to Minneapolis for a joint workshop with Epic representatives to discuss lessons learned from the parties' implementations and what would be done differently going forward. Abbott opted not to send Ms. Hull — whose role encompasses precisely that subject — because of the ongoing noncompete issue, and sent one of her peers instead. Ms. Hull did not receive even the notes from the meeting.

65. The restrictions deepened. From June 5 through June 8, 2026, Ms. Hull attended the American Diabetes Association's Scientific Sessions in New Orleans — a major industry event at which Abbott exhibits, and at which Ms. Hull's manager had told her, when she was hired, that she would staff Abbott's booth for its Epic-integration conversations. A few weeks before the conference, her manager instructed her not to have any conversations with any health system that uses Epic, and she was not staffed to work the booth; her role was reduced to mere attendee and observer. Because most large health systems run Epic, the instruction operated as a near-total bar on customer engagement. In the one substantive customer interaction she was permitted — covering a pre-existing relationship with a contact from a prominent Illinois health system — she was required to bring in a colleague to conduct the conversation while she took notes and handed the relationship to others to act upon: work she would ordinarily have performed herself. On information and belief, Abbott maintains records of the health systems that visited its booth and of the customer meetings arranged at the conference — the opportunities Ms. Hull was barred from pursuing.

66. As noted above, Ms. Hull filed and served her PAGA notice on June 10, 2026. The notice had no effect on Epic's behavior.

67. Ms. Hull's Abbott role had been hollowed out. She was hired onto Abbott's strategic partnerships team to drive the strategy for scaling Abbott's CGM integration with Epic across health systems. Instead: she was pulled from a planned trip to a health system in one state in her second week of employment; she was excluded from a planned engagement with a major health system in a second state; other health systems with whom she was to help engage have been handed to a colleague; and the key accounts she expected to support on site were required to proceed without her. She has instead been assigned to perform work outside the core Epic-

integration function she was hired to perform. That work concluded in late July 2026. She had been relegated to nearly exclusively internal support work outside the core Epic-integration function she was hired to perform.

68. Epic's exclusions extended even to training. Ms. Hull was told to sit out a half-day Epic "certification" session that Epic led to train Abbott's health-systems sales staff at the team's retreat in Boston on July 22, 2026. An Epic-certified professional with more than a decade of Epic experience was thus barred from an Epic training session offered to her Abbott colleagues.

69. Ms. Hull continued to be held out of customer trips and meetings involving Epic, her assignments continued to fall outside the function she was hired to perform, she was not permitted to support any "go-live" with Abbott's health-system customers, and Epic did not withdraw its position.

70. Ms. Hull filed suit on July 24, 2026. The press reported on her complaint.

**E. Epic's California Flim-Flam**

71. Faced with a lawsuit, on July 31, 2026, Epic's human resources department emailed Ms. Hull directly (Epic bypassed her counsel) "to provide a clarification in case it was not previously clear." It stated: "The referenced noncompete provisions that are (and remain) void and non-applicable while you live or lived in California include any provisions in agreements you may have with any of Epic's subsidiary companies, including . . . Boost, Inc. . . . . This was always Epic's intention, and we wanted to make sure we were clear on that. In addition, any provision establishing Wisconsin law as the law governing your Employment Agreement(s) with Epic or any subsidiary company will not apply while you live or lived in California." The email said nothing about the "waiting period" Epic had invoked to deny Ms. Hull's credentials, the customer-contract hiring restraints Epic HR had said "would still apply," the customer-contact or confidentiality covenants, or Epic's statements to Abbott. Epic continued to deny Ms. Hull a UserWeb account, and it continued to enforce its employment restraints against Abbott. So nothing at Abbott changed. This is the Epic flim-flam: it pretends to release an employee from her employment restraints while enforcing its employment restraints against everyone else. The result is that the employee remains restrained.

