CHRIS BAKER, State Bar No. 181557
cbaker@bakerlp.com
DEBORAH SCHWARTZ, State Bar No. 208934
dschwartz@bakerlp.com
BAKER DOLINKO & SCHWARTZ, P.C.
220 Montgomery Street, Suite 1094
San Francisco, CA 94104
Telephone: (415) 810-9486

Attorneys for Plaintiff
ANDREA HULL

**REDACTED** VERSION OF DOCUMENT SOUGHT TO BE SEALED (CIVIL L.R. 79.5)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREA HULL, an individual,

Plaintiff,

v.

EPIC SYSTEMS CORPORATION, a Wisconsin corporation; BOOST, INC., a Wisconsin corporation,

Defendants.

Case No. 4:26-cv-07702-AMO

**PLAINTIFF ANDREA HULL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Date: Thursday, January 7, 2027
Time: 2:00 p.m.
Courtroom: 5, 2nd Floor, 1301 Clay Street, Oakland
Judge: Hon. Araceli Martínez-Olguín

Action Filed: July 24, 2026
Trial Date: None set

## TABLE OF CONTENTS

**INTRODUCTION** .... 1
**STATEMENT OF FACTS** .... 3
I. Epic Systems .... 3
A. Epic's Market .... 3
B. How Epic's Solutions Work .... 4
C. Epic's Workforce .... 4
D. The Market for Epic Professionals .... 5
II. Epic's Employment Restraints .... 5
A. Epic's Employee-Side Restraints .... 5
A.1. Epic's Time-Bound Restraints .... 6
A.2. Epic's Forever Restraints .... 7
B. Epic's Employer-Side Restraints .... 7
III. Hull's Epic Employment .... 8
A. Ms. Hull's Career at Epic .... 8
B. Epic's California Flim-Flam .... 9
C. Hull Faces the Force of the Epic Flim Flam .... 9
D. Ms. Hull's Departure from Epic .... 10
IV. Hull's Abbott Employment .... 10
V. [redacted] Epic's Effort to Moot This Motion .... 12
**ARGUMENT** .... 14
I. Legal Authority and Background .... 14
A. Business & Professions Code § 16600 et seq. and 17200 et seq. .... 14
B. Labor Code § 2698 (PAGA) .... 14
C. Mootness .... 15
II. Plaintiff Is Entitled to a Preliminary Injunction .... 15
A. Likelihood of Success on the Merits .... 16
1. Epic's Employment Restraints Are Illegal .... 16
2. Epic's Enforcement Mechanisms Are Illegal Under Section 16600 .... 17
B. Irreparable Harm .... 18
C. The Balance of Equities and the Public Interest .... 21
D. The Scope of Relief .... 21
E. Judicial Notice and Bond .... 23
**CONCLUSION** .... 23

**APPENDIX A** .............................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) .......... 3, 15
*Alberto v. Cambrian Homecare*, 91 Cal. App. 5th 482 (2023) .......... 17
*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923 (2018) .......... 14, 16
*Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881 (1998) .......... 14, 21
*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) .......... 19
*Barker v. Insight Global, LLC*, No. 16-cv-07186-BLF, 2019 WL 176260 (N.D. Cal. Jan. 11, 2019) .......... 16
*Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117 (9th Cir. 2014) .......... 14
*Beverly Glen Music, Inc. v. Warner Commc'ns, Inc.*, 178 Cal. App. 3d 1142 (1986) .......... 18
*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) .......... 21
*Brown v. TGS Mgmt. Co.*, 57 Cal. App. 5th 303 (2020) .......... 17
*Califano v. Yamasaki*, 442 U.S. 682 (1979) .......... 21
*Conversion Logic, Inc. v. Measured, Inc.*, No. 2:19-cv-05546-ODW, 2019 WL 6828283 (C.D. Cal. Dec. 13, 2019) .......... 16, 19
*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .......... 23
*Doe v. Google, Inc.*, 54 Cal. App. 5th 948 (2020) .......... 15, 17
*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) .......... 20, 22
*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008) .......... 16, 21
*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .......... 14, 21
*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025), cert. granted in part, No. 25-1311 (U.S. June 30, 2026) .......... 21
*FBI v. Fikre*, 601 U.S. 234 (2024) .......... 15
*Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112 (9th Cir. 2008) .......... 21
*Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688 (H.L.) .......... 19
*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) .......... 23
*Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73 (2020) .......... 15, 17
*Kolani v. Gluska*, 64 Cal. App. 4th 402 (1998) .......... 22
*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) .......... 14
*Oman v. Delta Air Lines, Inc.*, 9 Cal. 5th 762 (2020) .......... 17
*Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304 (2016) .......... 14, 15
*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011) .......... 17
*VL Sys., Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708 (2007) .......... 16
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......... 15

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1985) ........ 20

**Statutes**

Cal. Bus. & Prof. Code § 16600 ........ 1, 14, 15, 16, 17, 22
Cal. Bus. & Prof. Code § 16600.1 ........ 14, 16, 17, 21
Cal. Bus. & Prof. Code § 16600.5 ........ 1, 14, 16, 18, 21
Cal. Bus. & Prof. Code § 16601 ........ 19
Cal. Bus. & Prof. Code § 17200 et seq. ........ 14
Cal. Bus. & Prof. Code § 17203 ........ 14
Cal. Lab. Code § 232........ 15, 17
Cal. Lab. Code § 232.5........ 15, 17
Cal. Lab. Code § 432.5........ 15, 17, 21
Cal. Lab. Code § 1197.5........ 15, 17
Cal. Lab. Code § 2698 et seq. (PAGA)........ 14, 15
Cal. Lab. Code § 2699........ 15, 17
2023 Cal. Stat. ch. 157, § 1 (S.B. 699)........ 21

**Rules and Orders**

Civil Standing Order for Cases Before Judge Martínez-Olguín § H.3 ........ 23

## INTRODUCTION

Employment restraints come in many forms. A noncompete covenant restrains where a person can work and what they can do. A non-solicitation covenant restrains with whom a person can work or do business. A no use or disclosure covenant restrains how a person works and what they can say about it. All employment restraints – even partial ones – violate California law, no matter where or when the restraints are signed and no matter the instrument in which the restraints are found. Cal. Bus. & Prof. Code §§ 16600(a)–(c), 16600.5(a)–(b). An employment restraint between two employers ("an employer-side restraint") is just as illegal as an employment restraint between an employer and employee ("an employee-side restraint"). § 16600(c). Since January 1, 2024, an employer that so much as attempts to enforce an employment restraint "commits a civil violation." § 16600.5(d).

Defendant Epic Systems Corporation and its family of companies (including Defendant Boost, Inc.) is the Google of the Electronic Health Records ("EHR") industry. Hospital systems and healthcare providers purchase and run Epic. Consultant groups install, implement, and maintain Epic. Life science companies (e.g., software companies, pharmaceutical companies, and device makers) access and utilize Epic to reach patients and providers. Like Google, Epic is almost impossible to avoid. If you have ever gone to the doctor, your health records are likely on Epic and must be accessed through Epic's MyChart patient portal. Hull Decl. ¶¶ 13–19, 23–24.