72. In anticipation of Ms. Hull's preliminary injunction motion (which clearly falls outside the scope of the arbitration agreement), on September 14, 2026, Epic's litigation counsel wrote to Ms. Hull's counsel that Epic "does not object to UserWeb access for Ms. Hull in the scope of her employment with Epic's customer, Abbott Diabetes Care"; that Epic "has also advised Abbott that any no-hire or cooling off provisions or restraints on the types of duties she may perform for Abbott under the license agreement between Epic and Abbott are waived"; and that the noncompete provisions, "including any restriction on employment with Epic customers, are and remain void and non-applicable while she lives in California." On that basis, Epic asserted that it had "fully addressed any alleged imminent harm to Ms. Hull, rendering the request for injunctive relief in her Complaint moot," and that any claims "must" be brought in arbitration.

73. The letter is limited to Ms. Hull's UserWeb access at Abbott. It does not address all of Epic's employment restraints; it does not withdraw the hiring restraints in Epic's contracts with any other customer or partner, does not address the "waiting period" as applied to any other employer or any other former employee, does not correct Epic's statements to Abbott, and does not amend the form agreement Epic continues to require its employees to sign.

74. On September 18, 2026, Ms. Hull's manager told her that Epic had communicated to Abbott that it was "waiving" the hiring provisions in its contract with Abbott and would permit her access to UserWeb, and that he would begin involving her in Epic-related conversations. Ms. Hull applied for UserWeb access that day.

75. Epic approved her account only on September 28, 2026, ten days after she applied the second time and six months after it first denied her.

76. On October 1, 2026, the day before the parties' Rule 26(f) conference, Epic's human resources department emailed Ms. Hull again, at the same personal address and again not through her counsel. The email stated that Epic and its subsidiaries "hereby waive any restriction on you becoming employed by any Epic customer in California, by virtue of any no-hire, waiting period, or other provisions in any license agreement between Epic and such customers"; that "[i]f you seek employment with any such customer, you may share a copy of this email with them"; that if such a customer sought UserWeb access for her, Epic "will not deny access on the grounds

of any of these waived restrictions"; and that the waiver was "in addition to" the September 30, 2025 and July 31, 2026 emails. The waiver — such as it is — runs to Ms. Hull alone and to Epic's customers in California alone. It does not reach Epic's consultants and partners, in California or elsewhere, or its customers outside California; it does not withdraw Epic's reserved right to refuse to work with a former employee a customer hires; it does not touch the restraints in Ms. Hull's own agreements or the form; and it leaves every customer contract as written, expecting each employer Ms. Hull approaches to take Epic's email over its own signed agreement (assuming her resume is not first screened out by recruiting software set to disregard resumes from recent Epic employees).

### F. The No-Hire, No-Poach, and "Cooling Off" Provisions in Epic's Customer Contracts

77. On information and belief, Epic's standard customer contracts — including its agreements with Abbott and with health systems and other organizations throughout California — contain provisions restricting the customer from hiring, engaging, or staffing former Epic employees, including no-hire and no-poach provisions and 12-month "cooling off" periods. Several of those contracts are public records, among them Epic's agreements with the City and County of San Francisco, the County of San Mateo, and the County of San Bernardino. Each contains a "Restriction on Offers of Employment" under which the customer agrees not to "solicit, discuss prospective employment with, or hire" any Epic employee who has worked on Epic software, during that person's Epic employment and for twelve months after, without Epic's prior written consent; each conditions a consultant's access to Epic's software on the consultant's own agreement with Epic that it "will not hire current or recent Epic employees"; and each provides that Epic "may choose not to work with or provide training for any former Epic employee" whom the customer hires within twelve months of departure. Epic's September 14, 2026 letter, described above, confirms that its license agreement with Abbott contains no-hire and "cooling off" provisions and restraints on the duties a former Epic employee may perform. Epic's own human resources department confirmed as much in writing: "customer contracts often include provisions related to hiring, which would still apply to those organizations." The position

Epic communicated to Abbott in April 2026 — relayed by an Abbott program manager as "we were informed former Epic employees should not be working on Epic direct, related work for 12 months" — and the Epic director's statement that Abbott "should have told" Epic when it saw Ms. Hull's resume, reflect the operation of these provisions, the Boost Agreement's covenants, or both.