Given its size and scope, an entire labor market has grown around Epic's solutions. And Epic has, unlawfully, written employment restraints into its contracts with both ends of this labor market. Epic's employee-side agreements (with employees) include non-competes, non-solicits and no-use-or-disclosure covenants. So, too, do its employer-side agreements with the customers, consultancies, partners and other businesses that use or access its solutions. The upshot of Epic's two-prong approach is that Epic's 14,000-plus employees have almost no market in which to sell their talents, knowledge, experience, skills and labor. And the health systems, consultancies, software companies, pharmaceutical companies and device makers that want to hire an experienced Epic professional to work – on their behalf – with Epic's solutions cannot do so.

Andrea Hull is one of many thousands adversely affected by Epic's employment restraints. She spent about 12 years – the first half (or maybe a third) of her career working for Epic. When she looked to leave Epic, there were bountiful job opportunities for persons with Epic experience, but almost none for her. As Epic gleefully tells its workforce: "there are waiting periods before working for listed competitors, consultants and any Epic customers," and "companies and consultants likely have agreements with Epic in regards to hiring as well."

Despite the limited opportunities, Ms. Hull eventually found a job with Abbott, a medical-device maker and, through Aura, a small Epic customer. Hull Decl. ¶ 35. But within weeks of beginning work at Abbott, Epic enforced its employment restraints against Hull and Abbott by denying Hull access to its UserWeb interface. It also told Abbott that former Epic employees "should not be working on Epic direct, related work for 12 months," and reminded Hull in writing that Epic's customer contracts "often include provisions related to hiring, which would still apply." Hull Decl. ¶¶ 40–44. Abbott pulled Hull from customer trips, conferences, and trainings, and reassigned her away from the Epic work she was hired to perform. Hull Decl. ¶¶ 43–48, 53. [redacted]

Every person or business that participates in the California market for EHR goods, services, or talent is harmed by Epic employment restraints.

Ms. Hull asks the Court to preliminary enjoin Epic, on behalf of herself, the State, and other aggrieved employees, from attempting to enforce or enforcing, directly or indirectly, whether through self-help or otherwise, any employment restraint against: (1) Plaintiff; (2) any person residing, working, or seeking employment – whether on a virtual or in-person basis – in California; (3) Any employer headquartered or incorporated in California; and (4) any foreign employer doing business in California, with respect to such business.

Epic's answer to its brazenly illegal conduct is that the case is moot. As this motion was being finalized, its counsel wrote that Epic will approve a UserWeb account for Ms. Hull "in the scope of her employment with . . . Abbott," has told Abbott that the license agreement's hiring

restraints are "waived" as to her, and repeats that her noncompete is void "while she 'lives' in California." Baker Decl. Ex. 1. On October 1, 2026, its human resources department emailed her that Epic "waive[s]" the no-hire and waiting-period provisions in its contracts with its California customers, as to her, and that she "may share a copy of this email" with any such customer. Hull Decl. ¶ 66, Ex. 14. As if requiring the wronged party to present an emailed permission slip with her employment application is going to cause a potential employer's recruiters and hiring managers to breach their own employer's employment restraints.

This is all too little, and it comes too late. A defendant claiming its own change of heart moots a case bears the "formidable burden" of showing that the conduct cannot reasonably recur, *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013), and a letter from counsel and an email from HR — revocable, unenforceable, ambiguous, burden-shifting, and confined to one employee — do not carry it. They leave untouched the restraints at every consultancy and partner, at every customer outside California, and in every colleague's contract. And Epic cannot moot a representative claim by claiming to accommodate the representative.

Each and every preliminary injunction factor favors Plaintiff's requested relief. (1) Employment restraints are illegal under California law; (2) The harm caused by the restraints is irreparable under binding precedent and includes the loss of goodwill, professional opportunity, work, and standing that no later judgment restores; and (3) The equities are one-sided. Epic has no lawful interest in enforcing its illegal restraints. The public interest, by contrast, is self-evident and carved deeply into the law.

The right to preliminary relief in this matter is clear. Ms. Hull asks that the Court grant her motion in its entirety.

## STATEMENT OF FACTS

### I. Epic Systems

#### A. <u>Epic's Market</u>

Epic Systems Corporation is a privately held Wisconsin company that licenses electronic health record and revenue-cycle software to hospitals, health systems, academic medical centers, payers, and life-science companies. Hull Decl. ¶ 7. Measured by patient volume, it is the largest

EHR vendor in the world. Hull Decl. ¶ 7; Baker Decl. Ex. 3. Epic's California customers include the University of California's five academic medical centers, the public health systems of five counties, Kaiser Permanente, Sutter Health, Stanford Health Care, and, presumably soon, the Los Angeles County Department of Health Services. Hull Decl. ¶ 9; Baker Decl. Ex. 6.

Epic uses the network effect of its dominant market position as a selling point. "Care Everywhere," Epic's record-exchange network, lets a clinician at one Epic customer retrieve a patient's record from another, so each health system's Epic installation is worth more as more health systems run Epic. Hull Decl. ¶ 8. "Aura," Epic's platform for laboratories, diagnostics, and device makers, is the route by which a company whose product must deliver data into a patient's chart – Abbott's continuous glucose monitors, for example – reaches the patients of Epic's customers. Hull Decl. ¶¶ 8, 14, 36. Finally, there is "MyChart," Epic's patient-facing portal.

B. How Epic's Solutions Work

Epic's software is not an application a hospital simply installs and runs. It is more of a framework. Each customer builds, on that framework, thousands of its own processes and records and connects the result to every other system it operates. Hull Decl. ¶¶ 13–15. That configuration work is called the "build," no two builds are alike, and the build does not end when the solution goes live; an Epic installation is a large, multi-year program of work. Hull Decl. ¶¶ 15–16.

C. Epic's Workforce

Epic employs roughly 14,000 people. About 8,000 of these persons are implementation or technical staff. These employees (as opposed to developers or back-office staff) serve the customer where the customer is. Hull Decl. ¶ 10. Every Epic customer is assigned Epic technical services staff – more than one hundred of them for a large California health system. Hull Decl. ¶¶ 10–11. Those employees travel to the customer's California sites at least monthly and support the customer virtually the rest of the time, wherever they happen to live. Hull Decl. ¶¶ 10–11. Ms. Hull herself supported two California customers – City of Hope and UC Davis Health – both on site and remotely while residing outside of California. Hull Decl. ¶ 6.

Boost, Inc. is Epic's customer-consulting division. A Boost consultant is placed with an Epic customer to do certain customer-specific work – the build, testing, training, and program

management that the health system would otherwise do with its own staff or with outside consultants. Hull Decl. ¶ 4. Its consultants transfer in from Epic, work remotely from anywhere in the continental United States, travel at least a quarter of the time, and answer to Epic's executives and Epic's human resources department. Hull Decl. ¶ 4, Ex. 3.

D. The Market for Epic Professionals

Unsurprisingly, an entire class of occupations has grown around the Epic framework. There are the analysts, trainers, project managers, and consultants who build, install, and maintain Epic for health systems; the consulting firms that staff those projects; and the device and life-science companies whose products connect to Epic. Hull Decl. ¶¶ 13, 23–24. Experience with Epic's solutions is a hiring requirement across all three groups. California health systems, consultancies, and device makers regularly post job positions requiring Epic experience and/or an Epic certification, at every level from build analyst to program director. Hull Decl. ¶¶ 23–25, Ex. 1.