78. These customer-contract provisions restrain competition in the labor market for Epic-skilled professionals. They restrict whom Epic's customers may hire and what work former Epic employees may perform, suppress those employees' mobility, compensation, and professional opportunities, and accomplish indirectly precisely what Business and Professions Code section 16600 forbids Epic to accomplish directly: the exclusion of former Epic employees from working in their profession. Under section 16600, subdivision (c), the statute's prohibition is "not limited to contracts where the person being restrained is a party to the contract."

79. The restraints' effect on Ms. Hull is concrete and twofold. First, her own employer had been told that former Epic employees should not be working on Epic-related work for 12 months, and it restricted her duties accordingly. Second, the restraints have shaped her job search — closing an entire tier of positions in her profession. On information and belief, these provisions operate the same way against every other recent California-resident former employee of the Epic Group.

**G. Epic's Gatekeeping of UserWeb, Certifications, and Conference Access**

80. Epic controls the practical gateway to the Epic-professional occupation. An individual "Service Account" on Epic's UserWeb is required for, among other things, registering for and attending Epic's XGM and UGM conferences, accessing Epic technical documentation, and maintaining Epic certifications through New Version Training and Continuing Epic Education. Epic certifications and current product knowledge are, as a practical matter, prerequisites to working in Epic-related health information technology — a field that spans, on information and belief, thousands of employers, including most major U.S. health systems and the vendors and consultancies that serve them. Epic is the sole source of these credentials and resources.

81. UserWeb accounts are personal to the individual user, who accepts Epic's UserWeb Terms of Use upon registration and use. Epic's published Terms of Use (last updated July 14, 2025) reserve to Epic the right to terminate any user's access "without prior notice to you for any reason that Epic deems appropriate," and purport to impose Wisconsin law and exclusive Dane County, Wisconsin jurisdiction on every user while reserving to Epic alone the right to seek injunctive relief in any jurisdiction. The published Terms of Use contain no "waiting period" or "cooling off" provision and no former-employee exclusion of any kind.

82. To the contrary: Epic's own UserWeb registration form offers accounts to persons who have "previously been certified in an Epic application" but are "not currently affiliated with an Epic customer or consulting firm," for certification maintenance. Epic thus holds UserWeb out to the general certified population — including unaffiliated former consultants — while denying it to recent former Epic employees specifically, pursuant to an unwritten twelve-month "waiting period" that appears in no published terms. Ms. Hull, a certified Epic professional sponsored by an Epic-customer-affiliated employer, was denied the access Epic makes available to virtually everyone else, solely because she recently worked for Epic.

83. Epic's denial of UserWeb credentials to recent former employees (or its threat to deny such credentials) is a systematic practice — administered through automated screening of applications against Epic's former-employee records, as Ms. Hull's own application experience confirms — implemented to enforce the void covenants in Epic's employment agreements and the no-hire and "cooling off" provisions in its customer contracts, and it degrades former employees' ability to perform Epic-related work to the point of unemployability in their occupation during the restraint period.

**H. Harm to Ms. Hull, to the State, and to the Public**

84. As a direct and proximate result of Defendants' conduct, Ms. Hull has suffered and continues to suffer harm, including: exclusion from the core functions of the job she was hired to perform; removal from customer trips, conferences, and meetings essential to her performance and advancement; reassignment to work outside the function she was hired to perform; delay and loss of the career advancement opportunities outlined when she joined Abbott; damage to her

professional reputation and standing with her employer and in the industry; impairment of the professional relationships, certifications, and skills on which her career depends; the exclusion of an entire tier of positions — Epic IT leadership roles at Bay Area health systems — from her job search; the steering of her choice of employer to companies she predicted would be beyond the reach of Defendants' restraints; lost compensation and employment benefits; and a distorted labor market that prevents and impairs the movement of Epic employees.

85. This harm is irreparable and cannot be remedied by damages. Each week Epic's restraints operate deprives Ms. Hull of professional opportunities, relationships, and momentum that cannot be recovered. She is also subject to suppressed wages that cannot be calculated.

**FIRST CLAIM FOR RELIEF**

**Violation of Business and Professions Code §§ 16600, 16600.1, and 16600.5 — Employee-Side Restraints**

**(Against All Defendants)**

86. Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

87. Epic's employment restraints in Ms. Hull's own Epic employment agreements are contract provisions by which she is restrained from engaging in a lawful profession, trade, or business. They are illegal.