Working with Epic solutions requires access to Epic's resources. This means an Epic UserWeb account. "UserWeb" is where Epic publishes its technical and implementation documentation, hosts its customer forums, posts its announcements to customers, houses its training materials, and registers attendance at its two annual customer conferences. It is also the means by which Abbott employees access the Aura demo. Hull Decl. ¶¶ 17, 19–20. A person who works with Epic – for a customer, a consultancy, or a company whose product connects to Epic – needs a UserWeb account to succeed in their work. Hull Decl. ¶ 17.

**II. Epic's Employment Restraints**

A. Epic's *Employee-Side* Restraints

Since at least 2014, Epic has required its employees – including Hull – to sign form employment agreements that contain numerous distinct employment restraints. These restraints are quoted verbatim in Appendix A to this Memorandum. Summaries are sufficient for Plaintiff's argument.

A.1. Epic's Time-Bound Restraints

Epic requires its employees – including Hull – to agree to the following employment restraints during their employment and for one to two years after (depending on the agreement).

1. The *Competitor* Non-Compete. Epic prohibits its employees from any employment or engagement with a "Direct Competitor" of Epic. According to Epic, its Direct Competitors include California-based companies like Apple, Google, and Salesforce; Veeva Systems, which Epic added to the list in the annex update it posted to Ms. Hull's account when she left; Meta and LeanTaaS, which Epic listed until that update; and companies that were headquartered in California when Epic first listed them, including McKesson and NextGen Healthcare. Boost Agreement Annex 1; Hull Decl. Exs. 8–10 (annexes), 11.

2. The *Customer* Non-Compete. Epic prohibits its employees from employment or engagement with any current or prospective customer of Epic in a role involving Epic software. As discussed above, Epic's California customers include every significant public and private hospital system in the State. Hull Decl. ¶¶ 6, 9.

3. The *Consultants and Partners* Non-Compete**.** Epic prohibits its employees from any employment or engagement with an Epic Consultant or Partner in work that overlaps with Epic's products or services. According to Epic, its consultants and partners include Accenture, Deloitte, IBM, PwC, and Optum/Change Healthcare, each of which has a substantial California workforce, and California-based companies like Notable (San Mateo), Genesys (Menlo Park), and TalkDesk (San Francisco). The list also reaches every organization that has signed a cooperative agreement with Epic, whether named or not. Boost Agreement Annex 2; Hull Decl. Ex. 11.

4. The *New Business* Non-Compete. Epic prohibits its employees from establishing or aiding in the establishment of any business anywhere that would develop, sell, or market "any product that overlaps with" Epic's. Boost Agreement § 4(b).

5. The *Business No-Solicitation* Covenant. Epic prohibits its employees from contacting Epic's potential or actual customers for the purpose of selling them a competitive product.

6. The *Employee No-Solicitation* Covenant. Epic prohibits its employees, during their employment and for two years after it ends, from "attempt[ing] to persuade or influence any then-existing employee to terminate his or her employment" with Epic (in the 2014 Epic form) or with any Epic Group company (in the 2018 Boost form).

A.2. Epic's Forever Restraints

Epic's no-use-or-disclosure restraints apply during each employee's Epic employment and forever after, draw no distinction as to when or how the employee obtained the information or whether it is confidential, and sit within a single, lengthy confidentiality provision in the form agreement. The forever restraints challenged in this motion are:

7. *The Software No Use or Disclosure Restraint.* Epic prohibits employees from ever using or disclosing – except to benefit Epic – what it describes as "proprietary information." This prohibition applies to a wide swath of information that is: (a) not confidential and (b) essential to interfacing with any Epic solution, whether as a customer, patient, consultant or otherwise. The prohibition applies, for example, to user interfaces, screens, functionality, software structures, and programming techniques.

8. The *Customer* No Use or Disclosure Restraint. Epic prohibits employees from ever using or disclosing (whether confidential or not, and regardless of the source) "customer and prospect lists and identities" and "business data of any customer." In other words, the restraint forbids a former employee from telling a prospective employer which health systems she has worked with and what she did there. Hull Decl. ¶ 6.

9. The *Coworker* No Use or Disclosure Restraint. Epic prohibits employees from ever using or disclosing "financial information about the Epic Group, its employees," or the "identities and talents of specific Epic Group employees." In other words, an employee may not use or disclose the names of their co-workers, their pay, their positions, or their skill sets.

10. The *Everything Else* No Use or Disclosure Restraint. Epic prohibits employees from ever using or disclosing its "company records" (of whatever type), as well as any "sensitive information relating to the business of the Epic Group which has been identified by the Epic Group as confidential."

None of the no use or disclosure restraints is limited to trade secrets. All encompass information about employer working conditions and employee wages.

B. Epic's *Employer-Side* Restraints

Epic does not confine its employment restraints to its employee agreements. It also inserts employment restraints into its agreements with other employers: I.e., Epic's customers, partners, consultants, and any other business that must use or access its solutions. Epic says as much in its employee agreements – its "customers, cooperative partners and primary consultants may also contractually agree not to employ you for a certain period of time after your employment with

Epic ends" – and says it again on the way out the door, warning each departing employee that "customers and consultants likely have agreements with Epic in regards to hiring as well." These restraints include:

> 11. The *Customer* No-Hire. Epic's standard license agreements with its customers contain a "Restriction on Offers of Employment." The customer agrees that it will not "solicit, discuss prospective employment with, or hire (directly as employees or indirectly)" any Epic employee who has worked on "the development, implementation, or maintenance of Epic software," during that person's Epic employment and for twelve months after.
>
> 12. The *Consultant and Partner* No-Hire. Epic's customer contracts also reach the customer's consultants. A customer may not give a consultant, outsourcer, staffing firm, trainer, or hosting provider access to Epic's software unless that third party first has "in place" its own agreement with Epic – one that "at a minimum" provides that the third party "will not hire current or recent employees of Epic customers who were involved in an active install for that customer or hire current or recent Epic employees." Every consultancy that wants to work on an Epic installation must therefore promise Epic not to hire Epic's people.
>
> 13. The *Work-Assignment* Restraint. Epic's customer contracts also require the customer to agree Epic "may choose not to work with or provide training for any former Epic employee" whom the customer, or the customer's consultant, hires "less than 12 months after the date of the termination of such former employee's employment with Epic."

## III. Hull's Epic Employment

### A. Ms. Hull's Career at Epic

Ms. Hull joined Epic shortly after graduating from law school: the start of her professional life. She worked there for close to twelve years, serving in a variety of management and administrative roles (including overseas). She managed Epic customer and consulting contracts, led enterprise testing for multi-hospital EHR implementations, co-designed a training program for an implementation serving more than 200,000 users, headed up Epic's international public policy efforts, and became certified in two Epic solutions. While living outside of California, she worked closely – both virtually and on site – with two of Epic's California customers, City of Hope and U.C. Davis.