88. By entering into the 2025 Boost Agreement with Ms. Hull — a contract that includes provisions void under the chapter — Defendants violated Business and Professions Code section 16600.1 and committed a civil violation under section 16600.5.

89. By enforcing or attempting to enforce its restraints against Ms. Hull — including by denying her UserWeb credentials; by communicating to Abbott that former Epic employees should not be working on Epic-related work for 12 months; by confirming to Ms. Hull in writing that the Boost Agreement remains the applicable one; by its policy of wrap-around restraints for everyone else — Defendants violated section 16600.5, subdivision (b), and committed further civil violations under subdivision (d). The Wisconsin choice-of-law provision provides no

defense: under subdivisions (a) and (b), the void provisions are unenforceable, and may not be the subject of enforcement attempts, “regardless of where and when the contract was signed.”

90. As an employee and former employee, Ms. Hull is authorized by section 16600.5, subdivision (e)(1), to bring this private action for injunctive relief. Defendants’ violations are ongoing and are causing irreparable harm — including by continuing to constrain the employers Ms. Hull may work for and what work she may perform, by restricting the persons with whom she can work, and by robbing her of the goodwill that belongs to her — warranting preliminary and permanent injunctive relief barring Defendants from maintaining, invoking, or enforcing the void provisions against Ms. Hull and against any other person residing or working in California, any person seeking employment in California, any employer headquartered or incorporated in California, and any employer doing business in California with respect to that business, and barring Defendants from denying or withdrawing UserWeb credentials, conference access, or certification maintenance on the basis of former employment or any “waiting period,” as relief necessary to make the injunction effective.

91. Under section 16600.5, subdivision (e)(2), Ms. Hull is entitled to recover her reasonable attorneys’ fees and costs as the prevailing employee.

**SECOND CLAIM FOR RELIEF**

**Violation of Business and Professions Code §§ 16600 and 16600.5 — Employer-Side Restraints**

**(Against All Defendants)**

92. Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

93. The no-hire, no-poach, and “cooling off” provisions in Defendants’ third-party contracts are contracts “by which anyone is restrained from engaging in a lawful profession, trade, or business” within the meaning of Business and Professions Code section 16600, subdivision (a). The persons restrained are Defendants’ former employees, including Ms. Hull. Under section 16600, subdivision (c), the statute’s prohibition is “not limited to contracts where the person being restrained is a party to the contract”; that Ms. Hull never signed Epic’s customer

contracts is therefore no obstacle to their invalidity as applied to her. Because these provisions operate as restraints in the employment context — they restrict whom Epic's customers may hire and what work former Epic employees may perform — they are void under section 16600, subdivisions (a) and (b), no matter how they are tailored. The provisions operated on Ms. Hull directly: they closed an entire tier of California employers to her job search and steered her selection of employer to one she believed to be beyond their reach — a belief Defendants' enforcement conduct proved mistaken.

94. By maintaining these provisions in its customer contracts and by invoking and applying them against Ms. Hull's employment — including through its communications to Abbott, its UserWeb denial, and its written warning to Ms. Hull that "customer contracts often include provisions related to hiring, which would still apply to those organizations" — and by purporting to "waive" those provisions for Ms. Hull alone, first as to Abbott and then as to Epic's customers in California, while maintaining them as to every other former employee and every other customer and partner, Defendants have attempted to enforce contracts that are void under the chapter, in violation of Business and Professions Code section 16600.5, subdivision (b), and have committed civil violations under subdivision (d).

95. Ms. Hull is entitled to a declaration that these provisions are void and unenforceable as applied to her and to Defendants' other employees and former employees; to preliminary and permanent injunctive relief barring Defendants from maintaining, invoking, applying, or enforcing them as to her and as to any other person residing or working in California, any person seeking employment in California, any employer headquartered or incorporated in California, and any employer doing business in California with respect to that business; and to her reasonable attorneys' fees and costs under section 16600.5, subdivision (e)(2).