Like all Epic employees, Epic required Hull to sign form employment agreements containing employment restraints. She signed an Epic agreement in 2014, a Boost agreement in

2018, an international assignment agreement (confirming the terms of her Epic agreement) in 2021, and another Boost agreement in 2025. None of these agreements contain an integration clause, and none says that it replaces the one before it.

B. Epic's California Flim-Flam

In the summer of 2025, Ms. Hull ended her overseas Epic assignment and moved to Concord, California. She signed her second Boost agreement in June 2025 and started work from her California residence in July 2025. Epic, of course, knew Hull was both working and living in California. It acknowledged the move in the memorandum offering her the transfer.

Epic also knew – and how could it not – that California law prohibits employment restraints. Among other things, on or around September 16 of 2025, Epic informed Ms. Hull and others that it was removing the competitor noncompete from its standard employee stock agreements for California residents. On September 30, 2025, Epic's human resources department sent an email – blind-copied, according to Epic, to "new California residents/soon-to-be residents" – announcing that "[b]ecause of California Assembly Bill 1076," the provision in Epic's employment agreement that "restricts you from working for certain companies for a defined period of time," and the "similar provision" in its employee stock agreements, "are void and will not apply to you as long as you live in California." But, according to Epic, all of the other restraints "continue to apply."

Epic's concession that certain *employee*-side restraints are void is not much use when Epic continues to require and enforce its *employer*-side restraints. An Epic employee, faced with a labor market devoid of suitable suitors, has no one to court or to be courted by. This is Epic's California flim-flam. It tightly grips with one hand what it purports to release with the other. And, as detailed next, "purports" is the operative verb.

C. Hull Faces the Force of the Epic Flim Flam

During the winter of 2025-26, Ms. Hull searched for a job outside of Epic. Hull Decl. ¶ 33. Because of Epic's employment restraints, career opportunities with Epic's customers or consultants were, as a practical matter, closed to her for a year after she left. Hull Decl. ¶ 33. Accordingly, she did not pursue the Epic IT manager and director positions then open at Stanford

Health Care, UCSF Health, John Muir Health, the San Francisco Department of Public Health, and Adventist Health, or at Accenture, Deloitte, Optum, and KPMG. Hull Decl. ¶ 34. With Epic's healthcare customers and consultants struck from her dance card, the market for her skills was very small indeed. Hull Decl. ¶ 35. She pursued, and eventually accepted, employment with Abbott because it is a medical-device maker rather than a health system or consultant – an Epic customer, but a small one, through Aura. Its Epic integrations were limited, and she believed it was large enough to resist Epic's unlawful enforcement efforts. Hull Decl. ¶ 35.

She was wrong.

D. Ms. Hull's Departure from Epic

Ms. Hull announced her resignation from Epic on March 9, 2026 and Epic terminated her employment effective March 9 or 10. Hull Decl. ¶ 2. Though Epic knew she lived (and lives) in California, it nevertheless posted to her HR account updated lists of verboten employers. Hull Decl. ¶¶ 26, 57, Ex. 11. The updated lists identified by name seven California companies: Apple, Google, Salesforce, Veeva Systems, Notable, Genesys, and TalkDesk. Epic also emailed her a set of departure documents. This email directed Ms. Hull to "[c]omplete this Form to acknowledge your understanding of the information." Hull Decl. ¶ 39, Ex. 12. The Departure FAQ told her to read her employment agreements "thoroughly" for their "key information." It repeated that there were "waiting period before working for listed competitors, consultants, and any Epic customers," told her she could not recruit Epic employees and must return, and never use, Epic information, and advised her that "customers and consultants likely have agreements with Epic in regards to hiring as well." Hull Decl. Ex. 12.

Ms. Hull completed and signed the form as directed. Hull Decl. ¶ 39. Epic thus obtained from Ms. Hull, on the effective date of her termination, a written acknowledgment that every restraint in every agreement she had signed with Epic remained in full force and effect.

**IV. Hull's Abbott Employment**

Abbott Diabetes Care hired Ms. Hull to work as an EHR Implementation Manager in Alameda, California. Hull Decl. ¶ 36. Her job was to develop the strategy for scaling the integration of Abbott's continuous glucose monitors with Epic's platforms, including Aura,

across more than 400 health systems; to work with those health systems to reduce integration friction; and to represent Abbott at industry conferences. Hull Decl. ¶ 36. Abbott had struggled for months to find someone with the Epic skill and experience the role required. Hull Decl. ¶ 36.

Ms. Hull started with Abbott on March 23, 2026. In her first week Abbott added her to customer trips and industry conferences, and within weeks her manager outlined routes for advancement. Hull Decl. ¶ 37. In late March 2026, Ms. Hull applied for an Epic UserWeb account in her own name for her Abbott role. Epic said no: "Since you departed Epic on 3/9/2026, you will need to wait 12 months before gaining access to the UserWeb." Hull Decl. ¶ 40, Ex. 4. Abbott asked Epic to make an exception. Epic said no. Hull Decl. ¶ 41.

Epic also told Abbott that Hull could not perform the work Abbott had hired her to do. On April 7, 2026, an Abbott program manager emailed Ms. Hull: "We were informed that you cannot have User Web Access for 12 months and former Epic employees should not be working on Epic direct, related work for 12 months." Hull Decl. ¶ 41, Ex. 5. Jake Gamble of Epic told Ms. Hull's Abbott director, Rob Shaw, in substance: "you should have told me when you saw her resume . . . I could have told you about all these considerations." Hull Decl. ¶ 42.

On April 28, 2026, Ms. Hull emailed Epic's human resources department and asked for "the final Epic Employment Agreement that is applicable to me *as a California resident*," noting that California law "impact[s] pieces of the general Boost Employment Agreement." Hull Decl. ¶ 44, Ex. 6. Jennifer Peterson of Epic HR replied the same day that the agreement "hasn't been modified." She added: "One thing to keep in mind is that our customer contracts often include provisions related to hiring, which would still apply to those organizations." Hull Decl. ¶ 44, Ex. 6.

Abbott complied with Epic's unlawful enforcement of its unlawful employment restraints. In Ms. Hull's second week, Abbott pulled her from a planned trip to a health system; a planned engagement with a major health system in another state proceeded without her; the accounts she was hired to support were handed to a colleague; and she was pulled from attending or exhibiting at Epic's XGM conference and told to avoid talking to Epic health systems while staffing Abbott's booth at a conference in Chicago. Hull Decl. ¶ 43. In June Abbott sent a peer in her

place to a joint Abbott–Epic workshop on implementation lessons learned – the subject of her role. Hull Decl. ¶ 46. At the American Diabetes Association's Scientific Sessions that same week, her manager instructed her not to have any conversations with any health system that uses Epic; in the one customer conversation she was permitted, a colleague conducted it while she took notes. Hull Decl. ¶ 47. On July 22, 2026, she was told to sit out a six-hour Epic certification session that Epic led for Abbott's health-systems sales staff at her own team's retreat. Hull Decl. ¶ 48.