**THIRD CLAIM FOR RELIEF**

**Unfair Competition (Bus. & Prof. Code § 17200 et seq.)**

**(Against All Defendants)**

96. Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

97. Defendants' conduct constitutes unlawful business acts and practices within the meaning of Business and Professions Code section 17200, including: entering into and maintaining contracts containing provisions void under section 16600; including noncompete clauses in employment contracts and requiring employees to enter noncompete agreements in violation of section 16600.1, subdivision (a); failing to provide the individualized written notices required by section 16600.1, subdivision (b) — a violation that constitutes an act of unfair competition by operation of section 16600.1, subdivision (c); attempting to enforce void contracts in violation of section 16600.5; maintaining, invoking, and applying no-hire, no-poach, and "cooling off" provisions void under section 16600, subdivision (c); requiring employees, as a condition of employment, to agree in writing to terms Defendants know to be prohibited by law, in violation of Labor Code section 432.5; maintaining confidentiality provisions that restrict employees from disclosing their wages, working conditions, and suspected violations of law, in violation of Labor Code sections 232, 232.5, 1102.5, and 1197.5, subdivision (k); requiring California employees to agree to out-of-state law and forum as a condition of employment, in violation of Labor Code section 925; requiring the waiver of unwaivable claims; and excluding Ms. Hull from occupationally necessary credentials in violation of the common law right to fair procedure, as alleged in paragraphs 98 and 99.

98. Under California common law, a private entity that controls access to a resource or affiliation practically necessary to the pursuit of an occupation may not exclude a person from it arbitrarily, or for reasons contrary to public policy, and must afford fair procedure. Epic controls such a resource. Individual UserWeb credentials — and the conference registration, technical documentation, and certification maintenance they gate — are practically necessary to pursue the occupation of an Epic-certified health-information-technology professional, an occupation practiced across thousands of employers. Epic is the sole source of these credentials and holds them out to the public of certified professionals, including persons unaffiliated with any Epic customer.

99. Epic excluded Ms. Hull from this resource arbitrarily and for reasons contrary to the fundamental public policy of California: it denied her application pursuant to an unwritten

waiting period that appears in no published terms, in order to enforce restraints that California law declares void, without disclosed criteria, without a meaningful opportunity to be heard, and while granting access to similarly situated certified professionals — indeed, while maintaining a discretionary waiver program that excuses the same restraints for employees and customers who demonstrate sufficient loyalty to Epic. Epic's violation of the common law right to fair procedure is an unlawful business practice under section 17200.

100. Defendants' conduct is also unfair within the meaning of section 17200. Conduct is unfair where it threatens an incipient violation of an antitrust law, or violates the policy or spirit of those laws, or otherwise significantly threatens or harms competition. Defendants' denial of UserWeb credentials and conference access to recent former employees — implemented to enforce void restraints and coordinated with the hiring restrictions in Defendants' customer contracts — violates the policy and spirit of Business and Professions Code sections 16600 and 16720 and significantly harms competition in the labor market for Epic-skilled professionals, even to the extent any individual denial is recast as unilateral conduct. Defendants' conduct further offends the established public policies of this State embodied in sections 16600 through 16600.5, and its gravity — the exclusion of California workers from their professions — vastly outweighs any utility, of which there is none.

101. Ms. Hull has suffered injury in fact and lost money or property as a result of Defendants' unfair competition, including lost compensation, benefits, and professional opportunities — among them the Epic IT leadership positions at California health systems that she was deterred from pursuing.

102. Ms. Hull seeks injunctive relief under section 17203, including orders: enjoining Defendants from enforcing or attempting to enforce the void provisions against Ms. Hull or any other person residing or working in California, any person seeking employment in California, any employer headquartered or incorporated in California, and any employer doing business in California with respect to that business; requiring Defendants to withdraw, in writing, their statements to Abbott regarding restrictions on Ms. Hull's work; enjoining Defendants from denying or withdrawing Ms. Hull's, or any other former employee's, UserWeb credentials,

conference access, or certification maintenance on the basis of former employment or any "waiting period" or "cooling off" period; enjoining Defendants from maintaining, invoking, or applying customer-contract no-hire, no-poach, or "cooling off" provisions as to any such person or employer; requiring Defendants to provide the written notices mandated by section 16600.1, subdivision (b); and requiring Defendants to give written notice of the Court's injunction to their customers, consultants, and partners and to their current and former employees.