Abbott, whose EHR-connected products depend on its relationship with Epic, would not take a stand against Epic on her behalf. Hull Decl. ¶ 38. She was reassigned to work outside the Epic-integration function for which she was hired. She remained excluded from Epic-related calls, meetings, and status reports. She was not permitted to support a single Epic customer; and the advancement her manager outlined in her first weeks has been delayed or lost. Hull Decl. ¶ 53.

## V. [redacted] Epic's Effort to Moot This Motion

[redacted]

Ms. Hull filed this action on July 24, 2026. Hull Decl. ¶ 49. One week later, on July 31, Epic emailed Hull, stating its competitor non-competes "are (and remain) void and non-applicable while you live or lived in California," and "[t]his was always Epic's intention." All of the other employment restraints against Hull, however, "continue to apply." Hull Decl. ¶ 51, Ex. 7.

While conceding certain of its restraints against Hull were void, Epic continued to enforce its restraints against Abbott. It continued to deny Hull a UserWeb account. Its purported change of heart changed nothing on the ground. Epic's employer-side restraints had successfully hollowed both her role at Abbott and the market for her services.

About two months later, as this motion was being finalized, Epic's counsel advised Hull's counsel, as to Abbott only, that Epic no longer objects to a UserWeb account for Ms. Hull "in the scope of her employment with . . . Abbott," that the "no-hire or cooling off provisions or restraints on the types of duties" in the Epic–Abbott license are "waived" as to Hull, and that her noncompete is void while she lives in California. On these bases, Epic asserted that Plaintiff's request for injunctive relief was "moot." Baker Decl. ¶ 2, Ex. 1.

On September 18, 2026, Ms. Hull's manager told her that Epic had "waived" the hiring provisions in its contract with Abbott as to her and would permit her UserWeb access, and she applied for an account the same day. Hull Decl. ¶ 55. Epic approved it on September 28, 2026 – ten days later, six months after it first said no, and two weeks after its counsel's letter. Hull Decl. ¶ 55.

On October 1, 2026, the day before the parties' Rule 26 conference, Epic's human resources department emailed Ms. Hull yet again, stating that Epic "hereby waive[s] any restriction on you becoming employed by any Epic customer in California, by virtue of any no-hire, waiting period, or other provisions in any license agreement between Epic and such customers." If she seeks such a job, "you may share a copy of this email with them." If a potential employer has questions, the email directs Ms. Hull to direct the potential employer to the person who sent her the email. Hull Decl. ¶ 66, Ex. 14. The email says nothing about Epic's consultants and partners, customers outside California, or engagement rather than employment.

Hull's one-year non-compete expires in March 2027. The no-use-or-disclosure covenants – which Epic maintains continue to apply – never expire. She remains, according to Epic, forever prohibited from using or disclosing information about the identities of the customers with whom she worked, the identities, wages, skills, and talents of her former coworkers, "company records," and anything else Epic deems "sensitive."

The distorted market in which Hull works also never expires. Every former colleague is bound by the same confidentiality covenant forever and by the same one-year bar for a year after his or her own departure; Epic's current employees are bound for as long as they stay; and the no-hire covenants Epic requires of its consultants and partners run from no certain date at all. Hull

Decl. ¶ 59. The twelve-month UserWeb waiting period appears in nothing Hull signed. In March 2027, Epic's customers will still apply Epic's rules, as Abbott did, denying Hull a competitive market and the opportunity to work and/or compete with her former coworkers.

## ARGUMENT

### I. Legal Authority and Background

#### A. Business & Professions Code § 16600 et seq. and 17200 et seq.

The use of employment restraints, or their attempted or actual enforcement, is illegal unfair competition under California law. Cal. Bus. & Prof. Code §§ 16600, 16600.1, 16600.5; *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 907–08 (1998). (Unless otherwise noted, statutory references are to the Business and Professions Code.) Section 16600.5(e)(1) gives an employee "a private action to enforce this chapter for injunctive relief." California's Unfair Competition Law (UCL) authorizes an injunction against "[a]ny person who engages, has engaged, or proposes to engage in unfair competition." § 17203. Public injunctive relief under section 17203 – relief whose "primary purpose and effect" is to prohibit unlawful acts that threaten the general public – is available to an individual plaintiff without class treatment. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955, 959–61 (2017). California and federal courts enjoin the enforcement of an employment restraint against everyone subject to it. E.g., *Robinson v. U-Haul Co. of Cal.*, 4 Cal. App. 5th 304, 316–21 (2016) (affirming injunction, entered in an individual action, barring U-Haul's enforcement of a noncompete against all current and former dealers); *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 951–52 (2018) (affirming injunction barring employer from attempting to enforce a void employee non-solicitation covenant against the defendants "and others similarly situated"); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002–03 (9th Cir. 2023).

#### B. Labor Code § 2698 (PAGA)

A PAGA action "is at heart a civil enforcement action filed on behalf of and for the benefit of the state," *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1124 (9th Cir. 2014), brought by the employee "as the proxy or agent of the state's labor law enforcement agencies," *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 81 (2020). Since 2024 an aggrieved employee "may be

awarded injunctive relief in a civil action filed on behalf of the employee and other current or former employees against whom a violation of the same provision was committed." Cal. Lab. Code § 2699(k)(1); see *id.* § 2699(e)(1). As relevant here, Labor Code section 432.5 forbids an employer to require an employee to agree in writing to any term the employer knows to be prohibited by law. Sections 232, 232.5, and 1197.5(k) prohibit employer restraints on the disclosure of information about an employer's working conditions or wages. These statutes, along with section 16600, are part of California's employee anti-gag rule. *Doe v. Google, Inc.*, 54 Cal. App. 5th 948, 961 (2020).

C. Mootness

A defendant that stops after it is sued does not moot the case. It bears "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013), and an assurance limited to "currently available information" "falls short of demonstrating that it cannot reasonably be expected to do again in the future what it is alleged to have done in the past," *FBI v. Fikre*, 601 U.S. 234, 242 (2024). U-Haul's "exception for [Robinson] alone" and its counsel's declaration that it had told its dealers it would not enforce did not defeat the injunction, because a company that "has not taken action to bind itself legally to a violation-free future" gives the court "reason to doubt the bona fides of its newly established law-abiding policy." *Robinson*, 4 Cal. App. 5th at 314–16. Nor may a defendant moot a representative claim by accommodating the representative. PAGA standing turns on "the fact of the violation," not its later remedy, *Kim*, 9 Cal. 5th at 84, because every PAGA claim is "a dispute between an employer and the state," *id.* at 81.