103. The injunctive relief sought is required to provide Ms. Hull complete relief. Incidentally, it would prohibit acts that threaten future injury to the market, the State, and the public.

**FOURTH CLAIM FOR RELIEF**

**Declaratory Judgment (28 U.S.C. §§ 2201, 2202)**

**(Against All Defendants)**

104. Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

105. An actual and justiciable controversy exists between Ms. Hull and Defendants within the meaning of 28 U.S.C. § 2201. Ms. Hull contends that the restrictive provisions of the Epic Agreements, the hiring restrictions in Defendants' customer contracts, and Defendants' "cooling off" credential-denial practices are void, unenforceable, and unlawful as to her and everyone subject to them under California law. Defendants, while conceding in writing that the noncompete provisions are void as to Ms. Hull and purporting to waive certain customer-contract restraints as to her alone, continue to maintain every agreement she signed in the form she signed it, continue to apply the hiring restraints in their customer contracts to every other former employee, continue to require the same form agreements of every employee, and dispute that Ms. Hull is entitled to any injunctive relief.

106. Ms. Hull is entitled to a judicial declaration that: (a) Epic's employment restraints — in all their forms — violate California law; (b) Epic's wrap-around restraint policy violates California law; and (c) Epic's enforcement of its restraints, through the denial of UserWeb access and otherwise, violates California law.

**FIFTH CLAIM FOR RELIEF**

**Civil Penalties and Injunctive Relief Under PAGA (Lab. Code § 2698 et seq.)**

**Requiring Agreement to Unlawful Terms (Lab. Code § 432.5)**

**(Against All Defendants)**

107. Ms. Hull incorporates each of the foregoing paragraphs as though fully set forth here.

108. The Private Attorneys General Act, Labor Code section 2698 et seq. ("PAGA"), authorizes an aggrieved employee, after exhausting the administrative prerequisites of Labor Code section 2699.3, to bring a civil action on behalf of the State of California and other current and former employees against whom a violation of the same provision was committed, to recover civil penalties for violations of the Labor Code and to obtain injunctive relief. The following allegations are common to the Fifth through Eighth Claims for Relief.

109. Ms. Hull is an aggrieved employee. Defendants employed her in California from July 2025 until March 2026, within the one year preceding her notice to the LWDA, and she personally suffered each of the violations alleged in the Fifth through Eighth Claims within that period: as a condition of her employment, Defendants required her to sign, on June 19, 2025, and to comply with, the Boost Agreement and Defendants' related policies containing each of the unlawful terms identified below, and Defendants maintained and enforced those terms against her in each pay period through her last day of employment.

110. Ms. Hull has exhausted her administrative remedies. On June 10, 2026, she gave written notice, by online filing with the LWDA and by certified mail to Defendants, of the specific provisions of the Labor Code and other law alleged to have been violated, including the facts and theories supporting each alleged violation, in accordance with Labor Code section 2699.3, subdivisions (a) and (c). More than 65 days have passed. The LWDA has not provided notice of an intent to investigate, and Defendants have not cured the violations. Defendants, which employ more than 100 employees, are not eligible for the pre-filing cure procedure of section 2699.3, subdivision (c)(2). All administrative prerequisites to suit have been satisfied.

111. The aggrieved employees include all current and former employees of Defendants and the Epic Group who, at any time within the applicable limitations period, resided in California or worked in California — whether virtually or in person — and were required to agree to, or comply with, Epic's employment restraints.

112. Labor Code section 432.5 prohibits an employer from requiring an employee or applicant to agree, in writing, to any term or condition that the employer knows to be prohibited by law. Defendants, sophisticated enterprises presumed and shown to know the law, required Ms. Hull and, on information and belief, every aggrieved employee to agree in writing, as a condition of employment, to terms prohibited by law, including:

(a) employment restraints that violate Business and Professions Code sections 16600, 16600.1, and 16600.5;

(b) employment restraints that restrict employees' rights to disclose their wages (Lab. Code, §§ 232, 1197.5, subd. (k)), to disclose information about working conditions (Lab. Code, § 232.5), and to disclose information about suspected or unlawful acts (e.g., Lab. Code, § 1102.5, subd. (a); Gov. Code, § 12964.5), without any carve-out for legally protected disclosures and without the immunity notice required by the Defend Trade Secrets Act, 18 U.S.C. § 1833(b);