**II. Plaintiff Is Entitled to a Preliminary Injunction**

A preliminary injunction issues when the movant is likely to succeed on the merits, is likely to suffer irreparable harm without it, the balance of equities tips in her favor, and the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A. Likelihood of Success on the Merits

1. Epic's Employment Restraints Are Illegal

All of Epic's time-bound employment restraints are illegal: The non-competes, non-solicits, no hires, and cooling-off covenants, all of them, in both its employee-side and employer-side agreements are illegal on their face. This is black letter law. "It is unlawful to include a noncompete clause in an employment contract." § 16600.1(a). See also § 16600(a) (declaring void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind"); § 16600(c) (explaining § 16600 extends to employer-side restraints (where the employee is not a party to the contract)); *VL Sys., Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708, 713–18 (2007) (no-hire clause in consulting contract void as applied to non-signatory employee); *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945–50 (2008) (customer non-solicit void); *AMN*, 28 Cal. App. 5th at 935–39 (employee non-solicit void); *Barker v. Insight Global, LLC*, No. 16-cv-07186-BLF, 2019 WL 176260, at *2–3 (N.D. Cal. Jan. 11, 2019); *Conversion Logic, Inc. v. Measured, Inc.*, No. 2:19-cv-05546-ODW, 2019 WL 6828283, at *4 (C.D. Cal. Dec. 13, 2019) (non-solicit restrains a person "by restricting who may work alongside them"). It makes no difference where or when the restraint was signed or where the employment was maintained. § 16600.5(a)–(b). A no-hire in a California hospital's Epic license is a California contract restraining California hiring, void as to "anyone" it restrains. § 16600(a), (c).

Epic's forever restraints are illegal as well. Two of them are non-solicits in disguise. The Coworker No Use or Disclosure Restraint (restraint 9) forbids a former employee, forever, to use or disclose the "identities and talents of specific Epic Group employees." An employee who may not disclose the identities or talents of her co-workers cannot recruit them, refer them, or help a new employer hire them. The Customer No Use or Disclosure Restraint (restraint 8) forbids her, forever, to use or disclose "customer and prospect lists and identities" and the "business data of any customer" – that is, to tell a prospective employer which health systems she has worked with and what she did there. Hull Decl. ¶¶ 6, 60–61. Confidentiality rules that keep employees "from disclosing who else works at [the company] and under what circumstances such that they might be receptive to an offer from a rival employer," or that otherwise "inhibit an employee seeking

new employment elsewhere," are restraints of trade under section 16600. *Doe v. Google*, 54 Cal. App. 5th at 953, 959; see *Brown v. TGS Mgmt. Co.*, 57 Cal. App. 5th 303, 316–19 (2020) (confidentiality provisions that "operate as a de facto noncompete provision" are void ab initio).

The no-use-or-disclosure covenants also violate the Labor Code. Sections 232, 232.5, and 1197.5(k) forbid an employer to require an employee to keep her wages or "information about the employer's working conditions" confidential, or to sign a document that "purports to deny" that right. Cal. Lab. Code §§ 232(a)–(b), 232.5(a)–(b), 1197.5(k)(1). Restraints 9 and 10 forbid disclosure of "financial information about the Epic Group, its employees" and anything Epic "identifie[s]" as confidential, with no carve-out for wages or working conditions. A broad confidentiality agreement without that carve-out is "facially illegal." *Alberto v. Cambrian Homecare*, 91 Cal. App. 5th 482, 493–94 (2023).

Finally, there is Labor Code § 432.5. It forbids an employer to require an employee to agree in writing to any term "known by such employer . . . to be prohibited by law." Cal. Lab. Code § 432.5. The statute has called non-competes unlawful (not just void) since January 1, 2024, § 16600.1. And the Labor Code restrictions on employer gag rules have been established since at least 2020. *E.g., Doe v. Google, supra.* Epic is presumed to know – and knew – all of this. Still, it required Ms. Hull to sign the Boost Agreement, restraints and all, in June 2025, knowing she was moving to California; told its California employees that September that the noncompete was void; and never changed the form. SOF §§ III.B, IV; Hull Decl. ¶ 51, Ex. 7. The aggrieved employees on whose behalf the State's section 432.5 claim is brought are, at a minimum, every Epic and Boost employee who resides in California or whose principal place of work is California. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1197–98 (2011); *Oman v. Delta Air Lines, Inc.*, 9 Cal. 5th 762, 773 (2020). Ms. Hull personally suffered the violation, Cal. Lab. Code § 2699(c)(1), and so may seek relief on their behalf. *Kim*, 9 Cal. 5th at 84.

2. <u>Epic's Enforcement Mechanisms Are Illegal Under Section 16600</u>

Epic has enforced, and continues to enforce, its employment restraints against Ms. Hull in at least nine ways: (1) it posted an updated and expanded list of forbidden employers to her account when she left; (2) it sent her a Departure FAQ telling her to read her employment

agreements (containing the illegal restraints) carefully and reminding her of the "waiting period before working for listed competitors, consultants, and any Epic customers"; (3) it took her signed acknowledgment of "the waiting periods specified in my employment, stock, or other agreements"; (4) it confirmed in writing that her illegal agreement "hasn't been modified" and that the hiring provisions in its customer contracts "would still apply"; (5) it denied her a UserWeb account; (6) it told Abbott that "former Epic employees should not be working on Epic direct, related work for 12 months"; (7) it enforced the no-hire, cooling-off, and duties restraints in its Abbott license for five months, until on September 14, 2026 it announced that they were "waived" – for her, at Abbott, and nowhere else; (8) after Abbott's business persons talked to Abbott legal and requested more information from Hull, it took Epic an additional 10 days to finally approve her UserWeb account; and (9) on October 1, 2026, it told Ms. Hull – but presumably no one else – like the customers subject to the restraints – that it had "waive[d]" only its California customers' no-hire and waiting-period provisions as to her, and told her to carry the email with her. SOF §§ III.D, IV, V.

Each is an attempt to enforce a void contract, and each is a civil violation. § 16600.5(b), (d). An employer may not do through her new employer or through a credential what it may not do directly; either way "the intent is the same: to deprive [her] of her livelihood." *Beverly Glen Music, Inc. v. Warner Commc'ns, Inc.*, 178 Cal. App. 3d 1142, 1144–45 (1986). As for the October 1 email: Epic retracted nothing; it "waived." You can only waive what you claim to hold. The email is Epic saying that it decides who may hire Ms. Hull, and that it has decided, for now, to let customers in California (but no one else) hire her. Even this limited subset of customers will have to be convinced that the hiring is actually permitted and that Epic will not interfere with the employment, as it repeatedly did with Abbott.

B. Irreparable Harm

Ms. Hull also faces irreparable harm, not just from the employment restraints in her own contract with Epic, but also because of the employment restraints in everyone else's contracts with Epic.

The "loss of opportunity to pursue [one's] chosen profession[s]" is irreparable. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). A worker's "aptitudes, his skill, his dexterity, his manual or mental ability . . . are not his master's property; they are his own property; they are himself." *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 714 (H.L.) (Lord Shaw).

The same is true of work and business relationships. The expectancy of future benefit from all these things, along with the reputation she earned, belong to Hull. They constitute her goodwill, and Epic, through its wrap-around restraints, takes it from her (and from all other Epic employees) without paying for it. California forbids this. § 16601 (permitting a noncompete in exchange for goodwill only upon the sale of a business). A covenant that restricts "who may work alongside" a worker restrains her profession. *Conversion Logic*, 2019 WL 6828283, at *4. Epic's wrap-around restraints do exactly that.

For five months Epic enforced its restraints against Ms. Hull through Abbott and its credentialing process. Today, Hull's career, at Abbott and elsewhere, turns on Epic's on-again, off-again waivers and on others' belief that a waiver has occurred and that Epic will not change its mind. Epic's September 14 letter and October 1 email do not carry Epic's "formidable burden." Part I.C, ante. The letter reaches Abbott. The email reaches employment by Epic customers in California, and that is all it reaches. It says nothing about the consultants and partners that make up half her market, nothing about the out-of-state customers she served from Concord, and nothing about any colleague's covenant. SOF § V.