(c) the invention and work-product assignment provision of Section 3 of the Employment Agreement, which contains no carve-out under Labor Code section 2870 and no written notice under section 2872 (Lab. Code, §§ 2870–2872);

(d) the Wisconsin choice-of-law and forum provisions of Section 8 of the Employment Agreement and Sections VI.a(2) and XII of the Mutual Arbitration Agreement, imposed as a condition of employment on employees who primarily reside and work in California (Lab. Code, § 925); and

(e) the predispute waiver of the right to bring or participate in any representative proceeding in Section II of the Mutual Arbitration Agreement, which is unenforceable as to PAGA claims as a matter of California public policy (Lab. Code, §§ 2698–2699; Civ. Code, §§ 1668, 3513).

113. As detailed above, Defendants' violations were knowing.

114. Ms. Hull seeks civil penalties on behalf of the State of California, herself, and all other aggrieved employees for each violation in accordance with the Labor Code.

**SIXTH CLAIM FOR RELIEF**

**Civil Penalties and Injunctive Relief Under PAGA (Lab. Code § 2698 et seq.)**

**Restraints on Disclosure of Wages, Working Conditions, and Unlawful Conduct (Lab. Code §§ 232, 232.5, 1102.5, 1197.5)**

**(Against All Defendants)**

115. Ms. Hull incorporates each of the foregoing paragraphs, including paragraphs 108 through 111, as though fully set forth here.

116. Labor Code section 232 provides that no employer may require, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages, require an employee to sign a waiver or other document that purports to deny the employee the right to disclose the amount of his or her wages, or discipline an employee who discloses the amount of his or her wages. Section 1197.5, subdivision (k)(1), provides that an employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, or inquiring about another employee's wages. Section 232.5 provides that no employer may require, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions, require an employee to sign a waiver or other document that purports to deny the employee the right to disclose such information, or discipline an employee who does so. Section 1102.5, subdivision (a), prohibits an employer from making, adopting, or enforcing any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee with authority to investigate, where the employee has reasonable cause to believe the information discloses a violation of law. Together these statutes establish, as a minimum employment standard, an employee anti-gag rule.

117. Epic's employment restraint policy violates each of these provisions. Among other things, it forbids every Epic Group employee, forever, from using or disclosing "financial

information about the Epic Group, its employees" and the "identities and talents of specific Epic Group employees," which is to say their own and their coworkers' pay and positions; Epic's "company records" and any "sensitive information . . . identified by the Epic Group as confidential," which is any working condition Epic cares to name; and the information about Epic's software, customers, and third parties that an employee would need to describe, to a regulator, a supervisor, or a coworker, a suspected violation of law. Section 5 requires the surrender of all materials "regarding" the same categories. Defendants required Ms. Hull and every aggrieved employee to sign these provisions as a condition of employment, and maintained and enforced them in every pay period.

118. Ms. Hull seeks civil penalties on behalf of the State of California, herself, and all other aggrieved employees for each violation of sections 232, 232.5, 1102.5, and 1197.5, per aggrieved employee, per pay period, in the amounts provided by the Labor Code. She also seeks injunctive relief enjoining Defendants from continuing to violate these Labor Code provisions.

**SEVENTH CLAIM FOR RELIEF**

**Civil Penalties and Injunctive Relief Under PAGA (Lab. Code § 2698 et seq.)**

**Unlawful Invention Assignment (Lab. Code §§ 2870–2872)**

**(Against All Defendants)**

119. Ms. Hull incorporates each of the foregoing paragraphs, including paragraphs 108 through 111, as though fully set forth here.

120. Labor Code section 2870 provides that any provision in an employment agreement that requires an employee to assign to the employer any invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information, and that neither relates to the employer's business or actual or demonstrably anticipated research or development nor results from work performed by the employee for the employer, is against the public policy of this State and unenforceable. Section 2871 prohibits an employer from requiring such an assignment as a condition of employment. Section 2872 requires an employer that requires an employee to sign an invention-assignment

provision to provide the employee, at the time the agreement is made, with written notice that the agreement does not apply to an invention that qualifies under section 2870.