Nor is Epic's word one a court can rest on. Its position on whether its restraints bind Ms. Hull changes all the time. She was told to sign the Boost agreement, restraints and all, though she was moving to California in June 2025. In September 2025, Epic supposedly announced certain restraints did not apply. When Ms. Hull left Epic in March 2026, she had to acknowledge the restraints did apply, along with the waiting periods in its third-party agreements. Epic then enforced the restraints with Abbott and denied her UserWeb credentials. When Hull reached out to Epic HR in April 2026, Epic confirmed the restraints still applied even though she was a California resident. In July 2026, shortly after she filed suit, Epic sent an email stating that certain

of her restraints were void in certain circumstances, but others would continue to apply. From July through most of September, Epic continued to enforce the restraints against Abbott, only to purportedly "waive" the restraints on September 14 as to Abbott alone, while continuing to deny Hull UserWeb access until September 28. SOF §§ III–V.

And then, on October 1, Epic emailed her that it was "waiving" the restraints in its contracts with its California customers (but no one else's) as to Hull alone, and told her she could use the email as proof. The October email is particularly rich. It does not lift the restraint. It hands Ms. Hull a permission slip and makes her responsible for presenting it. In *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996), fourteen motorcyclists proved that the Highway Patrol's statewide helmet-citation policy was unconstitutional. The court did not confine the injunction to the fourteen, and it did not suggest that they carry a copy of the judgment to show at the roadside in case they were pulled over. It enjoined the policy, statewide, because other agencies "follow the CHP's policy" and it was "unlikely that law enforcement officials . . . would inquire before citation into whether a motorcyclist was among the named plaintiffs." *Id.* at 1501–02. Epic's customers and consultants follow Epic's policy; it is written into their contracts, SOF § II.B, and they apply it at intake, without asking who the applicant is. Hull Decl. ¶¶ 42, 65. ("you should have told me when you saw her resume"). The burden of complying with the law is Epic's, not hers: a plaintiff "need not take any action to identify [herself] to make it easy for the [defendant] to comply." *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1985). And the slip confirms the restraint rather than lifting it. A recruiter who reads it learns that Epic decides who may hire Andrea Hull, and will call Epic to be sure; the email invites exactly that. Abbott did call. Hull Decl. ¶¶ 41, 66. A slightly smaller barrier where the law says there should be none is still a barrier, and it is Epic's to remove, not Ms. Hull's to carry.

This is not a defendant that has made it "absolutely clear" the conduct will not recur. This is a defendant that will take as much as it thinks it can get away with. This is a defendant seeking to keep its unlawful restraints in place.

C. The Balance of Equities and the Public Interest

Epic's side of the scale is empty. It has no lawful interest in enforcing a void restraint. California already forbids it to require, enter into, or attempt to enforce these restraints, §§ 16600.1(a), 16600.5(b)–(c); Cal. Lab. Code § 432.5, and it already requires it to tell every employee bound by a noncompete clause that the clause is void. § 16600.1(b). An order that holds Epic to those duties is "no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Hull's side of the scale is full. Even if the Court credits Epic's "waivers," she has not been granted complete relief. And the public interest is written into the statute. California has a "settled legislative policy in favor of open competition and employee mobility." *Edwards*, 44 Cal. 4th at 946. This policy was restated in 2023, when the Legislature found that out-of-state employers were "attempting to prevent the hiring of former employees" by California employers and that employers "attempt to subvert this longstanding policy by requiring employees to enter void contracts." 2023 Cal. Stat. ch. 157, § 1(a), (d)–(f) (S.B. 699); *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008).

D. The Scope of Relief

The measure of an injunction is complete relief. *Califano*, 442 U.S. at 702. "An injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit – even if it is not a class action – if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987). In *Epic Games*, one developer proved that Apple's anti-steering rule, imposed by contract on every developer, harmed it by "preventing other apps' users from becoming would-be Epic Games Store consumers." The Ninth Circuit affirmed an injunction protecting every developer "because the scope is tied to Epic's injuries" and "an injunction limited to Epic's subsidiaries would fail to address the full harm." 67 F.4th at 1003. Narrowing the order to Epic alone "would not facilitate the competition necessary to grant Epic complete relief." *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1192–93 (9th Cir. 2025), cert. granted in part on other grounds, No. 25-1311 (U.S. June 30, 2026). In *Application Group*, one California

employer obtained a judgment that a Maryland competitor's form noncompete was unenforceable as to all of the competitor's consultants, "without reference to present residence or employment location," to the extent it restrained "employment by a competitor in a business to be performed in California." 61 Cal. App. 4th at 890–91, 905. And *Easyriders* enjoined a statewide policy at the suit of fourteen plaintiffs because the people who applied it would not stop to ask who was exempt. 92 F.3d at 1501–02. When the plaintiff's injury is a restraint on the market she sells into, relief limited to her own contracts is not complete relief, and the benefit to the other participants in that market is the ordinary consequence of restoring it.

Harm to a market is harm to the persons in it, and Ms. Hull is in it. Section 16600 protects a person's freedom to engage in her trade, and subdivision (c) says the contract that restrains her need not be hers. The market for Ms. Hull's trade is the market for Epic professionals. Epic's policy is to write employment restraints into every contract on every side of that market. That is one policy – a wrap-around employment restraint on the market – and Ms. Hull lives inside it. Her own restraints could be waived tomorrow and the market would be the same market. Every employer that would hire her holds an Epic contract that says it may not. Every colleague who would refer her, join her, or tell her what the job pays is bound by the same no-disclosure covenants. Hull Decl. ¶¶ 59–65. Complete relief must be directed at the wrap-around policy, as well as Plaintiff's employment restraints, because "[m]any, perhaps most, employees [and employers] would honor these clauses without consulting counsel or challenging the clause in court." *Kolani v. Gluska*, 64 Cal. App. 4th 402, 407 (1998). That is exactly how Epic's restraints reach Ms. Hull: through the people around her.

There is no way to parse that policy so as to free Ms. Hull and no one else. A colleague's no-disclosure or non-solicit cannot be waived "as to Hull" in any way that frees him to join her at Abbott or elsewhere, because what forbids him is his own covenant as applied to his own employment. A customer's no-hire cannot be waived "as to Hull" in any way the customer's recruiters will act on, because Epic's policy is to the contrary. *Easyriders*, 92 F.3d at 1502. A permission slip is not relief. The only order that gives Ms. Hull complete relief is one that stops

Epic from enforcing its policy of wrap-around restraints to the extent that policy restrains labor-market trade in or with California.

For these reasons, Hull asks that the Court preliminarily enjoin Epic from attempting to enforce or enforcing, directly or indirectly, whether through self-help or otherwise, any employment restraint against: (1) Plaintiff; (2) any person residing, working, or seeking employment – whether on a virtual or in-person basis – in California; (3) Any employer headquartered or incorporated in California; and (4) any foreign employer doing business in California, with respect to such business.