121. Epic's employee agreements (Section 3 of the Employment Agreement, "Inventions & Work Product") declare every work of authorship the employee creates while employed, "regardless of whether or not they were created during or outside of normal business hours," to be a work for hire and "the sole and complete property of Boost" if it was generated in conjunction with assigned work, generated using or in the Epic Group's facilities, or created, generated, or copied onto any Epic Group computer, and require the employee to notify Boost (or Epic) of any patentable invention made "in the course of your duties" and to execute the documents necessary to transfer title to Boost or another Epic Group company. Section 3 contains no section 2870 carve-out, and neither the Boost Agreement nor any document Defendants provided with it contains the written notice section 2872 requires. Defendants required Ms. Hull and every aggrieved employee to sign these provisions as a condition of employment, and maintained them in every pay period.

122. Ms. Hull seeks civil penalties on behalf of the State of California, herself, and all other aggrieved employees for each violation of sections 2870 through 2872, per aggrieved employee, per pay period, in the amounts provided by the Labor Code; and injunctive relief under section 2699, subdivisions (e)(1) and (k)(1), requiring Defendants to provide the notice section 2872 requires and barring enforcement of Section 3 beyond the limits of section 2870.

**EIGHTH CLAIM FOR RELIEF**

**Civil Penalties and Injunctive Relief Under PAGA (Lab. Code § 2698 et seq.)**

**Unlawful Waivers of California Law, California Forum, and Representative Rights (Lab. Code §§ 925, 2698 et seq.)**

**(Against All Defendants)**

123. Ms. Hull incorporates each of the foregoing paragraphs, including paragraphs 108 through 111, as though fully set forth here.

124. Labor Code section 925 provides that an employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a

provision that would require the employee to adjudicate outside of California a claim arising in California, or that would deprive the employee of the substantive protection of California law with respect to a controversy arising in California. Section 8 of the Employment Agreement requires that the agreement "be interpreted in accordance with the laws of the State of Wisconsin." The Mutual Arbitration Agreement provides that it "shall be governed under" the Federal Arbitration Act "and the laws of the State of Wisconsin" (§ XII) and requires, "[a]bsent extraordinary circumstances," that any arbitration hearing be conducted on Epic's Verona, Wisconsin campus (§ VI.a(2)). Defendants required Ms. Hull, who primarily resided and worked in California, and, on information and belief, every aggrieved employee who primarily resided and worked in California, to agree to these provisions as a condition of employment, without the individual representation by counsel that would take the provisions outside section 925, and maintained them in every pay period.

125. Section II of the Mutual Arbitration Agreement requires each employee, before any dispute arises, to "waive the right to participate in or receive money or any other relief from any . . . representative proceeding." A predispute, categorical waiver of an employee's right to bring a representative action under PAGA is contrary to public policy and unenforceable. The waiver contravenes Labor Code sections 2698 through 2699 and is void under Civil Code sections 1668 and 3513.

126. Ms. Hull seeks civil penalties on behalf of the State of California, herself, and all other aggrieved employees for each violation of the above-referenced provisions, per aggrieved employee, per pay period, in the amounts provided by the Labor Code. She further seeks injunctive relief under section 2699, subdivisions (e)(1) and (k)(1), barring Defendants from requiring California employees to agree to out-of-state law or forum or to any waiver of representative rights, and from maintaining or enforcing those provisions; and reasonable attorneys' fees and costs under section 2699, subdivision (k)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Hull prays for judgment against Defendants, and each of them, as follows:

1. For the judicial declarations set forth above;
2. For preliminary and permanent injunctions as provided for by law, including under Business and Professions Code section 16600 et seq., PAGA, and Business and Professions Code section 17203;
3. For civil penalties pursuant to Labor Code section 2699;
4. For reasonable attorneys' fees;
5. For costs of suit; and
6. For such other and further relief as the Court deems just and proper.

Dated: October 3, 2026

BAKER DOLINKO & SCHWARTZ, P.C.

By: ______________________________

Chris Baker

Attorneys for Plaintiff Andrea Hull