E. Judicial Notice and Bond

Ms. Hull asks the Court to take judicial notice of the existence and terms of the five public Epic customer contracts attached to the Baker Declaration as Exhibits 7 through 11; of the public web pages collected in Exhibit 6; and of Epic's UserWeb Terms of Use and registration page as printed on September 29, 2026 (Exhibit 4). Civil Standing Order § H.3; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). Any bond should be nominal; there is "no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Ms. Hull proposes $1,000.

**CONCLUSION**

Epic's employment restraints are void, Epic is enforcing them, and every week it does so costs Ms. Hull – and the professionals like her – something no judgment restores. The Court should grant the motion and enter the accompanying proposed order.

Dated: October 4, 2026 BAKER DOLINKO & SCHWARTZ, P.C.

By: ______________________________

Chris Baker

Attorneys for Plaintiff Andrea Hull

## APPENDIX A

## TEXT OF THE RESTRAINTS — BOOST, INC. EMPLOYMENT AGREEMENT (JUNE 19, 2025) (HULL DECL. ¶¶ 27, 30, EX. 2)

*Section 4 — Covenant Not to Compete and Additional Restrictions* (in full, after three introductory paragraphs stating Epic's reasons):

> Therefore, if you have been certified in Epic software during your career at Boost or have ever been in a role that requires certification in Epic software, have had a login to an Epic customer production system or supporting infrastructure, are involved in sales of Epic software or services, or have used the title of director, vice president, officer, or similar title, then, during your employment with Boost, and for a period of one year after, the following separate restrictions below apply to you, unless you have a written exception from an Epic HR director.
>
> (a) Direct Competitors. You will not be employed or engaged by, whether as an employee, officer, partner, director, consultant or otherwise, or have an ownership interest in (other than the ownership of less than 1 percent of a publicly-held company), any Direct Competitor of the Epic Group. "Direct Competitors" are those companies listed on attached Annex 1 as updated by the Epic Group from time to time. This provision shall not restrict you as to employment, assistance, ownership, or service in connection with products or services that do not serve substantially similar functions as the Epic Group's products or services.
>
> (b) New Business Enterprise or Area of Business. You will not establish or aid others in establishing any new business enterprise or a new area of business for an existing business enterprise, in either case which would involve development, sale, or marketing of any product that overlaps with the Epic Group's.
>
> (c) Customer Contact. You will not contact any customer or Active Prospective Customer of the Epic Group with whom you have had contact during your last two (2) years of employment by Boost, for the purpose of either (i) attempting to sell them products or services competitive with the Epic Group, or (ii) attempting to dissuade them from doing or reducing the amount or types of their business with the Epic Group. An "Active Prospective Customer" means a prospective customer which has provided to the Epic Group a request for proposal, has a proposal from the Epic Group, or has contacted the Epic Group regarding the Epic Group's products or services within the last two (2) years of your employment with Boost.
>
> (d) Employment with Customers, Consultants and Cooperative Partners. You will not: Be employed or engaged by, directly or indirectly including as a Consultant, any Epic Group customer or

> Active Prospective Customer in a role that involves Epic software. Be employed or engaged by a Consultant or Cooperative Partner as defined in Annex 2, if your work would involve healthcare software or services that overlap with Epic products or services.

> The organizations listed on Annex 2 may change over time as Epic begins or ends collaboration with specific Consultants and Cooperative Partners.

*Annex 1 — Direct Competitors of Epic* ("This Agreement only applies to the healthcare software and services activities at these companies."):

> Altera Digital Health/Veradigm/Allscripts; Amazon/Amazon Web Services; Apple; athenahealth/Virence/GE Healthcare; Cedar; Cognizant; eClinicalWorks; Google/Alphabet; Health Catalyst; InterSystems (TrakCare and HealthShare); IQVA [sic]; LeanTaas; MEDITECH; Meta/Facebook; Microsoft; Moxe; NextGen Healthcare; Oracle Health; Palantir; Phreesia; Redox; Salesforce; TriNetX; Truveta. [For employees who worked outside the United States in the prior 12 months, the list adds:] Cambio; CGI/Logica; Chipsoft; EMIS; Philips Healthcare; SAP (health or wellness activities); System C; Telstra Health; Tieto; TPP/SystmOne. "Epic may update this list from time to time."

*Annex 2 — Epic Consultants and Cooperative Partners*:

> Consultants or Cooperative Partners are (i) any organization that has entered into a "Member Services", "Pal", "Partner", or similar cooperative agreement with Epic or its affiliates, and (ii) the following organizations: Accenture; Chartis; Deloitte; Ensemble; Evergreen; Huron; IBM/Kyndryl; Impact Advisors; Nordic Consulting; Notable; Optimum Healthcare IT; Optum/Change Healthcare; Pivot Point Consulting; R1; Tech Mahindra; Tegria/Bluetree. This Agreement only applies to the healthcare software and services activities at the specific Consultant and/or Cooperative Partner and others in the same corporate group such as subsidiaries, joint ventures, and pending mergers and acquisitions. Epic may update this list from time to time.

*Section 2 — Confidentiality* (first paragraph, "Trade Secret and Confidential Information," in full; the second paragraph, concerning patient health information, is not challenged):

> In order to conduct its business operations, the Epic Group must maintain in secret certain trade secrets and proprietary information. During this Agreement and thereafter, You agree to maintain in confidence these trade secrets and proprietary information and to use the information or secrets only as needed in your role for Boost and only for the proper business of Boost. These trade secrets and proprietary information include, by way of example, customer and prospect lists and identities; Epic Group sales strategies for existing and prospective customers; software, software systems or details of software including computer coding in any form, methods or operation, user interfaces, details of operation or functionality, details of reports, details of screens, structure and sequence of functionality

> and programs, software structural design such as programming points and the Epic pyramid, system deficiencies; programming techniques; user and program documentation; development history of any software system; internal discussions or strategies relating to competitors; information regarding discussions with consultants or information from consultants; financial information about the Epic Group, its employees or its current or prospective customers; identities and talents of specific Epic Group employees; company records; pricing information, pricing details and strategies; and other sensitive information relating to the business of the Epic Group which has been identified by the Epic Group as confidential. For purposes of clarity, similar information of third parties that is in the Epic Group's possession under an obligation of confidentiality also constitutes proprietary confidential information that you must maintain in confidence and use only in your role for Boost and only for the proper business of Boost.

*Earlier agreements.* The 2014 Epic Systems Corporation Employment Agreement (Hull Decl. Ex. 8) and the 2018 Boost, Inc. Employment Agreement (Hull Decl. Ex. 9) contain a confidentiality covenant (§ 2) in nearly identical terms; a covenant not to compete (§ 4) built on a closed competitor list, with a one-year tail; a separate one-year bar on employment with Epic's customers, consultants, and cooperative partners (§ 7); and a two-year covenant not to solicit Epic employees (§ 6) that the 2025 form omits. The January 2021 international assignment agreement (Hull Decl. Ex. 10) confirms the terms of the 2014 agreement, and the March 10, 2026 annex update (Hull Decl. Ex. 11) replaces Annexes 1 and 2.