# EXHIBIT 8

Epic

# LICENSE AND SUPPORT AGREEMENT

This License and Support Agreement (the "Agreement") is made between Epic Systems Corporation, located at 1979 Milky Way, Verona, Wisconsin 53593 ("Epic"); and the County of San Mateo, with its principal place of business at Redwood, City, CA 94063 ("You"). The definitions in Appendix A apply to this Agreement.

## 1. LICENSE

a. **General.** Epic grants You a non-exclusive, perpetual license to use the Program Property in the United States, subject to the terms of this Agreement. This Agreement does not give You ownership of any part of the Program Property.

b. **Rights to Copy Program Property.** You may copy the Program Property only: (i) for backup, recovery, training or testing purposes; (ii) to copy Workstation Code onto computers for authorized Affiliates; (iii) to create additional Production Directories in accordance with Subsection 4(c); and (iv) to modify and reproduce the Documentation.

c. **Sublicense for Third Party Software.** Epic grants You a sublicense to use the Third Party Software and Data with the Program Property, subject to this Agreement, including any applicable addendum or other mutually agreed terms. If "TBD" is listed on Exhibit 1 for any Third Party Software and Data, the license to that item is granted by and subject to a signed copy of Epic's third party tools order form.

## 2. INSTALLATION, TRAINING AND OTHER SERVICES

a. **General.** Epic will first deliver to You the Program Property (including Documentation Manuals) and will assist with Your implementation, all substantially in accordance with the Project Plan. You will provide the hardware and infrastructure that the Program Property operates on. Your project director and Epic's implementation director will work together to coordinate implementation and training activities.

b. **Initial Implementation Budget.** [redacted] Epic has in good faith prepared and provided an estimated implementation budget to You attached hereto as Exhibit 2(c) (the "Initial Implementation Budget"). [redacted] Epic acknowledges that as a government entity, You have obligations to provide transparency and accountability in Your contracting and, subject to the above assumptions and disclaimers, You do not expect the fees for the implementation services for the Items in scope on Exhibit 2(a) will be more than $14,105,650, as set forth therein. As of the effective date of this Agreement, modifications and increases to the implementation budget are typically adopted using an Implementation Service Request. [redacted]

c. [redacted] As part of its implementation services, Epic's project team holds regularly scheduled calls or meetings with Your project team to measure progress and proactively address any project concerns. [redacted]

[redacted]

d. **Training.** Your project team will travel to Epic to attend Epic's recommended training courses. Epic will assist Your project team in preparing for Your end-user training, which training will follow Epic's end-user training methodology (including its physician training recommendations). As of the date of this Agreement, Epic's end-user training methodology includes the option to have Epic staff, with assistance from Your super user leads, provide initial Program Property training to Your end users based on the Foundation System. You are responsible for reviewing any end-user training provided by Epic and supplementing it with operational and software training to ensure its appropriateness for Your specific system build, workflows (including third-party integrations), and standard operating procedures. Epic's budget estimates typically assume a specific number of end-user and qualified project team trainees for Epic's recommended training courses. Your end users and project team members may participate in additional training at Epic's standard rates for such services.

e. **Rates.** Implementation and training services provided by Epic will be at Epic's standard rates. The applicable rates for these services are listed on Exhibit 4 and will not increase during the first twelve (12) months of this Agreement.

f. **Access to Servers and Environments.** So that Epic can carry out services and other activities under this Agreement, You will provide Epic personnel access to the servers on which the Program Property is installed and grant Epic the right to access such servers and data stored using the Program Property. You may fulfill such minimum access standards in part or in whole through an agreement with a third party, including, if applicable, a separate agreement for the provision of hosting services by an Epic Owned Entity. The parties will use a LAN-to-LAN IPSec tunnel terminated on Epic's VPN concentrator and a suitable hardware VPN device at Your data center unless otherwise agreed. You are responsible for hardware, software, and line costs on Your end. Support may be impacted if Epic personnel are unable to access Your servers or if access is unreasonably slow. You will upgrade the access technology as needed to meet Epic's reasonable minimum access standards at Your cost. After First Live Use, Epic and You will work together in good faith to allow Epic personnel access using a secure and password-protected system. It is Your responsibility to obtain permissions required for Epic to access data stored using the Program Property, without imposing restrictions on Epic other than those in the Agreement. If You would like Epic to work with You and a third party to assist You in bringing data into the Program Property, You will provide Epic only the non-confidential information of the third party necessary to permit Epic to provide such assistance. Your environment may include shared functions or infrastructure (e.g., the Care Everywhere Certificate Authority, the messaging servers used for Push Notifications, or Nebula services) maintained and updated by Epic or a third party to simplify system management and allow for sharing and distribution of common rules (similar to antivirus software with self-updating virus definitions).

g. [redacted]

[redacted]

h. **Federal Regulatory Changes**. Epic will modify an Item to comply with changes in federal regulations if:

(i) You are implementing the Item or participating in the Maintenance Program for the Item when the change is proposed;

(ii) the change directly relates to the Item's functionality as described in the Documentation Manuals and would result in the operation of the Item in accordance with the Documentation Manuals violating the regulation; and

(iii) Epic determines in good faith that the change requires a technically feasible and commercially reasonable software modification.

Modifications under this Subsection will be available only in future releases. If Epic learns of the regulatory change reasonably in advance of its effective date, Epic will make a commercially reasonable effort to deliver the modification reasonably in advance of the date as of which the operation of the Item in accordance with the Documentation Manuals would violate that regulation. If Epic determines it cannot do so, Epic will arrange a meeting of affected customers to discuss how to address the regulation. Modifications may include changes to or the elimination of functionality, but Epic will use commercially reasonable efforts not to substantially reduce functionality.

i. [redacted]

j. **Participation in Cosmos.** This Agreement assumes Your implementation and use of Cosmos. You agree to the terms of the Cosmos Addendum, and, for as long as You participate in Cosmos, You will pay an annual Cosmos co-op fee if any such fee applies.

k. **Additional Services.** Epic may provide additional services at Epic's then-standard rates under mutually-agreed terms. Epic has provided an estimate of $5,211,000 for Boost services [redacted]

## 3. MODIFICATIONS

a. **General.** You and Epic may agree to Program Property modifications by entering into Epic's modification request form, which will include specifications and payment terms. You may choose a fixed-price or hourly option. Payment for a fixed-price modification is due on signing. Payments for hourly modification services are due as incurred. If Epic agrees to perform modifications pursuant to this Subsection, Epic will develop such modifications consistent with its interpretation of the associated software modification request form and the general needs of the Epic community, as well as its evaluation of technical considerations related to incorporating new development into Epic's existing software, including compatibility, consistency, and mitigation or avoidance of reasonably identifiable privacy, safety, and security risks. If Epic designs or develops the software in a way that is not inconsistent with its descriptions in the associated software modification request form, but You intended it to be different or interpreted the descriptions differently than Epic's reasonable interpretation of them, then You may submit a request for software modification services under this Subsection. If Epic agrees to provide the additional services, Epic will provide an estimate of the timeline and fees for the modification, and Epic's then-current rates will apply.

b. **Rates.** Modification services provided by Epic will be at Epic's standard rates. The current rates for these services are listed on Exhibit 4 and will not increase during the first twelve (12) months of this Agreement.

c. **Ownership.** Epic tries to generalize modifications for the benefit of the Epic community. This allows You to benefit from modifications initiated by others, and Epic to better support modifications and manage its releases. Accordingly, Epic owns all Code and Documentation and all intellectual property rights in modifications.

d. **Retrofits.** Modifications are typically made available in a future release unless otherwise agreed in the modification request form. Retrofits are available only with Epic's consent on such form. A "retrofit" is a modification to the Code of any version other than the version in development by Epic at the time of the modification.

## 4. PAYMENTS

a. **License Fee.** You will pay Epic the Program Property License Fee on the schedule in Exhibit 1, [redacted] Such license will be fully paid up for the specified Licensed Volume once all fees specified in this Agreement have been paid as required by this Agreement (subject to additional fees required to be paid for additional Licensed Volume, additional Production Directories, certain use outside of Your expected use of an Item, Subscription Items, and as otherwise provided in this Agreement).

b. **Increasing the Licensed Volume.** The Program Property license and maintenance fees on Exhibit 1 are based on the initial Licensed Volume for Your licensed use of the Program Property. At the time any Annual Volume exceeds a Licensed Volume, You will pay Epic an additional license fee and begin paying monthly maintenance fees to increase the Licensed Volume. Such increased Licensed Volume tier must cover the greater of the Annual Volume for the current license year or the estimated Annual Volume for the next license year. The additional license fee to increase Your Licensed Volume is the difference between the license fee for the new Licensed Volume tier and the

then-standard license fee for Your previous Licensed Volume tier. Fees for Affiliate Licensed Volume vary depending on Your relationship with the Affiliate and their size. You will permit Epic access to Your servers to determine the Annual Volume.

c. **Additional Production Directories.** Unless otherwise stated in Exhibit 1, You are licensed to one Production Directory. If You would like to use an additional Production Directory, You and Epic may enter into an amendment to this Agreement or You may sign another form prepared by Epic documenting the fees and terms for such use of the Program Property and Third Party Software and Data.

d. **Expected Use.** Although Epic's software is generally configurable for use in a range of settings, each Item listed in Exhibit 1 as an "Inpatient Item" or an "Ambulatory Item" is designed for use in specific healthcare contexts. For example, EpicCare Inpatient is designed primarily for use in hospitals. [redacted]

e. **Subscription Fees.** For each "Subscription Item" and "Annual Fee Item" on Exhibit 1, You will pay Epic a fee for Your use at the then-current standard subscription or annual rate. Unless otherwise stated on Exhibit 1, subscription fees are due quarterly in arrears, and annual fees are due annually in advance on January 1 (but Your first year's annual fee will be due on and prorated based on the date the license key for the Item is first activated). The current subscription and annual rates are stated on Exhibit 1 and are subject to change.

f. [redacted]

g. **Third Party Fees.** Except as otherwise stated on Exhibit 1, license fees for Third Party Software and Data are due on delivery, and maintenance fees are due annually in advance beginning on delivery. Subscription and annual fees are due as stated in Exhibit 1 or the applicable addendum. Maintenance and subscription fees for Third Party Software and Data are subject to change.

h. **Hourly and Training Fees; Out-of-pocket Expenses.** All hourly and training fees, travel, and other out-of-pocket expenses sustained by Epic under this Agreement are due as incurred. You will approve travel in writing in advance, and travel expenses will be in accordance with Epic's travel policy, the current version of which is attached as Exhibit 8. If You are more than sixty (60) days past due in paying reimbursable expenses, Epic may require prepayment of expenses.

i. **Payment Date; Interest.** You will pay Epic all fees and expenses by forty-five (45) days after the invoice date or, if later, by the date specified on the invoice or in this Agreement. [redacted] interest will accrue for such overdue Uncontested Amounts at the lesser of one percent (1%) per month or the maximum rate allowed by law. If an Uncontested Amount is more than sixty (60) days overdue, Epic may, with written notice to You, suspend services until the amount is paid and Your non-payment will be a material breach of this Agreement. You will only begin First Live Use of an Item if all due Uncontested Amounts have been paid.

j. **Maintenance Fees.** You will pay Epic a maintenance fee for each Item for which the Maintenance Program is then in effect. Maintenance fees are due monthly in advance. Except as otherwise set forth in this Agreement, Program Property maintenance fees will remain at the initial rates [redacted] (i) twelve (12) months from the date of [redacted] this Agreement, and are subject to annual increases thereafter. However, during the first five (5) years of this Agreement, when any such annual increase is made it will not exceed [redacted] 2% per year from the date of the Agreement; [redacted] Maintenance fees will also increase as otherwise specified in the Agreement.

k. **Fee Budgeting.** As of the effective date of this Agreement, You have estimated the total costs in this Agreement for the first ten (10) years [redacted] to be no more than $63,459,084 (the "Initial Budgeted Amount") for the purpose of satisfying Your payment obligations related to the services and the Items and Third Party Software and Data licensed by You as of the effective date of this Agreement under the terms and provisions of this Agreement. [redacted] You have informed Epic that You have available the Initial Budgeted Amount for the purpose of satisfying Your payment obligations for the first ten (10) years under this Agreement. [redacted]

**5. MAINTENANCE**

a. **General.** During the term of the Maintenance Program, Epic will provide the following services for each live Item as described in this Section: (1) consultation and assistance as set forth in Exhibit 6; (2) Updates; and (3) error-correction services as set forth in Exhibit 7.

b. **Maintenance Requests.** You will maintain a support team with a sufficient number of trained and knowledgeable employees who will contact Epic with Maintenance Program requests. If Epic identifies a pattern of direct requests by others, Epic will discuss such activity with You. If the requests persist, Epic may charge You at its then-current rates.

c. **Term and Termination of Maintenance Program.**

(i) *Term.* The Maintenance Program for an Item begins on its First Live Use and continues for successive one-year terms until terminated under this Subsection 5(c). Epic will coordinate Your maintenance payments so that each Item has the same maintenance year.

(ii) *Termination.* After the first maintenance term for an Item, You may terminate the Maintenance Program for that Item by giving at least ninety (90) days' notice to Epic. However, if You participate in the Maintenance Program for any Item, You must participate for all other Items that are in production use. If the Maintenance Program for all Program Property is terminated, maintenance for all Third Party Software and Data also will terminate. If You do not participate in the Maintenance Program and Epic provides You with services that are normally covered by the Maintenance Program, Epic's then-current non-participant fees and terms will apply.

(iii) *Re-Enrollment.* If You terminate the Maintenance Program for an Item, You may later re-enroll subject to Epic's then-current re-enrollment fee and terms.

(iv) *Staying Current.* During the Maintenance Program, You will use the Current Version of each Item, as well as other Epic-recommended infrastructure and software, such as the hardware operating system, Operating Environment, KB SQL software, and business intelligence and relational database management software, all subject to the Transition Period ("Staying Current"). The current "Transition Period" is the eighteen (18) month period beginning on release of the newer version. The Transition Period may change in connection with changes to Epic's release cycle. Epic may not retrofit Updates except to the extent You are Staying Current and Epic determines it is needed to correct a Substantive Program Error that does not have a Reasonable Workaround. While You are not Staying Current, Epic may increase Your monthly maintenance fees by five percent (5%) upon the end of the Transition Period and each subsequent six month period. If You are not Staying Current, Epic also may end the Maintenance Program on one-hundred and eighty (180) days notice to You (during which time You may become current to avoid termination).

(v) *No-Sunset Commitment*. Epic will offer the Maintenance Program for all Items for at least ten (10) years after the date of this Agreement. Epic may cease offering the Maintenance Program for an Item only with at least one year advance notice to You.

(vi) *Relationship with License.* Termination of the Maintenance Program under this Subsection does not terminate Your license to an Item. However, termination of Your license to an Item also terminates Your participation in the Maintenance Program for the Item.

d. **Third Party Software Maintenance.** Unless otherwise agreed, the maintenance program for any Third Party Software and Data to which a maintenance fee applies begins thirty (30) days after delivery. During Your participation, You will contact Epic for consultation or assistance about the third-party item. Epic will respond by assisting You or coordinating support from the supplier. You must participate in these maintenance programs while You participate in the Maintenance Program for any Item of Program Property. Epic also advises its customers on issues in Third Party Products not under maintenance through Epic upon request. Assistance that goes beyond determining whether an issue is a Program Error is chargeable at Epic's then-standard rates for such services.

e. **Performance and Use Monitoring.** Epic supports Your use of the Program Property in a variety of ways, such as by providing implementation, maintenance, and other services, and some of those activities can only be accomplished if Epic may access and use Your Data. Epic may use Your Data in accordance with the terms of this Agreement and Epic's data activity policy, which is currently available on Galaxy. For example, Epic may use automated configuration checking to determine if You are affected by a software error, or to proactively identify problems with or ways to enhance Your use of the Program Property. You may also choose to participate in certain elective activities, such as benchmarking programs where Epic aggregates and shares Performance and Use Data to allow cross-organizational comparisons. Epic may also use Performance and Use Data to improve software and services. As between You and Epic, You own Your Data. Epic will not sell Your Data. Epic also will not disclose Performance and Use Data to others in a manner that would reasonably identify You as its source without Your consent.

## 6. WARRANTY

a. **General.** As is the case with all complex software, the Program Property is likely to contain some errors. Both Epic and You must test for errors in the Program Property, and You are responsible for all final testing of the Program Property. During the Warranty Period, Epic warrants that the Program Property will not contain Substantive Program Errors. If You notify Epic of a Substantive Program Error during the Warranty Period and state that You are making a warranty claim, Epic will either correct the Substantive Program Error or provide a Reasonable Workaround as provided below in this Section.

b. **Cure Periods.** If You notify Epic of a Substantive Program Error during the Warranty Period as described above in this Section, Epic will have forty-five (45) days after the end of the Warranty Period to provide a correction or Reasonable Workaround. You will then have thirty (30) days from its receipt to notify Epic (in the same manner as Your original warranty notice) of Substantive Program Errors that: (i) were timely reported to Epic but are uncured; or (ii) arise from the correction or Reasonable Workaround. Epic will then have fifteen (15) days to correct or provide a Reasonable Workaround for the uncured or new Substantive Program Errors.

c. **Modified Code.** Epic provides a warranty for fixed-price modifications. The terms in Subsections 6(a), (b), and (f) apply to such warranty, except that the warranty period is the thirty (30) days after delivery of the modification to You.

d. **Correction of Program Errors After Warranty Period.** After the Warranty Period while You participate in the Maintenance Program, the correction of Program Errors (except those reported under Subsections 6(a)-(c)) is governed by the terms of the Maintenance Program.

e. **Limitations.** Epic is not responsible for issues or damages caused by or resulting from Non-Program Errors or third party criminal acts. With respect to any software modification or other development services, Epic's development obligation is limited to the functions expressly described in the specifications attached to the fully executed modification request form.

f. [redacted]

g. **Disabling Code.** Epic warrants that the Program Property does not contain Code designed by Epic to intentionally interfere with its normal operation after First Live Use to enforce this Agreement. In addition, after First Live Use of an Item, Epic will not disable Your use of an Item for such purposes without Your consent or a court order.

h. **Ownership.** Epic warrants that it has the right to license the Program Property to You under this Agreement. Your [redacted]

i. **Services Warranty.** Epic warrants that it will perform its services in a competent manner. [redacted]

j. **NO OTHER REPRESENTATION OR WARRANTY. THE ABOVE EXPRESS LIMITED WARRANTIES ARE EXCLUSIVE. EPIC DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF ACCURACY, TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, AND WARRANTIES AGAINST INFRINGEMENT AND INTERFERENCE WITH ENJOYMENT. NO EPIC EMPLOYEE OR OTHER PARTY IS AUTHORIZED TO MAKE A WARRANTY OR REPRESENTATION NOT IN THIS AGREEMENT.**

## 7. LIMITATIONS OF LIABILITY

a. **DISCLAIMER; CAP. THE TERMS IN THIS SECTION APPLY WHETHER THE LIABILITY ARISES OUT OF OR RELATES TO SOFTWARE, SERVICES OR OTHERWISE AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY UNDER THIS AGREEMENT. NEITHER PARTY WILL BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY, ENHANCED, CONSEQUENTIAL OR INDIRECT DAMAGES, OR LOSS OF BUSINESS, PROFIT OR REVENUE**

**(OTHER THAN AMOUNTS OWED FOR EPIC SOFTWARE AND SERVICES), ANTICIPATED SAVINGS, GOODWILL, OR REPUTATION, EVEN IF THE PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES OR THEY WERE OTHERWISE FORESEEABLE. UNDER NO CIRCUMSTANCES WILL EITHER PARTY'S TOTAL LIABILITY EXCEED, IN THE AGGREGATE FOR ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE EPIC FEES PAID IN THE EIGHTEEN (18) MONTHS PRECEDING THE DATE THE LAST SUCH CLAIM WAS FILED. THE LIMITATIONS SET FORTH IN THIS SUBSECTION 7(A) WILL NOT APPLY TO: (I) EITHER PARTY'S EXPRESS INDEMNIFICATION, DEFENSE, AND HOLD HARMLESS OBLIGATIONS UNDER THIS AGREEMENT; (II) CLAIMS ARISING OUT OF OR RELATING TO YOUR THEFT OR MISAPPROPRIATION OF PROGRAM PROPERTY OR OTHER EPIC SOFTWARE FOR THE PURPOSE OF DESIGNING, DEVELOPING, ENHANCING, OR SUPPORTING A COMPETITIVE PRODUCT; AND (III) YOUR OBLIGATIONS TO EPIC FOR ALL LICENSE, MAINTENANCE, AND OTHER FEES PAYABLE IN ACCORDANCE WITH THIS AGREEMENT (INCLUDING, IF YOU USE THE PROGRAM PROPERTY IN A MANNER THAT EXCEEDS THE LICENSED VOLUME OR OTHER RESTRICTIONS ON YOUR USE SET FORTH IN THIS AGREEMENT, THE AMOUNT EPIC WOULD CHARGE YOU WITH RESPECT TO SUCH USE).**

b. **Force Majeure.** Neither party is liable for delay in performance or nonperformance caused by circumstances beyond the party's reasonable control, including acts of God, fire, acts of a common enemy, war, actual or threatened terrorism, third party criminal acts, civil disturbance, embargo, law or governmental regulations or labor dispute. In such event, the period of performance will be extended to reflect such delay or as otherwise agreed by the parties.

c. **Timing of Actions.** Neither party will commence a Claim in arbitration or court for a matter arising out of or relating to this Agreement or any software, services, materials, reports, or other information provided by Epic more than twelve (12) months after the cause of action first arose.

## 8. CONFIDENTIAL INFORMATION

a. **Confidentiality.** Epic will not disclose Your Confidential Information and You will not disclose Epic Confidential Information, each except: (a) as required by law or court order; or (b) with the other party's written consent, including as provided in this Agreement. If either party is required by law or court order to disclose the other party's Confidential Information, the disclosing party will use reasonable efforts to provide the other party with prior written notice of such required disclosure and reasonably cooperate with the other party to limit such disclosure. Epic and You will each require (either through inclusion in a written agreement with such individuals or policies that apply to them) that their personnel maintain the confidentiality of the other party's Confidential Information and use it only within the scope of their duties.

b. **Business Associate Exhibit.** To address the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and associated regulations, the parties agree to the terms of Exhibit 5.

c. **Protected Communications**. Notwithstanding anything to the contrary in this Agreement, as long as Epic remains subject to 45 CFR 170 as a developer of certified health IT, You are permitted to make certain communications about Epic's certified applications in accordance with Section 4002 of the 21st Century Cures Act and 45 CFR 170.403 (the "Communications Rule"). You recognize that Epic needs to avoid outright copying of its intellectual property by third parties in order to remain viable as a company. To help support this, You will ensure that any communications involving Epic Confidential Information are within the scope of the protected subject areas in the Communications Rule, and that each such communication follows the "Communications about Epic Software Under the Communications Rule" overview, as updated from time to time at https://www.epic.com/commsrulepolicy, including that each communication uses the least amount of Epic Confidential Information necessary to fulfill its purpose.

d. **Public Records Act.** Epic recognizes that You are subject to the California Public Records Act ("PRA"), Government Code §§ 6250, et seq. Epic will work with You to provide necessary information (e.g., a copy of the Agreement with Epic Confidential Information redacted for Your response to a PRA request) to facilitate Your timely meeting Your legal obligations with respect to any legally required disclosure. If requested pursuant to a PRA request to disclose the redacted copy of the Agreement referenced in the immediately preceding sentence or any documents which contain Epic Confidential Information, You will give Epic notice and a copy of such PRA request [redacted] so that Epic may review the requested records. Epic may request You withhold, or redact those portions of, such records that Epic asserts are confidential or exempt from disclosure as provided under California law. Prior to any required disclosure, You and Epic will discuss how You are responding and Epic may seek a protective order, and You will reasonably cooperate with Epic's efforts to protect any Epic Confidential Information against disclosure, [redacted]

If a requestor seeks to obtain the redacted information through a court proceeding, You will promptly notify Epic allowing Epic reasonable time to oppose such request. [redacted]

## 9. PROGRAM PROPERTY PROTECTIONS

a. **General.** You will:

(i) Not reverse engineer any Program Property.

(ii) Limit access to the Program Property to Your Affiliates in the United States.

(iii) Store the Program Property securely and use Epic-approved security technology to provide and track electronic access to the Program Property, so that access is limited to permitted Affiliates.

(iv) If You discover that anyone with access to any Program Property is directly or indirectly assisting in the development, design, or enhancement of software that competes or may compete with any Epic software (and

Epic has not provided advance written consent for such activity), promptly discontinue such access or ensure the competitive activity is terminated.

(v) Notify Epic promptly in writing if You discover any person or entity has obtained non-permitted access to Program Property [redacted]

b. **Copyrights and Trademarks.** You will preserve all copyright and trademark notices in the Program Property and Third Party Software and Data. If You customize the Program Property, You will include Epic's logos and other trademarks in accordance with the requirements in the Documentation.

c. **Specifications, Source Code, and Extensions.**

(i) *Industry-defined Specifications.* Epic participates in developing certain industry-defined interoperability standards, such as HL7, FHIR, and similar specifications. Fees may apply to use Epic's implementations of such standards (e.g., interfaces, APIs). As of the date of this Agreement, Epic makes certain of its industry-standard and public APIs (as identified on Epic's open.epic APIs listing) available through open.epic under separate terms and fees.

(ii) *Confidential Information.* Epic will provide You with access to certain Epic Confidential Information under this Agreement, including Proprietary Data Schema and non-public program service calls. You may use such non-public information (A) for Your internal maintenance of the Program Property, and (B) to develop Extensions for internal use by You and Your Affiliates (but not other distribution) (collectively, "Internal Use"). You may only develop or assist in developing software that could potentially overlap with the functionality of Epic software if everyone involved in the development has been restricted, by procedure and in practice, from having direct or indirect access to Epic Confidential Information. If You would like certain of Your Personnel (e.g., individuals with only limited and incidental access to Epic Confidential Information) to participate in developing potentially competitive software without the protections described in the preceding sentence, at Your request Epic will discuss with You in good faith whether You and Epic can agree on reasonable alternative safeguards to protect against misuse of Epic Confidential Information. Development includes coding, defining requirements or specifications, and other design, development, and testing activities.

(iii) *Source Code.* Epic may provide You with source Code, to which access must be limited to a list of individuals approved by Your County Health Chief Information Officer (or similar executive). Like other Epic Confidential Information, You may use any source Code provided to You for Internal Use. If You would like to use source Code for any other purpose, such as to develop Extensions for commercialization via the Epic App Orchard, You may request a software development kit agreement for such use. You will maintain source Code provided to You only in the country for which it is licensed in Subsection 1(a), except with Epic's prior written consent. You also will not provide any third party with access to source Code without Epic's express written consent, which Epic typically only provides under a written agreement with You and the third party that contains specific protections against misuse (e.g., audit rights). In the future, Epic may limit or discontinue source Code access (e.g., due to security, confidentiality, or information management concerns). At Epic's request, You will delete all source Code that has been provided to You.

(iv) *Extensions.* Epic encourages and supports Your innovation efforts. However, it is important that Epic can continue developing its software for use by the Epic community without being blocked by intellectual property claims. Therefore, You and Your Affiliates will not enforce against Epic, its Owned Entities, or its or their direct or indirect customers or sublicensees, intellectual property rights in (i) Extensions, or (ii) an invention (e.g., method or system patent claims) by or in which data is exchanged with an electronic health record. In addition,

You and Your Affiliates will not assign any such intellectual property rights to a third party that has not agreed to the restriction in the preceding sentence, and any purported assignment otherwise is void. You may share an Extension with the Epic community only by donating it to the Epic Community Library, commercializing it via Epic's App Orchard, or otherwise with Epic's prior written consent. If You change the source Code, Proprietary Data Schema, or non-public program service calls, Epic's warranty and maintenance obligations will cease. Development of Programming Points Code is not a change to the source Code. You will not modify the source Code or use data structures or program service calls in a manner that circumvents Volume counts.

d. **Unlicensed Software.** Given the integrated nature of Epic's software, Epic may provide You code for software that You have not licensed. Epic typically restricts access to unlicensed software using license keys. You will respect Epic's access restrictions and not use unlicensed code, except for incidental copying necessary for licensed use of the Program Property. The restrictions on use and the confidentiality and safekeeping terms that apply to the Program Property also apply to unlicensed code and documentation.

e. **Third Party Assistance.** Some organizations choose to have third parties assist with their operations (e.g., implementation or operational services, outsourcing, administrative staff augmentation, hosting) and would like such third parties to have access to Epic Confidential Information. To protect confidentiality and reduce Your involvement in disputes that may arise, before providing such access You will work with Epic to ensure the access is covered by a written agreement between the third party and Epic, and You will only provide access as provided in that agreement. In addition, in certain cases Epic may rely more heavily on Your management and control of a third party, and You may need to sign a multi-party agreement with Epic, the third party, and possibly certain of the third parties' employees. For example, since the Program Property is licensed for use in the United States and international access can pose security and other concerns, You may need to sign an agreement permitting access outside the United States. Epic also may decline to enter into an agreement with the third party in certain circumstances, e.g., due to concerns about intellectual property protections in the country in which the third party operates, its security or confidentiality practices, Epic's or other customers' past experiences with the third party, or competitive issues.

## 10. YOUR RIGHT TO TRANSFER THIS AGREEMENT

You may assign this entire Agreement either to an Owned Entity or as part of the acquisition of substantially all of Your assets by another entity. In either case, the assignee must be a hospital or physician organization, must not be an Epic competitor, and must agree in writing to the assignment and the Agreement's terms. You will be liable for the obligations under this Agreement if the assignee fails to satisfy them. You will not assign, transfer, delegate, sublicense, or timeshare this Agreement, in part or in whole, other than as expressly provided in this Agreement. Any attempt to do so, whether by You or on Your behalf, is void.

## 11. USE OF PROGRAM PROPERTY BY AFFILIATES

a. **General.** You may allow an Affiliate to access and use the Program Property, subject to the terms below and elsewhere in this Agreement:

(i) You will not allow access to an individual or entity that licenses software to health care organizations (or any other potential Epic competitor) without Epic's prior written consent.

(ii) You will only provide Affiliates with access to the Program Property to the extent necessary for use of the Program Property in Your and Your Affiliates' health care delivery operations.

(iii) Subject to Section 9 and except as agreed in writing by Epic, only Your employees may access Code other than Workstation Code.

(iv) Affiliates are subject to all of the limitations of this Agreement. You will have the same responsibility to Epic for an Affiliate's actions and omissions as if they were Your own actions and omissions.

(v) While You are providing access to Affiliates, You will (i) maintain designated staff resources who oversee Your relationships with Affiliates and complete and maintain Epic's then-recommended training curriculum for that role, and (ii) use Epic's then-recommended method (e.g., by setting service area designations) to identify each Affiliate.

(vi) If Epic informs You that it has concerns about how You are extending to or supporting Your Affiliates, You and Epic will work together to address Epic's concerns. Until Epic informs You that its concerns have been resolved, You will cease all sales and implementation activities with Affiliates unless otherwise approved by Epic in writing.

(vii) Epic may communicate directly with Affiliates as Epic reasonably deems necessary to work with You toward the goal of fostering effective extensions to and support of Affiliates. Epic may provide services for Affiliate implementations and support, including by sharing software expertise and recommendations on staffing, governance, and overall strategy based on Epic's experience and recommended practices. Any such services will be provided at Epic's then-standard rates. In addition, to gauge the success of Your Affiliates' use of the Program Property and identify potential improvements, Epic or another rating agency selected by Epic (e.g., KLAS) may survey or otherwise collect feedback from Affiliates and may share that feedback with You. You and Epic will work together on such activities. You agree that a rating agency that surveys or collects feedback from Affiliates may share the results directly with Epic.

b. **Single Licensee.** Except as otherwise provided in this Agreement or pricing documentation for additional Production Directories or Licensed Volume, all Affiliates will be combined with You and treated as a single licensee under this Agreement. For example: (1) except as provided for a specific Affiliate, all Volume attributable to You or any Affiliate will be aggregated to determine if You have exceeded the Licensed Volume; (2) no additional copies of the Program Property will be provided to any Affiliate (except applicable Workstation Code); (3) all implementation, maintenance, modification requests, and the like will be conducted through the employees designated by You to contact Epic; and (4) You will be responsible for all payments to be made to Epic with regard to the activities of any Affiliate. Termination of this Agreement or a license to an Item will terminate the corresponding rights of any Affiliate.

## 12. INDEMNIFICATIONS

a. **Intellectual Property Indemnification.** Epic will defend or settle, indemnify, and hold harmless Your Indemnitees from any third-party Claim brought against them to the extent: (1) it is a Claim of infringement of a patent, copyright, or trademark, in each case enforceable in the United States; (2) it is based on use of the Program Property as delivered to You by Epic and in accordance with the Documentation Manuals and this Agreement; and (3) it is not based on use of the Program Property in combination with other hardware or software except to the extent use of the Program Property alone would constitute infringement. You will promptly notify Epic in writing of the Claim, provide Epic with the information reasonably required for its defense, and grant Epic exclusive control over its defense and settlement. If such a Claim is or Epic becomes aware that it may be brought, Epic may:

(i) procure the right for You to continue to use the Program Property that is the subject of the Claim; or

(ii) modify, replace or remove the Program Property, with the resulting Program Property having functionality substantially similar to or better than it did as of the date of this Agreement;

or, if Epic determines that options (i) and (ii) are not technically feasible or commercially reasonable,

(iii) modify, replace, or remove the Program Property, with the resulting Program Property having less functionality than it did as of the date of the Agreement. Epic will use good faith efforts to minimize feature reduction and to

provide non-infringing substitute functionality or other workarounds. If there is a material reduction in Program Property functionality under this Subsection 12(a)(iii), You may terminate Your license to the affected Item;

or, if Epic determines that (i), (ii), and (iii) are not technically feasible or commercially reasonable,

(iv) terminate Your license to the affected Item.

Upon termination under Subsection 12(a)(iii) or (iv), You will cease use of the Item and return it to Epic. Epic will then reduce any depreciated license fee outstanding and refund to You any depreciated License Fee Paid to Epic for the Item, with such reduction and refund determined based on the license fee for the Item less depreciation calculated on a straight line basis over ten (10) years from the date of this Agreement through the date of termination. This Subsection states the entire liability and obligation of Epic to Your Indemnitees arising out of or relating to violations of intellectual property rights.

b. [redacted]

[redacted]

c. **Third Party Products.** You will use Third Party Products in connection with Your use of the Program Property, and such Third Party Products have their own use limitations. Accordingly, You will indemnify, hold harmless, and defend Epic Indemnitees from any Claim arising out of or relating to Your use of a Third Party Product unless it is sublicensed under and used by You only in accordance with this Agreement. Epic will promptly notify You in writing of any such Claim, provide You with the information reasonably required for its defense, and grant You control over its defense and settlement.

## 13. TAXES

Except for taxes based on or measured by Epic's net income, all taxes (including sales, use, excise, property, and similar taxes) arising out of this Agreement or otherwise related to the license, use, implementation, maintenance or modification of the Program Property, or other software or services will be Your responsibility. If Epic pays or is required to pay such taxes (or related penalties or interest), You will promptly reimburse Epic. You have advised Epic that all of the transactions related to this Agreement are tax-exempt. You will substantiate any tax-exempt status by providing Epic with evidence satisfactory to the relevant tax authorities. At Epic's reasonable request, You also will provide other relevant documentation, confirm Your payment of taxes, or facilitate Epic's collection of taxes. If Your tax status changes, You will promptly inform Epic by an email to finance@epic.com.

## 14. TERM AND TERMINATION

a. **General.** This Agreement (including all licenses) will continue in effect until the Agreement or the applicable license is terminated in accordance with this Section or another express termination provision of this Agreement.

b. **Termination Upon Bankruptcy, Insolvency and the Like.** Subject to applicable bankruptcy and insolvency laws, if either party (i) ceases the active conduct of business; (ii) voluntarily becomes subject to a bankruptcy or insolvency proceeding under federal or state statute; (iii) has filed against it an involuntary petition for bankruptcy that is not dismissed within sixty (60) days of filing; (iv) becomes insolvent or subject to direct control by a trustee, receiver, or similar authority; or (v) winds up or liquidates its business, voluntarily or otherwise, then the other party may, at its sole option, terminate this Agreement immediately.

c. **Termination Upon Material Breach; Cure Periods.** A party (the "Notifying Party") may terminate this Agreement if the other party (the "Breaching Party") materially breaches its obligations and does not cure the breach within forty-five (45) days of receipt of notice from the Notifying Party. The notice will be provided in accordance with Section 15, will reference this Subsection or state it is a notice of material breach, and will describe the breach in sufficient detail to permit the Breaching Party to cure the breach. Where another provision of this Agreement includes an express termination right and cure period, this Subsection will not apply.

d. [redacted]

[redacted]

e. **Effect of Termination.** All licenses granted under this Agreement terminate when this Agreement terminates. Within thirty (30) days of the effective date of termination of this Agreement or a license, [redacted] You will return all copies of the applicable Code and Documentation to Epic, or destroy such copies and certify to Epic that such actions have occurred. You will remain liable to Epic for all fees and expenses accrued prior to such termination. [redacted]

f. **Transition Assistance**. Upon Your request, Epic will provide reasonable assistance to effect a transition to another information system [redacted] including by cooperating with You or a third party with respect to data conversions and interfaces. Epic will provide You with patient data previously processed by the applicable Program Property in a standard electronic format that You can transition to another information system. You agree to provide Epic with reasonable advance written notice of any requests for cooperation under this Subsection, and the parties will in good faith seek to agree on a timeline for Epic to perform such services taking into account Epic's available resources, then-current development projects and commitments, and the scope and nature of the services requested. Epic will provide the services under this Subsection at Epic's then-current rates for such services.

g. **Survival.** The following terms will survive termination: Subsections 2(i)(ii) and (iv), 3(c), Section 4 (to the extent applicable for pre-termination use or obligations [redacted] Subsections 5(e) (for Performance and Use Data collected before termination [redacted] 6(e), (f), (i) and (j), Sections 7-10, 12-13, Subsection 14(e), and Sections 15-17, and the terms of any addenda, amendments, or software orders governed by this Agreement to the extent provided in such agreements or covering similar subject matter to other surviving terms.

## 15. NOTICE

a. **General.** Notice required under this Agreement must be in writing, delivered by reputable overnight courier, by U.S. mail via registered, certified or overnight delivery and return receipt requested, or by personal delivery, and addressed to the following addresses (or another address a party designates by notice to the other party):

If to Epic: Judith R. Faulkner

If to You: County Health System – Health IT

CEO
Epic Systems Corporation
1979 Milky Way
Verona, WI 53593

with a copy to:

General Counsel
Epic Systems Corporation
1979 Milky Way
Verona, WI 53593

225 37th Ave.
San Mateo, CA 94403

with a copy to:

County of San Mateo
County Attorney's Office
Redwood City, CA 94063
Fax: 650-636-4034

b. **Invoices.** Invoices should be sent by email to the following email address (or another email address You designate by email to finance@epic.com): hs_hit_accountspayable@smcgov.org

c. **Payments.** Payments should be payable to Epic Systems Corporation and sent to the following address (or to another address Epic designates by notice to You):

Epic Systems Corporation
Box 88314
Milwaukee, WI 53288-0314

## 16. RECORDS REQUIREMENTS

To the extent 42 U.S.C. § 1395x(v)(1)(I) (as amended) and regulations promulgated thereunder apply, until the expiration of four (4) years after furnishing services and/or products under this Agreement, Epic will make available, upon written request of the Secretary of the Department of Health and Human Services, or upon request of the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement and the books, documents, and records of Epic that are necessary to certify the nature and extent of the costs for which You seek reimbursement. In addition, if Epic carries out its duties under this Agreement through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period with a related organization, such subcontract will contain a similar clause allowing access to the subcontract, and books, documents, and records of such organization that are necessary to verify the nature and extent of such costs.

## 17. MISCELLANEOUS

a. **Governing Law, Forum and Jurisdiction.** This Agreement will be governed and interpreted under the laws of the Jurisdictional State, without reference to its conflicts of laws principles, and any action (including by arbitration, if applicable) arising out of or relating to this Agreement will be brought exclusively in the Jurisdictional State. If Epic institutes the applicable legal action, then the "Jurisdictional State" for such action and all counter claims to such action will be San Mateo County, California. If You institute the applicable legal action, then the "Jurisdictional State" for such action and all counterclaims to such action will be Dane County, Wisconsin. Provided the action is brough in accordance with this Subsection 17(a), Epic and You consent to the personal jurisdiction and venue of the state and federal courts (and arbitration, if applicable) located in the Jurisdictional State.

b. **Severability.** The provisions of this Agreement will be severable, so that if any provision is found unenforceable, it and related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose. However, severability will not apply if it materially changes the benefit of this Agreement to either party.

c. **No Waiver; No Course of Conduct.** Failure to enforce a provision of this Agreement will not bar future enforcement. The parties' conduct will not be used to interpret this Agreement.

d. **Purchase Orders.** Epic accepts Your purchase orders only for accounting convenience. Purchase order terms, other than those in a software or service order prepared by Epic and signed by You, will not amend this Agreement or otherwise constitute an agreement between the parties.

e. **Entire Agreement.** The appendices, exhibits, and addenda to this Agreement, and software or service orders prepared by Epic and signed by You, are part of this Agreement. Except as expressly provided in another written agreement between You and Epic or an Epic Owned Entity, this Agreement is the entire understanding between the parties on its subject matter. Any amendment must be in writing and agreed to by a duly authorized representative of each party.

f. **Subcontracting and Assignment by Epic.**

(i) *Subcontracting.* Epic may subcontract its activities under this Agreement to any Epic Owned Entity. Epic also may subcontract such activities to non-Epic subcontractors. Epic will inform You in advance of any proposed non-Epic subcontractor and the activities it would carry out, and You may approve or reject the subcontractor. Epic is responsible to You for work performed by its subcontractors to the same extent as it is for Epic's own work. Relevant terms of this Agreement apply to subcontractors in the same manner as they apply to Epic. Code or documentation provided to You by an Epic subcontractor is owned by Epic and treated as Code and Documentation under this Agreement.

(ii) *Assignment by Epic.* Epic may assign this Agreement either to an Owned Entity or as part of the acquisition of substantially all of Epic's assets by another entity. In either case, the assignee must agree in writing to the assignment and the Agreement's terms. Epic will remain liable for Epic's obligations under this Agreement if the assignee fails to satisfy them.

g. **Restriction on Offers of Employment.** Epic and You will not solicit, discuss prospective employment with, or hire (directly as employees or indirectly) any employee of the other party, except with the other party's prior written consent. The restriction in the previous sentence applies during an individual's employment with the other party and for twelve (12) months following such employment, and only to employees who have worked on the development, implementation, or maintenance of Epic software. Epic may choose not to work with or train former Epic staff hired in violation of this Subsection. Notwithstanding the foregoing, and for the avoidance of doubt, nothing contained in this Subsection 17(g) will prevent an Epic employee whose position at Epic was unrelated to the development, installation, or maintenance of Epic software from securing a publicly posted position with You that is unrelated to the development, installation, or maintenance of Epic software. For the avoidance of doubt, a general job announcement or position posting will not violate the foregoing as long as such announcement or posting is not targeted specifically at the other party's personnel, provided that an individual responding to such a general solicitation is not hired in violation of this Subsection. [redacted]

h. **Non-Discrimination and Equal Opportunity.** As of the date of the Agreement, Epic has adopted policies not to discriminate against any employee or applicant for employment to be employed in the performance of this Agreement on the basis of race, ethnicity, religion, color, creed, sex, disability, national origin, ancestry, age, sexual orientation, gender identity, marital status, citizenship, employee weight, employee height, AIDS/HIV status, genetic information, or United States military service veteran's status.

i. [redacted]

[redacted]

j. **Independent Contractors; No Third-Party Beneficiaries or Joint Employers.** Epic and You are independent contractors and not each other's agents. Except to the extent expressly specified, this Agreement does not create third-party beneficiaries. Epic and You are not joint employers of the other's employees and do not have the right to make employment decisions about the other's employees.

k. **Interpretation; Authorization; Counterparts.** Headings in this Agreement will not affect the interpretation of this Agreement. In this Agreement, the words "include" and "exclude" and their variants are not words of limitation, and examples are for illustration and not limitation. In addition, all references in this Agreement to Epic's standard rates or fees mean the rates or fees Epic normally charges at such time to its similarly situated customers for the applicable services or software. Each party represents that the individual signing on its behalf is authorized to bind the party. This Agreement and its incorporated documents may be signed on paper, by facsimile or electronically, and may also be signed in counterparts.

THIS AGREEMENT HAS BEEN ENTERED INTO AS OF THE DATE OF YOUR SIGNATURE BELOW.

| COUNTY OF SAN MATEO | EPIC SYSTEMS CORPORATION |
|---|---|
| By: ______________________ | By: Judith R Faulkner |
| Name: ______________________ | Name: Judith R. Faulkner |
| Title: President, Board of Supervisors, San Mateo County | Title: CEO |
| Date: ______________________ | Date: October 18, 2022 |

BMJ

ELS

Resolution No.:
ATTEST:

By:
Clerk of Said Board

COUNTY OF SAN MATEO

# APPENDIX A
# DEFINITIONS

1. "Affiliate" means Your Owned Entities; any hospital or physician organization with fewer than 200 licensed beds and an expected Annual Volume (calculated based on the organization's full operations as if each Item were fully implemented) of fewer than 200,000 Ambulatory Visits that is within Your service area, shares Your Production Directory, and shares or is reasonably likely to share patients with You; and, anyone else (e.g., larger organizations) approved by Epic in writing. "Affiliates" include Your and the above entities' employees and medical staff.

2. "Annual Volume" means the aggregate Volume for the Program Property during (i) the 12-months following the date of this Agreement, and (ii) each subsequent 12-month period.

3. "Claim" means all claims, demands and actions, and all associated liabilities, damages, refunds and costs, including settlements and attorney's fees.

4. "Code" means all object and source code provided by Epic to You under this Agreement, including for the Program Property and in the master patient index and training environments. Code is delivered when it is first made available to You.

5. "Confidential Information" means Your Confidential Information or Epic Confidential Information, as applicable given the context.

6. "Contested Amount" means the amount of an Epic charge that You dispute in good faith in a written notice describing the dispute and provided to Epic by the due date, so long as You have paid all undisputed amounts then due.

7. "Current Version" means the most recent release of an Item, including subsequent special updates to that release.

8. "Documentation" means all documents or materials in any format, including technical data associated with the Program Property, relating to the functionality, operation, use, source code, data structures, implementation, or maintenance of the Program Property or other Epic software, which are (i) provided to You under this Agreement, or (ii) created by You or on Your behalf (only to the extent revealing Epic Confidential Information).

9. "Documentation Manuals" means the Setup and Support Guides and Release Notes provided by Epic for the Program Property, and exclude other Documentation, such as data models, data dictionaries, or objects listings.

10. "ECI" means the Employment Cost Index for total compensation (not seasonally adjusted) for private industry workers, management, professional and related occupations, excluding incentive paid occupations, December 2005 = 100, published by the U.S. Department of Labor, Bureau of Labor Statistics. Unless otherwise specified, the ECI published most recently before the date of the Agreement applies. If the ECI is discontinued, Epic will substitute a similar cost index.

11. "Epic Confidential Information" means, except as provided below, all information concerning: the functionality, operation, use, code, data structures, or development of either Epic software (including the Program Property) or Third Party Software and Data; Proprietary Data Schema; Epic's training, implementation, maintenance and other services; and this Agreement's terms. "Epic Confidential Information" excludes information: (a) generally available to the public without fault by You; (b) rightfully known by You non-confidentially before Epic first provides You access to such information; (c) independently developed by You without use of any Epic Confidential Information; or (d) rightfully obtained by You from a third party with the right to disclose it non-confidentially.

12. "Epic Fees Paid" means all fees paid by You to Epic for (i) Your license to the Program Property, and (ii) the hourly and Maintenance Program services provided to You by Epic under this Agreement.

13. "Extension" means any development that incorporates or references any (i) Epic source Code libraries, (ii) Epic APIs that are not available for public use through open.epic, (iii) Proprietary Data Schema, or (iv) other Epic Confidential Information.

14. "First Live Use" for an Item occurs when You first use the Item to process actual patient data for production purposes.

15. "Indemnitees" means the applicable party and its Owned Entities, and its and their employees, officers, directors, and contractors. Your Indemnitees also include Affiliates.

16. "Item" means each uniquely identified item of Epic software (together with its specified components) licensed to You under the Agreement. The initial Items are specified as Program Property on Exhibit 1. Items may be added by amendment or an Epic-prepared order form signed by You. An Update is not a new Item.

17. "License Fee Paid" means the portion of the Program Property License Fee You have paid Epic that is attributable to a given Item, or, for software licensed after the date of this Agreement, the portion of the license fee You have paid Epic.

18. "Licensed Volume" means the limitations on the Annual Volume specified in Exhibit 1 and increased under Subsection 4(b). You represent that You reasonably calculated the expected Annual Volume based on Your and Your Owned Entities' current operations as if each Item were fully implemented and such expected Annual Volume does not exceed the Licensed Volume. Certain Affiliates may be assigned separate Licensed Volumes.

19. "Maintenance Program" means the maintenance services for the Program Property described in Section 5.

20. "Non-Program Error" means an apparent or real defect, error, or other anomaly that Epic reasonably determines does not originate from an Item (e.g., incorrect use or input, hardware, Third Party Products, or other non-Program Property code) or is a result of the design, configuration, presentation format, or general flow and function of, or a non-Epic modification to, the Program Property. A Non-Program Error is not a Program Error.

21. "Operating Environment" means the InterSystems or other operating environment that Epic may specify from time to time. The Operating Environment is initially specified on Exhibit 1.

22. "Owned Entity" is an entity that (a) directly or indirectly owns or controls more than fifty percent of the applicable party, or (b) is more than fifty percent owned or controlled, directly or indirectly, by the applicable party or an entity described in clause (a).

23. "Performance and Use Data" means the following data relating to Your use of the Program Property: operating system metrics (e.g., CPU utilization, file system usage, disk read performance), Operating Environment metrics (e.g., database accesses per second, available licenses, database free space), Program Property activity metrics (e.g., number of appointments created, average length of stay, medications ordered), configuration selections (e.g., workflows, item selections) and other performance metrics and usage data. Performance and Use Data excludes Protected Health Information (as defined in Exhibit 5).

24. "Production Directory" means each (i) copy of the server Code used to process actual patient data; and (ii) actual patient database exceeding one (if any) processed by the same server Code copy of Program Property. For example, if You use three copies of the server Code to process data, two of those copies each process one patient database and one copy processes two patient databases, You use four Production Directories. Directories used solely for testing or training; disaster recovery; shadow copies supporting MyChart or EpicCare Link; or reporting copies supporting read-only reporting functions are not Production Directories.

25. "Program Error" means a reproducible error or defect in an Item that results in its failure to operate in substantial conformity to descriptions of such operation in the Documentation Manuals. For the avoidance of doubt, operation of an Item that is not inconsistent with its operation as described in the

Documentation Manuals will not constitute a Program Error.

26. “Program Property” means, for each Item, the Code, Documentation, Updates, and other modifications provided to You under this Agreement and described as included in the Item’s Documentation Manuals. If You would like to license additional functionality, additional fees will apply.

27. “Program Property License Fee” is the amount specified on Exhibit 1 as the “Program Property License Fee”.

28. “Programming Points Code” means code external to the source Code that is executable, in accordance with Epic’s instructions, at designated places in the Code.

29. “Project Plan” is the project plan agreed to and periodically revised as agreed by the parties’ implementation teams. A sample is attached as Exhibit 2(b).

30. “Proprietary Data Schema” means metadata describing the specific location, arrangement, or structure of the data elements used in the Program Property, excluding publicly-available standard HL7 formats or other Epic-published exchange formats.

31. “Reasonable Workaround” means a workaround of a Program Error that does not materially decrease the general utility of the Program Property.

32. “Substantive Program Error” means a Program Error that materially and adversely affects Your operations.

33. “Support Materials” are content, formats, forms, data, software, configuration, tools, and other materials created for use with the Program Property and made available through the Community Library or otherwise by Epic (e.g., in starter sets and the Foundation System), such as: report formats, SmartForms, SmartSets, SmartText, SmartPhrases, pathways, decision support rules, selection lists, flowsheets, care plans, patient education, handouts and letter forms, after visit summary forms, preference lists, reference master files, category lists and other reference tables.

34. “Third Party Product” means equipment, software, data, code sets, or other information or material used with, by or in the Program Property, whether or not supplied by Epic.

35. “Third Party Software and Data” means the items of software and content specified in the Third Party Software and Data section of Exhibit 1, or as otherwise may be added by amendment or an Epic-prepared form signed by You.

36. “Uncontested Amount” means an amount charged by Epic to You that is not a Contested Amount.

37. “Update” means a release of or patch to an Item (with error corrections, enhancements, or extensions) that Epic generally makes available free of charge to its similarly situated customers under the Maintenance Program, including applicable Documentation Manuals. Updates are limited to functionality and features described as included in an Item in its Documentation Manuals. If You would like to license additional functionality, additional fees will apply.

38. “Volume” means the actual level of use of the Program Property determined under Exhibit 1 and Subsection 11(b).

39. “Warranty Period” means, for each Item, the period beginning on delivery and ending [redacted] after First Live Use.

40. “Workstation Code” means the components of the object Code designed to operate on personal computers for the purpose of accessing the object Code on Your server(s).

41. “Your Confidential Information” means, except as provided below, all confidential patient data stored using the Program Property and Your confidential information concerning Your business strategies and finances. “Your Confidential Information” excludes information that: (a) is generally available to the public without fault by Epic; (b) is rightfully known by Epic non-confidentially before Epic’s first access to such information from You; (c) is independently developed by Epic without use of any Your Confidential Information; (d) is rightfully obtained by Epic from a third party with the right to disclose it

non-confidentially; (e) relates to the identity of the Program Property licensed by You, the types and configuration of hardware or operating systems running the Program Property, the identity of software or hardware with which the Program Property interfaces for You, the sites where Epic is implementing, interfacing or maintaining the Program Property (or expects to do so), or development relating to the Program Property; or (f) concerns software, data structures, medical content, internet portals or technology, or related development, implementation, maintenance, or other services.

42. "Your Data" means (1) Your Confidential Information to which Epic has access, and (2) Performance and Use Data.

43. "Your Personnel" means You and Your Affiliates, all of Your and their employees and agents, and all persons involved in any way with the Program Property.

# List of Exhibits

| Exhibit | Description |
| --- | --- |
| 1 | Program Property, Third Party Software and Data; Additional Terms and Billing Information |
| 2(a) | Preliminary Implementation Sequence |
| 2(b) | Sample Project Plan |
| 2(c) | Initial Implementation Budget |
| 2(d) | Sample ISR |
| [redacted] | |
| 4 | Epic's Current Standard Hourly Rates |
| 5 | Business Associate Exhibit |
| 6 | Epic's Support Policies |
| 7 | Epic Error Correction Services |
| 8 | Travel Policy |
| Addendum | Care Everywhere Addendum |
| Addendum | Carequality Addendum |
| Addendum | Cosmos Addendum |
| Addendum | Epic Cognitive Computing Addendum |
| Addendum | Payer Platform Addendum |
| Addendum | InterSystems Software Addendum: Terms of InterSystems Sublicense |
| Addendum | SQL Addendum: Terms of KB Systems' KB_SQL Sublicense |
| Addendum | CPT Addendum |
| Addendum | ACC-NCDR® Registry Communication Module Addendum |
| Addendum | PKWARE |

**Exhibit 1**

| **Epic Program Property:** | **Initial Monthly Maintenance Fee:** | **Comments:** |
|---|---|---|
| EpicCare Inpatient Clinical System [redacted] | [redacted] | [redacted] |
| EpicCare Ambulatory Electronic Health Record [redacted] | [redacted] | [redacted] |
| Beacon Oncology | [redacted] | |
| Beaker Laboratory [redacted] | [redacted] | |
| Behavioral Health | [redacted] | |
| Cupid Cardiology | [redacted] | |
| Dermatology | [redacted] | |
| Dorothy Home Care [redacted] | [redacted] | |
| EpicCare Link | [redacted] | |
| Dialysis | [redacted] | |
| Bones Orthopaedics | [redacted] | |
| Fertility | [redacted] | |
| Kaleidoscope Ophthalmology | [redacted] | |
| Lumens Endoscopy | [redacted] | |
| Long-Term Care | [redacted] | |
| OpTime Operating Room Management System [redacted] | [redacted] | |
| Research | [redacted] | |
| Radiant Radiology [redacted] | [redacted] | |
| Rehab | [redacted] | [redacted] |
| Secure Chat | [redacted] | |
| Compass Rose Comprehensive Care Coordination | [redacted] | |
| Stork Obstetrics | [redacted] | |
| Willow Ambulatory Pharmacy [redacted] | [redacted] | [redacted] |
| Wisdom General Dentistry | [redacted] | |
| Resolute Hospital Billing and Patient Accounting [redacted] | [redacted] | [redacted] |
| Resolute Professional Billing and Patient Accounting [redacted] | [redacted] | [redacted] |

| **Epic Program Property:** | **Initial Monthly Maintenance Fee:** | **Comments:** |
|---|---|---|
| Prelude Registration [redacted] | [redacted] | |
| Cadence Scheduling [redacted] | [redacted] | |
| Grand Central Patient Flow [redacted] | [redacted] | [redacted] |
| Cheers CRM for Healthcare [redacted] | [redacted] | |
| Nurse Triage | [redacted] | |
| Health Information Management – Chart Tracking | [redacted] | |
| Cognitive Computing Machine Learning Model Library | [redacted] | [redacted] See Epic Cognitive Computing Addendum to this Agreement. |
| Cognitive Computing Cloud Models | [redacted] | [redacted] See Epic Cognitive Computing Addendum to this Agreement. |
| Cognitive Computing Developer Platform | [redacted] | See Epic Cognitive Computing Addendum to this Agreement. [redacted] |
| Nebula Cloud Platform | [redacted] | [redacted] |
| Cogito ergo sum Analytics [redacted] | [redacted] | [redacted] |
| Healthy Planet Population Health [redacted] | [redacted] | [redacted] |
| Healthy Planet Link Portal for Community Partners | [redacted] | |
| Blood Administration [redacted] | [redacted] | [redacted] |
| Clinical Device Decision Support | [redacted] | [redacted] |
| Remote Monitoring | [redacted] | [redacted] |
| Base Payer Platform Network for Providers | [redacted] | See Payer Platform Addendum to this Agreement. |
| Bridges EDI Developer's License | [redacted] | |
| Charge Router | [redacted] | |
| Identity Embedded Master Person Index | [redacted] | |
| Pulse | [redacted] | |
| System Pulse | [redacted] | |
| Haiku for smartphone, Canto for tablet, Limerick for Apple Watch | [redacted] | [redacted] |
| Push Notifications | [redacted] | [redacted] |
| Care Everywhere [redacted] | [redacted] | See Care Everywhere and Carequality Addenda to this Agreement. |

**Licensed Volume:**

[redacted]

**License Fee Schedule:**
Program Property License Fee: $8,586,900

[redacted]

*Other Program Property*
*(not included in Program Property License Fee)*

| Epic Program Property: | License Fee: | Initial Monthly Maintenance Fee: | Comments: |
|---|---|---|---|
| MyChart Patient Experience Platform – Personalized [redacted] | [redacted] | | [redacted] |
| MyChart Bedside Portal for Admitted Patients | [redacted] | | [redacted] |
| Welcome Patient Kiosk | [redacted] | | [redacted] |
| Epic Video Client | [redacted] | | [redacted] |
| ACC-NCDR® Registry Communication Module | [redacted] | | [redacted] See ACC-NCDR® Registry Communication Module Addendum to this Agreement. [redacted] |
| Cosmos | [redacted] | | [redacted] See Cosmos Addendum to this Agreement. [redacted] |

| Epic Program Property: | License Fee: | Initial Monthly Maintenance Fee: | Comments: |
| --- | --- | --- | --- |
| Standard Interfaces and Data Connectors | [redacted] | | [redacted] |

**Notes and Assumptions for Program Property:**

- Each Item of Program Property is licensed solely for use in a single Production Directory in accordance with the Documentation Manuals and with the other Items of Program Property included in this Exhibit 1 at the Licensed Volume specified for the Program Property. If any Licensed Volume increases or additional Epic software or Production Directories are licensed, additional fees will apply.

[redacted]

- Initial monthly maintenance fees listed are before any annual or other increases (e.g., changes in Licensed Volume or additional Program Property). Maintenance fees for each application begin upon First Live Use. See Section 4(j) (Maintenance Fees) of this Agreement.
- Additional functionality that You have not licensed as of the date of this Agreement, including functionality that Epic develops in the future as a separately licensed application, may be added to Exhibit 1 through a completed software order or license amendment.
- ONC Certification Details

**Product-Specific Notes for Program Property:**

[redacted]

[redacted]

*Third Party Software and Data*

| Third Party Software and Data (not Program Property) | License Fee | Initial Monthly Maintenance Fee | Comments/Licensed Levels |
|---|---|---|---|
| InterSystems IRIS | [redacted] | [redacted] | See InterSystems Software Addendum to this Agreement.<br><br>Volume TBD as per Subsection 1(c) of this Agreement. [redacted] |

| Third Party Software and Data (not Program Property) | License Fee | Initial Monthly Maintenance Fee | Comments/Licensed Levels |
|---|---|---|---|
| InterSystems IRIS – Small Non-Production License | [redacted] | [redacted] | See InterSystems Software Addendum to this Agreement.<br>[redacted] |
| KB Systems SQL | [redacted] | [redacted] | See SQL Addendum to this Agreement.<br>Sixteen (16) concurrent user run-time license. |
| PKWARE SecureZIP | [redacted] | [redacted] | See PKWARE Addendum to this Agreement. |
| CPT Code License – Online Certification Environments only | [redacted] | | See CPT Addendum to this Agreement.<br>[redacted] |
| Third Party Infrastructure for Nebula Cloud Platform | [redacted] | | [redacted] |
| BI-RADS® ATLAS | [redacted] | [redacted] | [redacted] |

| Third Party Software and Data (not Program Property) | License Fee | Initial Monthly Maintenance Fee | Comments/Licensed Levels |
|---|---|---|---|
| Images from the Sourcebook of Medical Illustration | [redacted] | [redacted] | [redacted] |
| Miscellaneous Assessment Tools Collection | [redacted] | [redacted] | [redacted] |

**<u>Notes and Assumptions for Third Party Software and Data:</u>**

- Licensed levels for Third Party Software and Data are designated above in Comments/Licensed Levels column. Each item of Third Party Software and Data is licensed solely for use in a single Production Directory at the specified licensed levels and with the Items of Program Property included in this Exhibit 1 at the Licensed Volume specified for the Program Property. Additional fees will apply if any license levels or Licensed Volumes increase or if applications are added.
- Third party software fees are current as of the date of this Exhibit 1 and subject to change. Maintenance on most third party applications begins 30 days after delivery of the software; trial licenses are available in some cases.

*Certain Other 3rd Party Software and/or Data*

| **Certain Other 3rd Party Software and/or Data (not Program Property ) (not Third Party Software and Data)** | **License Fee** | **Initial Monthly Maintenance Fee** | **Comments/Licensed Levels** |
|---|---|---|---|
| Intelligent Medical Objects – Personal Health Terminology – Advanced Option | [redacted] | | [redacted] |
| UpToDate – Core | [redacted] | | [redacted] |
| UpToDate – Core, Image/Imprint, IMM English, and English Warning Labels | [redacted] | | [redacted] |
| CareSelect | [redacted] | | [redacted] |

**Notes and Assumptions for Certain Other 3rd Party Software and/or Data:**

- Certain Other 3rd Party Software and/or Data is not sublicensed to You by Epic. You must sign a license agreement directly with the applicable third party vendor. [redacted]
- Licensed levels are designated above in Comments/Licensed Levels column and/or in and subject to the separate agreements. This Certain Other 3rd Party Software and/or Data is licensed solely for use in a single Production Directory at the specified licensed levels and with the Items of Program Property included in this Exhibit 1 at the Licensed Volume specified for the Program Property. Additional fees will apply if any license levels or Licensed Volumes increase or if applications are added.
- Third party software fees are current estimates as of the date of this Exhibit 1 and subject to change. Maintenance on most third party applications begins 30 days after delivery of the software; trial licenses are available in some cases.

**Attachment A**

[redacted]

[redacted]

# San Mateo County Health System

*Proposed Implementation Sequence*

[redacted]

Exhibit 2

[redacted]

[redacted]

[redacted]

[redacted]

The estimates below are based on the Implementation Staffing Plan and Implementation Sequence dated May 6, 2022

## Epic Implementation Services

**Estimated Epic Implementation Fees**

[redacted]

| | |
|---|---|
| **Epic Implementation Services Total** | **$10,186,000** |

[redacted]

| | |
|---|---|
| ***Optional Epic Boost Services*** | **$5,211,000** |

[redacted]

[redacted]

Epic

**Requestor:**
**Date Requested:**
**Epic Implementation Director:**
**Epic Budget Advisor:**
**Date Prepared:**
**New Customer Budget Number?:**

# Implementation Service Request

**Type:** ☐ Addition ☐ Reallocation ☐ Reduction ☐ Administrative

**Category:** ☐ Scope Change ☐ Timeline Change ☐ Other Assumption Change
☐ Supplemental Customer Build, Testing, etc.
☐ Supplement Customer Staff ☐ Go-Live Related Help
☐ Interfaces Added ☐ Other

ISR #: 0
TLP #:
Applications:

**Customer & Project:** ______________________________

**Description:** ______________________________

## Description

**Details** **Estimate**

**Total Cost** **$0**

*Separate travel authorizations will be sent for approving travel expenses related to on-site work.

**Epic Signature:** ______________________________ **Date:** ______________
0

## Acceptance

I authorize the implementation budget reallocation or addition (as applicable) specified above. I understand that (a) if the scope of services requested change, prices may change, (b) if this Implementation Service Request is signed more than 60 days after the date it was prepared, Epic may revise the quotation, (c) the actual hourly rate depends on the services performed and the person performing the services and that (d) the terms of the license agreement between Epic and Customer apply to this Implementation Service Request. Except as otherwise provided in the license agreement, work associated with this Implementation Service Request will be billed as incurred. I have authority on behalf of the Customer to authorize and sign this Implementation Service Request.

ONC Health IT Certification (for Meaningful Use) information, including pricing and limitations, is available here: http://www.epic.com/mu

**Signature:** ______________________________ **Date:** ______________

**Print Name:** ______________________________

**Purchase Order:** ______________________________ (If applicable)

[redacted]

# EXHIBIT 4

## EPIC HOURLY RATES

| Services** | Hourly Billing Rate (at Epic) | Hourly Billing Rate (on Site) |
|---|---|---|
| [redacted] | | |

## EPIC PROJECT TEAM TRAINING CHARGES

[redacted]

| Project Team Training at Epic* | Charge Per Trainee Per Class Per Day |
|---|---|
| [redacted] | |

## EPIC VIRTUAL END-USER TRAINING CHARGES

[redacted]

| Type of Training Track* | Charge Per Trainee Per Assigned Track |
|---|---|

[redacted]

**Exhibit 5**

**Business Associate Exhibit**

**BACKGROUND**

A. You ("Covered Entity") and Epic ("Business Associate") have entered into a License and Support Agreement (inclusive of this Exhibit, the "Agreement"), pursuant to which Covered Entity has licensed software from Business Associate and Business Associate provides implementation, maintenance, support and other services to Covered Entity.

B. Covered Entity possesses Protected Health Information that is protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), subtitle D of Title XIII of Division A of the American Recovery and Reinvestment Act of 2009 ("HITECH") and the regulations promulgated thereunder by the United States Department of Health and Human Services, and is permitted to use or disclose such Protected Health Information only in accordance with HIPAA, HITECH and the Regulations.

C. Business Associate will have access to and may receive Protected Health Information from Covered Entity in connection with its performance of services to Covered Entity. In addition, Business Associate owns and operates a web-based personal health records service, currently known as Lucy, (the "PHR Service") that can be made available to patients of Covered Entity by way of a link provided on Covered Entity's patient portal website. The PHR Service allows patients to initiate transfers of data from Covered Entity to the PHR Service.

**TERMS**

**1. Definitions.** All capitalized terms used but not otherwise defined in this Exhibit have the same meaning as those terms in the Regulations.

a. Breach. For purposes of Sections 2(d) and 2(k) of this Exhibit only, "Breach" has the meaning set forth in § 164.402 (including all of its subsections) of the Regulations; with respect to all other uses of the word "breach" in this Exhibit (e.g., section 4), the word has its ordinary contract meaning.

b. Individual. "Individual" has the same meaning as the term "individual" in § 160.103 of the Regulations and shall include a person who qualifies as a personal representative in accordance with § 164.502(g) of the Regulations.

c. Protected Health Information. "Protected Health Information" has the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

d. Regulations. "Regulations" means the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A, C, D and E, as in effect on the effective date of the Agreement.

e. Required By Law. "Required By Law" has the same meaning as the term "required by law" in § 164.103 of the Regulations.

f. Secretary. "Secretary" means the Secretary of the Department of Health and Human Services or his designee.

**2. Obligations and Activities of Business Associate.**

a. Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by this Exhibit, the Agreement or as Required By Law.

b. Business Associate agrees to use appropriate safeguards and comply, where applicable, with Subpart C of 45 CFR Part 164 of the Regulations with respect to electronic Protected Health Information, to prevent use or disclosure of the Protected Health Information other than as provided for by this Exhibit or the Agreement.

c. Business Associate agrees to mitigate, to the extent reasonably practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Exhibit.

d. [redacted] Business Associate agrees to report to Covered Entity any Security Incident respecting electronic Protected Health Information in Business Associate's possession or control, and any use or disclosure of the Protected Health Information not provided for by the Agreement, of which Business Associate becomes aware [redacted]

e. Business Associate agrees to ensure that, in accordance with 45 CFR § 164.502(e)(1)(ii) and 45 CFR § 164.308(b)(2) of the Regulations, any subcontractors that create, receive, maintain or transmit Protected Health Information on behalf of Business Associate agree to comply with the same or similar restrictions and conditions that apply to Business Associate with respect to such information.

f. If Business Associate maintains Protected Health Information in a Designated Record Set for Covered Entity, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner reasonably designated by Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under § 164.524 of the Regulations.

g. If Business Associate maintains Protected Health Information in a Designated Record Set for Covered Entity, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to § 164.526 of the Regulations at the request of Covered Entity or an Individual, and in the time and manner reasonably designated by Covered Entity.

h. To the extent Business Associate is to carry out any of Covered Entity's obligations under Subpart E of 45 CFR 164 of the Regulations, Business Associate will comply with the requirements of Subpart E of 45 CFR 164 of the Regulations that apply to Covered Entity in the performance of such obligations.

i. Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, in a time and manner reasonably designated by Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Regulations.

j. Accounting of Disclosures.

1. Business Associate agrees to document such disclosures by Business Associate of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with § 164.528 of the Regulations.

2. Business Associate agrees to provide to Covered Entity or an Individual, in time and manner reasonably designated by Covered Entity, information collected in accordance with Section 2(j)(1) of this Exhibit, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with § 164.528 of the Regulations.

k. Notifications Regarding Breaches of Unsecured PHI.

1. Following Business Associate's discovery of a Breach of Unsecured Protected Health Information, Business Associate will notify Covered Entity of such Breach in accordance with §§ 164.410 and 164.412 of the Regulations.

2. With regard only to Breaches of Unsecured Protected Health Information that occur in connection with the PHR Service, Business Associate will (instead of Covered Entity) provide such notifications to Individuals and to the media as are required by §§ 164.404 and 164.406 of the Regulations.

l. Restriction against Sale of PHI. Business Associate will not sell PHI or receive any direct or indirect remuneration in exchange for PHI except as permitted by this Exhibit, the Agreement or federal law.

**3. Permitted Uses and Disclosures by Business Associate.**

a. Except as otherwise expressly limited in this Exhibit, Business Associate may use or disclose Protected Health Information to perform functions, activities or services for, or on behalf of, Covered Entity in connection with the Agreement and any other agreements in effect between Covered Entity and Business Associate, including without limitation the provision of software implementation, maintenance and support services, provided that such use or disclosure would not violate the Regulations if done by Covered Entity.

b. Except as otherwise expressly limited in this Exhibit, Business Associate may use Protected Health Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

c. Except as otherwise expressly limited in this Exhibit, Business Associate also may disclose Protected Health Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate if the disclosure is Required By Law, or if Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

d. Except as otherwise expressly limited in this Exhibit, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity as permitted by § 164.504(e)(2)(i)(B) of the Regulations.

e. Business Associate may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with § 164.502(j)(1) of the Regulations.

**4. Termination.**

a. <u>Termination for Cause.</u>

1. By Covered Entity. Upon Covered Entity's knowledge of a material breach by Business Associate of this Exhibit, Covered Entity may:

A. Provide a reasonable opportunity for Business Associate to cure the material breach or end the material violation and if Business Associate does not cure the material breach or end the material violation within a reasonable time, Covered Entity may terminate this Exhibit and the provisions of the Agreement that require or permit Business Associate to access Protected Health Information; or

B. If Business Associate has breached a material term of this Exhibit and cure is not possible, immediately terminate this Exhibit and the provisions of the Agreement that require or permit Business Associate to access Protected Health Information.

2. By Business Associate. Upon Business Associate's knowledge of a material breach by Covered Entity of this Exhibit, Business Associate may:

A. Provide a reasonable opportunity for Covered Entity to cure the material breach or end the material violation and if Covered Entity does not cure the material breach or end the material violation within a reasonable time, Business Associate may terminate this Exhibit and the provisions of the Agreement that require or permit Business Associate to access Protected Health Information; or

B. If Covered Entity has breached a material term of this Exhibit and cure is not possible, immediately terminate this Exhibit and the provisions of the Agreement that require or permit Business Associate to access Protected Health Information.

b. <u>Effect of Termination.</u>

1. Except as provided in paragraph (2) of this section, upon termination of this Exhibit, for any reason, Business Associate will return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision applies to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate will retain no copies of the Protected Health Information.

2. In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate will provide to Covered Entity notification of the conditions that make return or destruction infeasible. In such event, Business Associate will extend the protections of this Exhibit to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

3. If the provisions of the Agreement that require or permit Business Associate to access Protected Health Information are terminated pursuant to any provision in Section 4(a) above, then the maintenance program under the Agreement will also terminate. Upon such termination, Business Associate will refund any maintenance fees previously paid by Covered Entity to Business Associate with respect to the unused portion of the maintenance program for the future. Except as provided herein, any termination of the maintenance program or provisions of the Agreement that permit Business Associate to access Protected Health Information will not affect the parties' other obligations or rights under the Agreement.

**5. Miscellaneous.**

a. Changes to Regulations. If the Regulations are amended, including by way of anticipated regulations yet to be promulgated as provided in HITECH, in a manner that would alter the obligations of Business Associate as set forth in this Exhibit 5, then the parties agree in good faith to negotiate mutually acceptable changes to the terms set forth in this Exhibit 5.

b. Survival. The respective rights and obligations of Business Associate under Section 4 of this Exhibit survive the termination of this Exhibit.

c. Interpretation. Any ambiguity in this Exhibit shall be resolved to permit compliance with the Regulations.

d. Unencrypted PHI. Covered Entity will not send unencrypted PHI to Business Associate in any form, including via email or on mobile devices such as USB drives. Should Covered Entity do so, Business Associate is not responsible for any damages arising out of or relating to unencrypted PHI that Covered Entity sends to Business Associate in any form.

e. Application of Civil and Criminal Penalties. Business Associate acknowledges that pursuant to §§ 13401(b) and 13404(c) of HITECH:

1. in the case Business Associate violates any security provision specified in § 13401(a) of HITECH, sections 1176 and 1177 of the Social Security Act (42 U.S.C. 1320d-5, 1320d-6) shall apply to Business Associate with respect to such violation in the same manner such sections apply to a covered entity that violates such security provision; and

2. in the case Business Associate violates any provision of 13404(a) or 13404(b) of HITECH, the provisions of sections 1176 and 1177 of the Social Security Act (42 U.S.C. 1320d-5, 1320d-6) shall apply to the Business Associate with respect to such violation in the same manner as such provisions apply to a person who violates a provision of part C of title XI of such Act.

**Exhibit 6**

**Epic Support Policies**

***Support Available 24 x 7***
Epic provides telephone consultation and assistance support to You through its technical services staff at any time, 24 hours per day and 7 days per week.

***Where to Call***
For all calls, whether during the Daytime Support Hours or the Nighttime Support Hours, call Epic's general telephone number at (608) 271-9000. The "Daytime Support Hours" are 7 a.m. to 8:00 p.m., Monday through Friday, Central Time, excluding holidays (currently New Year's Day, Memorial Day, July 4, Labor Day, Thanksgiving, Christmas Eve, Christmas, and New Year's Eve). "Nighttime Support Hours" are all other times.

***Consultation and Assistance***

- **General Daytime Support.** [redacted]
- **General Nighttime Support.** [redacted]
- **Support Relating to Correction of Errors.** [redacted]

***Releases***

- You, in connection with Your hosting provider (as applicable), are responsible for installing all Updates. [redacted]

***Other Services***
Services not listed as included for no additional charge above are chargeable at Epic's then-standard rates for such services.

These services are available only to customers on standard maintenance.
Epic reserves the right to change these policies and prices from time to time.

**Exhibit 7**

**Epic Error Correction Services**

A description of Epic's error correction services is below. [redacted]

Exhibit 8

# Epic Travel Policies

## General

Before traveling to Your facilities, Epic must receive written authorization from You for the travel as provided in the Agreement. Epic will complete a travel authorization form which, unless agreed otherwise, will include the names of everyone who will be billing his or her travel expenses to You, the on-site dates for the personnel, and an estimate for all expenses. [redacted]

## Certain Reimbursable Expenses

*Transportation*:

Air: Economy-class seats (i.e., Standard Economy, Main Cabin, or similar) generally are to be booked. Optional upgrades will not be reimbursed. Flights are chosen based on price and schedule. Epic will choose the most cost effective flight that otherwise satisfies its booking criteria (e.g. avoidance of double connections, fits any reasonable time constraints). If a charter would be of equal cost to or less expensive than commercial airfare due to the number of traveling staff, Epic may use a charter.

Ground: You will reimburse Epic for tolls, parking fees, a standard amount for mileage to and from the outbound airport, airport shuttle service, public transportation, taxis, and ride-sharing services (e.g., Uber and Lyft). Personal car mileage is based on the IRS set rate. Epic will normally rent cars from a national car rental chain to take advantage of its national discounted rates whenever feasible. [redacted]

*Accommodations*: You will reimburse Epic for the single occupancy cost of a standard room at an Epic standard hotel. [redacted] Epic standard hotels are hotels that serve business travelers with suitable internet connections, business centers, safety (internally and in the surrounding locale), cleanliness, on-site or nearby food service, and on-site or nearby gathering areas to accommodate groups for work-related meetings, as well as short commuting distances and sufficient vacancies to accommodate the Epic staff on that trip.

[redacted]

Exhibit 8

[redacted]

### Non-Reimbursable Expenses

You will not reimburse Epic for the following expenses:

- Hotel movies
- Entertainment
- Sightseeing
- Alcoholic beverages
- Child or pet care
- Damages to an employee's personal vehicle
- Lost or stolen funds or personal property
- Parking tickets, speeding tickets, etc.
- Travel insurance
- Insurance in connection with personal automobiles
- Hotel health club memberships
- Laundry service (unless Epic staff is on site for six consecutive days or more)
- Personal services and personal supplies
- Meals in Madison or the Madison area (other than at the Madison airport)
- Any expense which is not bona fide for federal income tax purposes

### Documentation of Travel Expenses

Epic travelers generally are required to provide Epic with receipts for their travel expenses. Lodging receipts should include the name and location of the lodging, dates of stay and separate amounts for charges such as meals. On the occasion a receipt is lost or misplaced, Epic's accounting department will obtain documentation from the traveler for the applicable expenses. [redacted]

**Care Everywhere Addendum**

The following provisions apply to Your use of Care Everywhere to exchange patient information with Epic systems of other Epic customers who also license Care Everywhere ("Care Everywhere Customers" or "Care Epic Customers") and to exchange basic continuity of care information meeting the supported form with non-Epic systems, except as otherwise noted below. For the sake of clarity, the subset of Care Everywhere functionality supporting such exchanges between Epic systems was previously referred to as "Care Epic" and the subset of Care Everywhere functionality supporting such exchanges between Epic and non-Epic systems was previously referred to as "Care Elsewhere." References to Care Epic or Care Elsewhere in the Rules of the Road and Governing Council Procedures will be read in that context.

1. **Termination.** You may at any time disconnect from the Care Everywhere Network (referred to in the Governing Council Procedures as the CE Network or Network) or from any specific connection with a non-Epic system (each, a "Non-Network Connection"), thereby discontinuing all communications with all other Care Everywhere Customers and all Non-Network Connections or with that Non-Network Connection, respectively, and You will inform Epic of such disconnection as soon as possible under the circumstances, but in no event more than one (1) business day thereafter.

2. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Attachment A**
Care Everywhere Grievance Process Flow Diagram

[redacted]

**Attachment B**
Care Everywhere Grievance Claim Form

[redacted]

**Attachment C**
Care Everywhere Review Standards and Sanctions

[redacted]

[redacted]

[redacted]

**Attachment D**

Care Everywhere Grievance Appeals Process Flow Diagram

[redacted]

**Carequality Addendum**

Epic's Care Everywhere application ("Care Everywhere") allows Epic customers to exchange patient data with other Epic customers that also license Care Everywhere and to exchange continuity of care information meeting the supported form with organizations that are not using Epic software. Epic has entered into an arrangement with Carequality that allows Care Everywhere users to exchange patient data with other participants in Carequality (each, a "Carequality Participant") for certain use cases using the Carequality framework. The following provisions apply to Your use of Care Everywhere – Carequality Treatment Exchange (the "Carequality Treatment Functionality"), Care Everywhere – Carequality SSA Determination (the "Carequality SSA Functionality"), and Care Everywhere – Carequality Electronic Case Reporting (the "Carequality eCR Functionality", and collectively with the Carequality Treatment Functionality and the Carequality SSA Functionality, the "Carequality Functionality") to enable such exchanges. In the future Epic may also develop other functionality related to Carequality, including without limitation the ability for You to utilize additional Carequality permitted purposes of use (e.g. Payment, Operations, Public Health, Research), and such additional functionality may be licensed separately.

1. **Termination.** [redacted]

2. **Requirements.**

[redacted]

[redacted]

**3. Escalation and Indemnification.**

[redacted]

b. [redacted] Therefore, to the extent permitted by the law applicable to You, You agree to hold harmless, indemnify, and defend Epic and its officers, employees, contractors, and agents (collectively the "Indemnitees") from and against any Claim brought by any other Implementer, Carequality Connection, End User, or any of Your or their patients asserted against the Indemnitees or any of them, arising out of, or in any way connected with the Carequality Functionality, including without limitation claims based on an Indemnitee's negligence. For purposes of this Section 3(b) of this Addendum, "Claim" means a claim, damage, liability, claim of loss, lawsuit, cause of action, or other claim and includes without limitation, reasonable attorneys' fees. End User as used in this Section 3(b) is as defined in the Carequality Connection Terms.

**Exhibit 1**

**Carequality® Connection Terms**

The contents of this Exhibit 1 are the Carequality Connection Terms that must be legally binding on every Carequality Connection, as that term is defined below. Sponsoring Implementer, as defined below, must ensure that these terms are included, directly or by reference, in a legally enforceable agreement or any other legally enforceable mechanism selected by Sponsoring Implementer (the "Enforcing Agreement"). These terms must be presented, directly or by reference, in the Enforcing Agreement as they appear in this Exhibit 1, without alteration or modification.

1. ***Definitions***: As used herein, the following terms have the following meanings:

1.1. Adverse Security Event: The unauthorized acquisition, access, disclosure, or use of individually identifiable health information (as defined in the HIPAA Regulations) while such information is being transmitted between Implementers or Carequality Connections as specified by a Carequality Implementation Guide and pursuant to a valid CCA or Carequality Connection Terms, as applicable, but shall not include (i) any unauthorized acquisition, access, disclosure or use of encrypted data; (ii) any unintentional acquisition, access, disclosure, or use of health information if (I) such acquisition, access, disclosure, or use was made in good faith and within the course and scope of the employment, or if not an employee, as a member of the workforce of an End User; and (II) such health information is not further acquired, accessed, disclosed or used by the End User; or (iii) any acquisition, access, disclosure or use of information that was not directly related to use of the Carequality Elements.

1.2. Applicable Law: (i) If Organization is not a Federal agency, all applicable statutes and regulations of the State(s) or jurisdiction(s) in which Organization operates, as well as all applicable Federal statutes, and regulations; or (ii) if Organization is a Federal agency, all applicable Federal statutes, regulations, standards and policy requirements of the Organization agency.

1.3. Business Associate: An organization that is defined as a "business associate" in 45 C.F.R. § 160.103 of the HIPAA Regulations.

1.4. Business Day(s): Monday through Friday excluding federal or state holidays.

1.5. Carequality Connection: An organization that is properly listed in the Carequality Directory in accordance with the requirements of Section 15 of the CCA.

1.6. Carequality Directory: A set of information that includes entries for all organizations who have been accepted as Carequality Implementers, along with those organizations' Carequality Connections, which serves as the definitive reference for identifying those organizations who are valid participants in exchange activities through the Carequality Elements, and for obtaining the information needed to establish technical connectivity with such organizations.

1.7. Carequality Elements: Those elements that have been adopted by Carequality to support widespread interoperability among Implementers including, but not limited to, the Carequality Connected Agreement, the Carequality Connection Terms, the Carequality Directory, Implementation Guides, and the Carequality Policies.

1.8. Carequality Policies: Those policies and procedures adopted by Carequality which are binding on Carequality, Implementers, Carequality Connections or all of them.

1.9. Carequality Use Case: A combination of a set of functional needs and a particular technical architecture for addressing those needs, for which the Carequality Steering Committee ("Steering Committee") has adopted an Implementation Guide.

1.10. Confidential Information: Proprietary or confidential materials or information of a Discloser in any medium or format that a Discloser labels as such upon disclosure or given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered confidential. With respect to Carequality, Confidential Information also includes those components of the Carequality Elements that the Carequality Steering Committee determines should be labeled Confidential. Notwithstanding any label to the contrary, Confidential Information does not include any Contribution (even if included in a Carequality Element); any information which is or becomes known publicly through no fault of a Recipient; is learned of by a Recipient from a third party entitled to disclose it; is already known to a Recipient before receipt from a Discloser as documented by the Recipient's written records; or, is independently developed by Recipient without reference to, reliance on, or use of, Discloser's Confidential Information.

1.11. Contribution: Any submission by a Discloser to Carequality intended by the Discloser to be considered for inclusion in any of the Carequality Elements, including comments submitted on any media, oral discussions at meetings of any work group, committee or sub-committee or other types of submissions.

1.12. Covered Entity: An organization that is defined as a "covered entity" in 45 C.F.R. §160.103 of the HIPAA Regulations.

1.13. Discloser: The entity that discloses Confidential Information to a Recipient.

1.14. Dispute: Any controversy, dispute, or disagreement arising out of or relating to the interpretation or implementation of the Carequality Elements.

1.15. End User: An individual or program generating a request for information, responding to a request for information, publishing information to a list of recipients or receiving published information through the Carequality Elements.

1.16. Exchange Activity: Any use of the capability provided or supported by the Carequality Elements to exchange information among Implementers or their Carequality Connection.

1.17. Governmental Entity: A local, state or Federal agency.

1.18. HIPAA Regulations: The Standards for Privacy of Individually Identifiable Health Information and the Security Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and 164) promulgated by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act (HIPAA) of 1996, as in effect on the effective date of the Enforcing Agreement and as may be amended, modified, or renumbered.

1.19. Implementation Guide: A guide adopted by Carequality that sets forth the technical specifications and additional business rules that apply to Implementers and Carequality Connections who declare support for a specific Carequality Use Case. Additional business rules will include, but not be limited to, permitted purposes for the Carequality Use Case, roles associated with the Carequality Use Case and specifications on compliance with Section 8 of these Carequality Connection Terms ("Non- Discrimination").

1.20. Implementer: An organization that has signed the Carequality Connected Agreement and been accepted as such by Carequality.

1.21. Organization Business Rule: A data sharing restriction that Organization has adopted for itself and its End Users. An Organization Business Rule may only be based on a policy decision that Organization has made with respect to the handling of patient data identified as clinically or legally sensitive, or to the consent or authorization that is required to share data with other

Implementers and Carequality Connections. It is not necessary that the Organization Business Rule be required by Applicable Law or be based on Applicable Law.

1.22. Organization: The Carequality Connection on which these Carequality Connection Terms are binding.

1.23. Recipient: The entity that receives Confidential Information from a Discloser.

1.24. Sponsoring Implementer: The entity that is a party to the Carequality Connected Agreement and is ensuring that these Carequality Connection Terms are legally binding on Organization, either directly through contract or some other appropriate relationship with Organization, or by relying on one or more intermediaries. This term is used to distinguish this specific entity from other Implementers, and applies to that entity both during the period in which it is seeking to attain Implementer status, and after it is accepted as an Implementer.

2. ***Recognition as a Carequality Connection.***

2.1. Organization. Upon Sponsoring Implementer determining to its satisfaction that Organization has met the requirements to be a Carequality Connection, and Sponsoring Implementer's inclusion of Organization in the Carequality Directory, Organization shall be recognized as a Carequality Connection, subject to all obligations, terms and conditions contained herein and entitled to all rights and benefits conferred upon Carequality Connections including, but not limited to, inclusion in the Carequality Directory.

2.2. Sub-Organization Entities. Sponsoring Implementer may delegate to Organization the authority to identify to Carequality those of Organization's subsidiary and related entities that Organization wishes to be listed in the Carequality directory as Carequality Connections of Sponsoring Implementer ("Sub- Organization Entities"). Such entities include, but are not limited to, separately branded business divisions, individual hospitals, individual clinics or medical offices, and otherwise-unaffiliated entities who contract with Organization for use of Organization's electronic health record system. For all Sub- Organization Entities that Organization identifies, it shall ensure that each Sub-Organization Entity is legally required to comply with these CC Terms. In addition, Organization shall work cooperatively with Sponsoring Implementer to assure that its Sub-Organization Entities are not already listed in the Carequality Directory by another Carequality Implementer.

3. ***Suspension and Termination***.

3.1. Suspension. Sponsoring Implementer or Carequality may suspend Organization's ability to participate in any exchange activity under the Carequality Connection Terms in the event that Sponsoring Implementer or Carequality determines, following completion of a preliminary investigation, that (i) Organization has breached a material provision of these Carequality Connection Terms and failed to cure such breach within fifteen (15) days or such other period of time that the Parties have agreed to, of receiving notice of same; or (ii) there is a substantial likelihood that Organization's acts or omissions create an immediate threat or will cause irreparable harm to Carequality, Sponsoring Implementer, another Implementer, Carequality Connection, End User or individual (collectively, a "Threat Condition"). Organization may provide notice to Sponsoring Implementer that it wishes to temporarily remove itself from the Carequality Directory in the event that Organization or any of Organization's End Users cannot comply with these Carequality Connection Terms.

3.2. Termination. Sponsoring Implementer may terminate Organization's status as a Carequality Connection with immediate effect by giving notice to Organization if: (i) Organization is in material breach of any of these Carequality Connection Terms and fails to remedy such breach within 30 days after receiving notice of such breach; or (ii) Organization breaches a material provision of these Carequality Connection Terms where such breach is not capable of remedy.

Subject to the terms of any agreement between Organization and Sponsoring Implementer, Organization may voluntarily terminate its status as a Carequality Connection at any time by providing written notice to Sponsoring Implementer and to Carequality at least 60 prior to the effective date of the termination. The notice shall indicate the reason(s) for Organization deciding to terminate its status as a Carequality Connection. If Organization is a U.S. federal agency, then the Contract Disputes Act ("CDA"), 41 U.S.C. sections 7101 et seq., shall govern alleged breaches under these Carequality Connection Terms.

4. ***Legal Requirements***. Organization shall, at all times, fully comply with all Applicable Law relating to these Carequality Connection Terms and the use of the Carequality Elements. To further support the privacy, confidentiality, and security of health information exchanged pursuant to these Carequality Connection Terms, Organization agrees that when acting as a Carequality Connection, it will comply with the provisions of the HIPAA Regulations that are applicable to Business Associates as a minimum contractual standard of conduct even if Organization is not a Covered Entity, a Business Associate, or a Governmental Entity. Notwithstanding any provision of these Carequality Connection Terms to the contrary, an Organization that is a federal agency and is not otherwise subject to the HIPAA Regulations shall not be required to comply with the HIPAA Regulations under these Carequality Connection Terms.

5. ***Compliance with the Implementation Guides and Carequality Policies.*** Organization shall implement and maintain support of at least one Carequality Use Case and shall indicate to Sponsoring Implementer the Organization's role in such Carequality Use Case ("Carequality Use Case Role"). For all Carequality Use Cases supported by Organization, Organization shall comply with all components (unless such components are designated as optional) set forth in the applicable Implementation Guide that apply to (i) the Organization's Carequality Use Case Role or (ii) all Carequality Connections. Organization is encouraged, but not required, to comply with all optional components of the applicable Implementation Guide(s). Organization also agrees that, if it is not in compliance with all applicable components of the Implementation Guide(s) and all Carequality Policies applicable to Carequality Connections, Sponsoring Implementer may exercise its right to suspend Organization in accordance with Section 3.1. Notwithstanding any provision of these Carequality Connection Terms to the contrary, if Organization is a U.S. federal agency, no change in policies or procedures shall apply to such agency until the agency has received 60 days' prior written notice of the change and has assented in writing to the change. If the agency does not assent or does not object based on federal law to the change(s) in writing within 60 days, the change(s) shall apply to the agency. In the event of an agency objection based on federal law, if the objection is not resolved prior to the effective date of the change(s) to which the agency objects, the agency may voluntarily and/or selectively suspend participation or Carequality may suspend the agency if the agency is unable to comply with the change(s) pending continued efforts to reach a resolution.

6. ***Non-Discrimination.*** With respect to Implementers and Implementers' Carequality Connections that have implemented the same Carequality Use Case as Organization and Organization's End Users, neither Organization nor its End Users shall unfairly or unreasonably limit exchange or interoperability with such Implementers or their Carequality Connections. Each Carequality Use Case's Implementation Guide will provide specific requirements for compliance with this requirement in the context of that Carequality Use Case.

7. ***Organization Autonomy.*** To the extent that Organization has adopted Organization Business Rules, Organization is permitted to continue acting in accordance with such Organization Business Rules, even if they restrict Organization's ability to support exchange of information with other Implementers or Carequality Connections or to meet the requirements of Section 6 above, provided that Organization applies such Organization Business Rules consistently with respect to other Implementers and Carequality Connections and the Organization Business Rules do not impose conditions that would unfairly or unreasonably limit interoperability.

8. ***Accountability.***

8.1. Organization Accountability. Organization shall be responsible for any harm to Carequality, its Sponsoring Implementer, other Carequality Connections of its Sponsoring Implementer, other

Implementers and their Carequality Connections which harm is caused by Organization's, or its End Users, acts and omissions. Organization shall not be responsible for the acts or omissions of any Implementer or other Carequality Connection. Notwithstanding any provision in these Carequality Connection Terms to the contrary, Organization shall not be liable for any act or omission if a cause of action for such act or omission is otherwise prohibited by Applicable Law. This section shall not be construed as a hold harmless or indemnification provision.\

8.2. Carequality Accountability. Organization will not hold Carequality, or anyone acting on its behalf, including but not limited to members of the Steering Committee, Advisory Council, Dispute Resolution Panel or any work group, or subcommittee, of any of these or Carequality's contractors, employees or agents liable for any damages, losses, liabilities or injuries arising from or related to these Carequality Connection Terms. This section shall not be construed as an indemnification provision.

8.3. Limitation on Liability**.** Notwithstanding anything in these Carequality Connection Terms to the contrary excluding section 8.4, in no event shall Carequality's, Sponsoring Implementer's or Organization's total liability to each other and all third party beneficiaries arising from or relating to these Carequality Connection Terms exceed an aggregate amount equal to three million dollars ($3,000,000), whether a claim for any such liability or damages is premised upon breach of contract, breach of warranty, negligence, strict liability, or any other theories of liability, even if the entity whose conduct creates the liability has been apprised of the possibility or likelihood of such damages occurring.

8.4. Federal agencies. Notwithstanding any provision of these Carequality Connection Terms to the contrary, if Organization is a U.S. federal agency nothing in these Carequality Connection Terms shall be construed to limit in any way the sovereign immunity enjoyed by federal agencies or to limit the ability of the federal agency to seek to recover damages from Carequality, Implementers, or their Carequality Connections.

9. ***Dispute Resolution.***

9.1. Organization acknowledges that it may be in its best interest to resolve Disputes between or among Organization, or its End Users, and Carequality, other Implementers or their Carequality Connections through a collaborative, collegial process rather than through civil litigation. Organization has reached this conclusion based upon the fact that the legal and factual issues involved in these Carequality Connection Terms are unique, novel, and complex and limited case law exists which addresses the legal issues that could arise from these Carequality Connection Terms or the Enforcing Agreement. Organization acknowledges that Carequality has adopted a Dispute Resolution Process which Organization agrees to follow. Further, Organization agrees to use its best efforts to resolve Disputes with Carequality, other Carequality Connections and their Implementers or with another Implementer directly if the Dispute does not involve another Implementers' Carequality Connections, through discussions with those involved in such Dispute before even submitting the Dispute to its Implementer pursuant to the Dispute Resolution Process. If Organization requires assistance in identifying contact information for another Carequality Connection, or an Implementer, it shall seek that assistance from Sponsoring Implementer.

9.2. If, despite using its best efforts, Organization cannot resolve any Dispute through discussions with the other parties involved, then Organization will notify the Sponsoring Implementer of the Dispute and request that the Implementer initiate the Dispute Resolution Process. Organization is required to undertake these efforts in the event of a Dispute before seeking any other recourse.

9.3. Notwithstanding the above, Organization may be relieved of its obligation to participate in the Dispute Resolution Process if Organization (i) believes that another Implementer's or Carequality Connection's act or omission will cause irreparable harm to Organization or another organization or individual (e.g. Implementer, Carequality Connection, End User or consumer) and (ii) pursues

immediate injunctive relief against such Implementer or Carequality Connection in a court of competent jurisdiction. Organization must inform its Sponsoring Implementer of such action within two business days of filing for the injunctive relief and of the result of the action within 24 hours of learning of same. If the injunctive relief sought is not granted and Organization chooses to pursue the Dispute, the Dispute must be submitted to the Organization's Sponsoring Implementer in accordance with the Dispute Resolution Process so that the Sponsoring Implementer can determine next steps.

10. ***Cooperation***. Organization understands and acknowledges that numerous activities with respect to Carequality shall likely involve its Sponsoring Implementer, other Implementers and their Carequality Connections, employees, agents, and third party contractors, vendors, or consultants. To the extent not legally prohibited, Organization shall: (a) respond in a timely manner to inquiries from Carequality, its Sponsoring Implementer, other Implementers or their Carequality Connections about possible issues related to the Carequality Use Case(s) in which Organization is involved; (b) collaboratively participate in discussions coordinated by Carequality to address differing interpretations of requirements set forth in an applicable Implementation Guide(s) prior to pursuing the Dispute Resolution Process; (c) make reasonable efforts to notify its Sponsoring Implementer when persistent and widespread connectivity failures are occurring with its Sponsoring Implementer or with other Implementers or their Carequality Connections, so that all those affected can investigate the problems and identify the root cause(s) of the connectivity failures; (d) work cooperatively, including without limitation facilitating contact with other Implementers or their Carequality Connections, to address the root cause(s) of persistent and widespread connectivity failures; (e) subject to Organization's right to restrict or condition its cooperation or disclosure of information in the interest of preserving privileges in any foreseeable dispute or litigation or protecting Organization's confidential information, provide reasonable information to others in support of collaborative efforts to resolve issues or Disputes; (f) provide information and other relevant assistance to Sponsoring Implementer in connection with this Section 10; and (g) subject to Organization's right to restrict or condition its cooperation or disclosure of information in the interest of preserving privileges in any foreseeable litigation or protecting Organization's Confidential Information, provide reasonable information to aid the efforts of Organization's Sponsoring Implementer, other Implementers or their Carequality Connections to understand, contain, and mitigate an Adverse Security Event, at the request of such Implementer or Carequality Connection. In no case shall Organization be required to disclose individually identifiable health information in violation of Applicable Law. In seeking another's cooperation, Organization shall make all reasonable efforts to accommodate the other's schedules and reasonable operational concerns.

11. ***Adverse Security Event Reporting***.

11.1. As soon as reasonably practicable, but no later than five (5) business days after determining that an Adverse Security Event has occurred and is likely to have an adverse impact on an Implementer(s) or Carequality Connection(s), Organization shall provide Sponsoring Implementer with notification of the Event through the notification protocol specified by Sponsoring Implementer. The notification should include sufficient information for Sponsoring Implementer to understand the nature of the Adverse Security Event and identify other Implementers or Carequality Connections that may be impacted by the Adverse Security Event. Notwithstanding the foregoing, Organization agrees that (a) within one (1) hour of learning that an Adverse Security Event occurred and that such Event may involve an Implementer or Carequality Connection that is a Federal agency, it shall alert the Federal agency in accordance with the procedures and contacts provided by such Federal agency, and (b) that within twenty-four (24) hours after determining that an Adverse Security Event has occurred and is likely to have an adverse impact on an Implementer(s) or Carequality Connection(s) that is a Federal agency, Organization shall provide a notification to the Federal agency in accordance with the procedures and contacts provided by such Federal agency, and Organization shall copy Sponsoring Implementer and Carequality on any such notification.

11.2. This Section 11 shall not be deemed to supersede Organization's obligations (if any) under relevant security incident, breach notification or confidentiality provisions of Applicable Law. Compliance

with this Section 11 shall not relieve Organization of any other security incident or breach reporting requirements under Applicable Law including, but not limited to, those related to consumers.

12. ***Acceptable Use.*** Carequality has adopted permitted purposes for the use of the Carequality Elements that are specifically set out in the Implementation Guide for each Carequality Use Case. Organization shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides. If Organization does not comply with these permitted purposes or other applicable provisions in the Implementation Guide, Carequality may exercise its right to suspend Organization in accordance with Section 3 of these Carequality Connection Terms. If Organization is not a Covered Entity or Governmental entity, then (i) Organization may only use the interoperability available through Carequality to transmit or receive information on behalf of its End Users and not on its own behalf; and (ii) Organization will not re-use, re-disclose, aggregate, de-identify or sell any information transacted by its End Users for its own benefit unless its respective Carequality Connections or End Users have given Organization the explicit written authority to do so.

13. ***Confidentiality.***

13.1. Organization agrees to use any Confidential Information that it obtains solely for the purpose of performing its obligations under the Carequality Connection Terms, and for no other purpose. Organization will disclose the Confidential Information it receives only to its employees and agents who require such knowledge and use in the ordinary course and scope of their employment or retention, and are obligated to protect the confidentiality of such Confidential Information. In the event Organization has any question about whether information and/or materials it receives is Confidential Information, it shall treat the same as if it were Confidential Information. For the avoidance of doubt, the Carequality Elements that are not labeled as Confidential Information by the Carequality Steering Committee are not confidential and are not covered by the provisions of this section.

13.2. Organization may be given access to all or a portion of the Carequality Directory by Sponsoring Implementer. The Carequality Directory is intended to be used by Implementers, Carequality Connections, and End Users to create and maintain operational connectivity under the Carequality Elements, including the development and maintenance of effective user interfaces for relevant systems. Organization agrees that it will only use and disclose information contained in the Carequality Directory as necessary to advance the intended use of the Carequality Directory. For example, Organization is permitted to disclose information contained in the Carequality Directory to the personnel of its EHR vendor who are engaged in assisting Organization with establishing and maintaining connectivity via the Carequality Elements. Further, Organization shall not use the information contained in the Carequality Directory for marketing or any form of promotion of its own products and services, unless this use and disclosure is part of an effort by Organization to expand, or otherwise improve, connectivity via the Carequality Elements, and any promotion of Organization's own products or services is only incidental to the primary purpose. In no event shall Organization use the information contained in the Carequality Directory in a manner that should be reasonably expected to have a detrimental effect on another Implementer, Carequality Connection, End User, or other individual or organization.

14. ***Contributions; IP Rights; Ownership of Materials; License***. Organization acknowledges that any copyrights, patent rights, trade secrets, trademarks, service marks, trade dress, and other intellectual property in or related to Carequality including, but not limited to, these Carequality Connection Terms, Implementation Guides, Carequality Elements, Carequality Policies, related materials, information, reports, processes (the "Carequality IP"), are protected under applicable United States law. Recognizing that the Carequality IP is the work product of the membership of Carequality, and that Carequality is the collective representative of all Implementers' interests, these intellectual property rights are asserted and held by Carequality in its capacity as the representative of its total membership and licensed to Organization hereunder. This does not apply to Carequality trademarks, service marks or trade dress rights, which are discussed separately below. Organization is encouraged to provide Contributions to Carequality and

understands that Carequality must obtain certain rights in such Contributions in order to include the Contribution in Carequality IP. Notwithstanding any provision of these Carequality Connection Terms to the contrary, if Applicant is a U.S. federal agency and considers certain information to be the intellectual property of the U.S. government, the agency shall not contribute such information unless and until it has entered into a written agreement with Carequality for the transfer or license of such intellectual property rights.

14.1. With respect to each Contribution, Organization represents that: (a) no information in the Contribution is confidential; (b) Carequality may freely disclose the information in the Contribution; and (c) to the best of its knowledge, such Contribution is free of encumbrance as it relates to the intellectual property rights of others.

14.2. To the extent that a Contribution or any portion thereof is protected by copyright or other rights of authorship, Organization grants a perpetual, irrevocable, non-exclusive, royalty-free, world-wide, sublicensable right and license to Carequality under all such copyrights and other rights in the Contribution to copy, modify, publish, display and distribute the Contribution (in whole or part) and to prepare derivative works based on or that incorporate all or part of such Contribution, in each case, for the purpose of incorporating such Contributions into the Carequality IP. Organization also grants Carequality the right: (a) to register copyright in Carequality's name any Carequality IP even though it may include Contributions; and (b) to permit others, at Carequality's sole discretion, to reproduce in whole or in part the resulting Carequality IP.

14.3. Organization shall identify to Carequality, through the issuance of a letter of assurance, any patents or patent applications which Organization believes may be applicable to any Carequality Element specifically including, but not limited to, any Implementation Guide. This assurance shall be provided without coercion and shall take the form of a general disclaimer to the effect that the patent holder will not enforce any of its present or future patent(s) that would be required to implement or use the Carequality Element relevant to any person or entity using the patent(s) to comply with such Carequality Element.

14.4. Sponsoring Implementer grants to Organization a perpetual, irrevocable, non-exclusive, royalty-free, world-wide, right and license to use, the Carequality IP for the purpose of enhancing interoperability (including through the modification of its products and services to implement the Carequality Use Cases and conform to the Implementation Guides) Organization and its End Users have and will continue to possess the usage rights to the Carequality IP as authorized by Sponsoring Implementer's Carequality Connected Agreement and these Carequality Connection Terms. Organization retains ownership of any Contribution it provides, granting only the licenses described in this Section. Nothing shall prevent Organization from (i) changing Organization's technology, services or any Contribution in any way, including to conform to the requirements of an Implementation Guide or (ii) making any change available to any other person or entity. Notwithstanding anything to the contrary in the Carequality Connection Terms, all right, title, and interest in any change to Organization's technology, services or any Contribution will accrue to the benefit of, and be owned exclusively by, Organization.

14.5. The trademarks, services marks, trade dress, business names, company names, and logos owned by Carequality, including without limitation CAREQUALITY and all Carequality logos, (collectively, the "Carequality Marks") are an important part of maintaining the strength and reputation of Carequality and its efforts to enable the interoperable exchange of healthcare information. Organization may not use the Carequality Marks to brand any of Organization's products or services and may not incorporate any Carequality Marks in any of Organization's domain names except as provided in Carequality's published guidelines on use of trademarks. Organization shall not apply for registration of any trademark, service mark, trade dress, business name or company name, or logo that incorporates any Carequality Mark or any element confusingly similar to any Carequality Mark. In connection with any non-trademark, descriptive use of Carequality Marks, Organization will use the registration symbol ® or the trademark or service mark symbols, ™ or ℠, as more fully set out in the Carequality guidelines on use of

trademarks, and indicate in the text that the Carequality Mark used "is the registered trademark of Carequality," "is the trademark of Carequality," or "is the service mark of Carequality," respectively.

15. ***Disclaimers.*** Organization acknowledges that Implementers and Carequality Connections may be added to or removed from the Carequality Directory at any time; therefore, Organization may not rely upon the inclusion in the Carequality Directory of a particular Implementer or Carequality Connection. IT IS EXPRESSLY AGREED THAT IN NO EVENT SHALL CAREQUALITY OR ORGANIZATION BE LIABLE TO EACH OTHER OR ANY THIRD PARTY BENEFICIARY FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR REVENUES, LOSS OF USE, OR LOSS OF INFORMATION OR DATA, WHETHER A CLAIM FOR ANY SUCH LIABILITY OR DAMAGES IS PREMISED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORIES OF LIABILITY, EVEN IF THE ENTITY WHOSE CONDUCT CREATES THE LIABILITY HAS BEEN APPRISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES OCCURRING. NO PROVISION OF THE CCA, OR THE CAREQUALITY CONNECTION TERMS, SHALL BE CONSTRUED AS AN INDEMNIFICATION REQUIREMENT FOR ANY IMPLEMENTER OR CAREQUALITY CONNECTION, INCLUDING BUT NOT LIMITED TO A FEDERAL AGENCY, THAT IS PRECLUDED BY LAW FROM INDEMNIFYING THIRD PARTIES.

16. ***Miscellaneous/General***

16.1. Amendment. These Carequality Connection Terms may be amended by Carequality from time to time, subject to the requirements of Section 21.4 of the CCA. Sponsoring Implementer will inform Organization of such amendments along with their effective date, which shall be at least thirty (30) days after the date on which Sponsoring Implementer informs Organization of such amendments.

16.2. Third Party Beneficiary. Carequality, other Carequality Connections of the Sponsoring Implementer, other Implementers and their Carequality Connections shall be deemed third party beneficiaries of these Carequality Connection Terms for purposes of enforcing Organization's compliance with these Carequality Connection Terms.

**Cosmos Addendum**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Epic Cognitive Computing Addendum**

The following terms apply to the Cognitive Computing Model Library [redacted]

**Payer Platform Addendum**

The following provisions apply to Your use of Payer Platform.

1. **Termination.** Payer Platform facilitates data exchange between healthcare providers and payers that license qualifying Epic software. You may discontinue use of Payer Platform at any time, thereby suspending data exchange connections with all other Epic customers that were facilitated by Payer Platform. If You elect to discontinue Your use of Payer Platform, You will inform Epic as soon as possible under the circumstances, but in no event more than two (2) business days thereafter.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**InterSystems Software Addendum**

A part of the software supplied to You by Epic consists of the software (either M, Caché or InterSystems IRIS, as applicable) from InterSystems Corporation of Cambridge, Massachusetts. The following terms and conditions apply to the sublicense of the Sublicensed Software from Epic to You, the User, as required and authorized by InterSystems.

1. REPRESENTATION OR WARRANTIES OF INTERSYSTEMS

EXCEPT AS EXPRESSLY PROVIDED HEREIN, INTERSYSTEMS DOES NOT MAKE AND SHALL NOT BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE CONDITION, MERCHANTABILITY, TITLE, DESIGN, OPERATION OR FITNESS FOR A PARTICULAR PURPOSE OF THE SUBLICENSED SOFTWARE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE SUBLICENSED SOFTWARE.

a. InterSystems hereby represents and warrants as follows:

(i) InterSystems has (a) valid title to the Sublicensed Software, free of all liens, encumbrances, restrictions and claims of others, (b) the right to license the same to Epic, and (c) the right to license Epic to grant sublicenses of the type granted to User by Epic.

(ii) Any Sublicensed Software services performed hereunder or under any Sublicensed Software maintenance agreement between InterSystems and Epic shall be performed by highly skilled personnel qualified to perform such services and such services shall be performed in a professional and workmanlike manner in accordance with the then prevailing standards of the computer services industry.

(iii) The Sublicensed Software and its use do not and will not violate or infringe upon any currently issued United States patent or any copyright, trade secret or other property right (whether conferred by statute, code, common law, or otherwise) of any other person or entity that is valid or enforceable in the United States or in any country in which Epic now maintains or hereafter maintains any office, property or data processing services.

(iv) The Sublicensed Software, as delivered by InterSystems, is free from material defects in manufacturing and materials and shall operate substantially in conformance with the Applicable Specifications relating to such Sublicensed Software until thirty (30) days after the later of (a) initial delivery of the Sublicensed Software to User, and (b) the date when User first uses the Epic Program Property, whether for testing, training, processing of patient data or other purpose (the "Software Warranty Period").

b. During the Software Warranty Period, InterSystems shall promptly provide, through Epic and at no charge to User, corrections, modifications or additions to the Sublicensed Software in the event that Epic notifies InterSystems in writing of any substantive errors in the Sublicensed Software. User shall assist Epic and, upon request, InterSystems, in identifying the circumstances in which any such substantive errors are discovered and, if requested by Epic or InterSystems, shall document the existence of the same. In no event shall InterSystems have any responsibility to correct any data base errors or errors or damages caused by or arising out of hardware defects or input errors or resulting from changes to or modifications of the Sublicensed Software made by Epic or User without the express written approval of InterSystems.

c. All warranty claims or other claims pursuant to this section shall be made to InterSystems through Epic.

d. The foregoing representations and warranties are by InterSystems only. Epic makes no representations or warranties pursuant to, and Epic shall have no liability arising out of, this section.

2. INDEMNIFICATION OF INTERSYSTEMS

a. InterSystems shall, and hereby agrees to, indemnify, defend, and hold harmless User and its officers, employees, agents, and representatives, from and against any and all third-party claims, actions damages, liabilities, costs, and expenses (including, without limitation, reasonable attorneys' fees and expenses arising out of the defense of any claim, whether proven or not) arising from or based upon a breach by InterSystems of any of its representations or warranties in Section 1(a)(i) or 1(a)(iii) above.

b. (i) The indemnities specified in Section 2(a) above shall not apply to a specific claim, action, or allegation unless User shall have provided written notice of such claim, action, or allegation to InterSystems as soon as practicable, and shall have granted InterSystems full opportunity to control the response thereto and the defense thereof, including without limitation any agreement relating to the settlement thereof; provided, however, that User shall have the right to monitor, at its own expense, InterSystems' defense of any such claim, action, or allegation and, if necessary, to preclude a default judgment or other loss of rights, to file pleadings on its behalf in the event InterSystems fails to fulfill its obligation to defend User pursuant to this Section 2.

(ii) In the case of a claim based on a breach of the representation and warranty contained in Section 1(a)(iii) above, the indemnity specified in Section 2(a) shall not apply to any claim, action, or allegation (or any judgment or order related thereto) based upon: (a) the use by User of the Sublicensed Software in combination with other hardware or software not supplied by InterSystems, where the use of the Sublicensed Software alone is not claimed or alleged to be an infringement; (b) the modification or alteration of the Sublicensed Software in a manner that is not approved by InterSystems; or (c) the failure by User to implement a release or engineer change order for the Sublicensed Software issued by InterSystems and supplied to User by Epic (which release or change order does not preclude the Sublicensed Software from meeting the standards specified in Section 1(b)).

c. In the event that the Sublicensed Software (or any component or part thereof) becomes the subject of any claim, action, or allegation of the type specified in Section 1(a)(iii), InterSystems shall promptly use all reasonable efforts at its expense: (a) to procure for User the right to continue using the Sublicensed Software (or applicable component or part thereof); or (b) if such continued use cannot be so procured, to modify it to become non-infringing; or (c) if such modification cannot be so implemented, to provide substitute hardware, software, or other products, components or parts of similar capability acceptable to and approved by User, which approval shall not be unreasonably withheld or delayed.

d. THE FOREGOING STATES THE ENTIRE OBLIGATION OF INTERSYSTEMS WITH RESPECT TO THE INFRINGEMENT OF PATENTS, COPYRIGHTS, AND OTHER PROPRIETARY RIGHTS.

e. The foregoing indemnification is by InterSystems only. Epic makes no indemnification pursuant to, and Epic shall have no liability arising out of, this section.

3. LIMITATION OF LIABILITY

Except as specifically set forth in Sections 1 and 2 above, InterSystems shall have no liability of any kind to the User, whether direct or indirect, for any loss or damage suffered by the User or its employees, agents or representatives, or customers or patients using the facilities or retaining the services of the User, as a result of or arising out of the Sublicensed Software.

The liability of InterSystems for any loss or damage directly or indirectly suffered by User as a result of any defects in the Sublicensed Software or any acts of omission of InterSystems or its officers, employees, agents, or representatives hereunder shall in no event exceed any amount equal to the license fees paid or owed to InterSystems by Epic in respect of the specific Sublicensed Software or services on account of which User has suffered loss or damage. The foregoing shall not apply to claims of property damage or bodily injury or those claims based on the willful misconduct of InterSystems.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, IN NO EVENT SHALL INTERSYSTEMS BE LIABLE FOR SPECIAL, INCIDENTAL, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT TORT, OR ANY OTHER LEGAL THEORY EVEN IF INTERSYSTEMS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SUCH DAMAGES SHALL INCLUDE, WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF SAVINGS OR REVENUE, LOSS OF USE OF THE LICENSED SOFTWARE OR ANY ASSOCIATED EQUIPMENT OR SOFTWARE, COST OF CAPITAL, COST OF ANY SUBSTITUTE EQUIPMENT, FACILITIES OR SERVICES, DOWNTIME, THE CLAIMS OF THIRD PARTIES (INCLUDING, WITHOUT LIMITATION, CUSTOMERS OR OTHER PERSONS USING THE FACILITIES OF THE USER), AND PROPERTY DAMAGE.

4. PROPRIETARY RIGHTS AND CONFIDENTIALITY

a. The Sublicensed Software and related materials (including, without limitation, the System Documentation) are and shall remain, the sole property of InterSystems or one or more of its affiliates. No right to print or copy, in whole or in part, any such Sublicensed Software, System Documentation or related materials is granted hereunder except as herein expressly provided.

b. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE USER AGREES NOT TO (i) DECOMPILE, DISASSEMBLE OR REVERSE ENGINEER THE LICENSED SOFTWARE OR (ii) USE OR DISCLOSE OR DIVULGE TO OTHERS ANY DATA OR INFORMATION RELATING TO THE LICENSED SOFTWARE AND/OR THE TECHNOLOGY, IDEAS, CONCEPTS, KNOW-HOW AND TECHNIQUES EMBODIED THEREIN.

c. The obligations of confidentiality and non-use described in Section 4(b) above shall not be deemed to include disclosure or other use of such data or information to the extent that the User can prove the same is or becomes publicly known within the public domain (other than by acts attributable to the User or any of its officers, agents, shareholders of privately-held companies, employees or representatives). Information shall not be deemed to be in the public domain by reason of the general licensing and other commercial disposition of the Sublicensed Software by InterSystems in the ordinary course of its business. The existence of a copyright notice shall not cause, or be deemed or construed as causing, the Sublicensed Software or System Documentation to be published copyright work or to be in the public domain.

d. Nothing contained in this Section shall prohibit the User or any of its officers, agents, shareholders, employees or representatives from:

(i) using his or its general technical skills when not otherwise inconsistent with the terms hereof; or

(ii) disclosing data or information pursuant to any enforceable administrative or judicial order, provided, however, that the User first notifies InterSystems of the entry or existence of such order and of the User's intention to comply with its terms. Data or information shall not be deemed to be in the public domain solely by reason of any such order.

e. The User further agrees:

(i) except for back-up security purposes, not to copy, reproduce or duplicate, or allow to be copied, reproduced or duplicated, in whole or in part, the Sublicensed Software, System Documentation or any related materials without the prior written consent of InterSystems;

(ii) not to provide or otherwise make available any Sublicensed Software, System Documentation or related materials in any form to any other person or organization, without the prior written consent of InterSystems; and

(iii) that it will take appropriate action with its officers, agents, shareholders, employees or representatives, by instruction, agreement or otherwise, to satisfy its obligations under this Agreement with respect to use, copying, modification, and protection and security of the Sublicensed Software, System Documentation and related materials. Without limiting the generality of the foregoing, the User shall in any event devote the same degree of care to protecting the Sublicensed Software and System Documentation as it devotes to the protection of its own confidential and proprietary information.

f. In the event of any breach or threatened breach of the provisions of this Section, InterSystems shall, in addition to all other rights and remedies available to it at law or in equity, be entitled to a temporary or permanent decree or order restraining and enjoining such breach and the User shall not plead in defense thereto that there would be an adequate remedy at law, it being hereby expressly acknowledged and understood that damages at law will be an inadequate remedy in the event of such a breach or threatened breach.

g. If, having complied with the foregoing provisions of this Section, the User has actual notice of any unauthorized possession, use or knowledge of any part of the Sublicensed Software or physical embodiment thereof, or of the System Documentation or any other information made available pursuant to this Agreement by anyone else other than persons authorized by this Agreement to have such possession, use or knowledge, the User agrees to notify InterSystems promptly of the circumstances surrounding such unauthorized possession, use or knowledge.

h. The User shall not remove or destroy any proprietary markings or proprietary legends placed upon or contained within the Sublicensed Software or any related materials or System Documentation in the User's possession.

i. Subject to other restrictions contained herein, User shall have the right to grant access to the Sublicensed Software to its employees. In addition, the Sublicensed Software may also be used, solely to run Epic's Program Property (and not to develop or run other applications), by other organizations to whom the User provides access to Epic's Program Property, unless the providing of such access is the primary relationship between the User and other said organizations.

j. User shall use the Sublicensed Software only to run the Epic Program Property or applications developed by the User to be run in conjunction with the Epic Program Property, but the primary use must be to run the Epic Program Property.

5. DEFINITIONS

For the purposes of this Addendum only, the following definitions apply to the capitalized terms as follows.

"Applicable Specifications" means, in the case of any Sublicensed Software, the functional, performance and operational characteristics of such Sublicensed Software as set forth in the System Documentation.

"Sublicensed Software" means the computer programs (which, unless otherwise determined by InterSystems in its sole discretion, shall be in Object Code version only) licensed by InterSystems through Epic to You hereunder, which are more fully identified as InterSystems software in Exhibit 1 to the Epic License and Support Agreement of which this is a part, together with any enhancements and related items which InterSystems may announce while the Agreement is in effect.

"System Documentation" means the documentation, reference manuals, user guides and other standard visually readable materials relating to the Sublicensed Software furnished by InterSystems to Epic and licensed by Epic to You hereunder.

"User" and "You" mean the licensee in the Epic License and Support Agreement to which this InterSystems Software Addendum is a part.

**SQL Addendum**

This is a software license (the "Sublicense and Limited Warranty") authorized by Knowledge Based Systems, Inc. ("KBS"), a Virginia corporation, with its mailing address at 43053 Midvale Court., Ashburn, VA 20147. The KB_SQL Software ("SOFTWARE") is sublicensed by Epic to You as the end user; it is not sold. The SOFTWARE is subject to the following license terms and conditions.

1. <u>LICENSE</u>

**1.1 Copyright**
The SOFTWARE is copyrighted material. Once You have paid the required license fee, You may use the SOFTWARE for as long as You do not violate the copyright and if You follow these simple rules.

**1.2 Maximum Number of Users**
You may use the SOFTWARE on any computer or computer network for which it is designed so long as no more than the specified number of concurrent user(s) (see comments in Exhibit 1 to the main license agreement with Epic) use it at any one time. Your license to use the SOFTWARE allows use of the SOFTWARE both (a) by the specified number of concurrent users in a single production environment, AND, simultaneously, (b) by the specified number of concurrent users in a single shadow environment for real-time or near-real time data access and reporting. Alternatively, you may use the SOFTWARE in two shadow environments for real-time or near-real time data access and reporting, so long as You make no use of the SOFTWARE in any production environment. If Your number of concurrent users in any environment exceeds your licensed level of concurrent users, You must upgrade Your license to an appropriate number of users or pay for additional copies of the SOFTWARE. Additionally, use of the SOFTWARE for real-time or near-real time data access and reporting in more than two environments as described in this paragraph (either production and one shadow or two shadows), requires the purchase of additional copies of the SOFTWARE for each such additional environment.

**1.3 Copies**
You may make copies of the SOFTWARE for backup purposes and for use in non-production environments in conjunction with Epic Software. All such copies, together with the original, must be kept in Your possession or control.

For purposes of this paragraph:

1.3.1 a shadow environment is for backup purposes if the SOFTWARE gets copied to the environment only due to replication, or if the SOFTWARE is installed on the environment for disaster recovery, as long as (in either case) the SOFTWARE is not used in the shadow environment;

1.3.2 environments such as Test, Release, and Train (whether created as shadows or otherwise), in which no useful, production use of the SOFTWARE occurs, are non-production environments;

1.3.3 a shadow environment in which the SOFTWARE is used for real-time (or near real time) data access and reporting purposes (i.e., one which has the purpose or effect of load-balanced reporting) requires appropriate licensing as provided in paragraph 1.2.

**1.4 Modifications**
You may not make any changes or modifications to the licensed SOFTWARE, and You may not decompose, disassemble, or otherwise reverse engineer the SOFTWARE. You may not rent or lease it to others.

**1.5 Breach of this Agreement**
In the event You breach this Sublicense and Limited Warranty, Epic or KBS may, at their sole option in addition to other remedies, terminate Your right to use the SOFTWARE.

1.6 You acknowledge that you do not have the right to resell or sublicense SOFTWARE under any circumstances.

2. USING COMPILED QUERY ROUTINES

**2.1 Query Routines**
Compiled Query Routines that are generated by the KB_SQL compiler may be used, given away or sold without additional license or fees.

3. LIMITED WARRANTY

**3.1 Distribution Media and Documentation**
KBS warrants the physical distribution media (diskettes, tape, etc.) and physical documentation shipped with the SOFTWARE to be free of defects in materials and workmanship for a period of 60 days from the purchase date. If KBS receives notification within the warranty period of defects in materials or workmanship, and such notification is determined to be correct, KBS will replace the defective distribution media or documentation.

**3.2 Product Returns**
DO NOT RETURN ANY PRODUCT UNTIL YOU HAVE CALLED THE KBS CUSTOMER SERVICE DEPARTMENT AND OBTAINED AUTHORIZATION FOR SUCH RETURN.

**3.3 No Other Warranties**
KBS SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. UNDER NO CIRCUMSTANCES SHALL EPIC HAVE ANY LIABILITY WHATSOEVER WITH RESPECT TO THE SOFTWARE OR ANY WARRANTY HEREUNDER.

**3.4 Breach of this Limited Warranty**
THE ENTIRE AND EXCLUSIVE LIABILITY AND REMEDY FOR BREACH OF THIS LIMITED WARRANTY SHALL BE LIMITED TO REPLACEMENT OF DEFECTIVE DISTRIBUTION MEDIA OR DOCUMENTATION AND SHALL NOT INCLUDE OR EXTEND ANY CLAIM FOR OR RIGHT TO RECOVER ANY DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF GOODWILL, PROFIT, USE OF MONEY, DATA OR USE OF THE SOFTWARE, OR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR OTHER SIMILAR DAMAGE CLAIMS, EVEN IF KBS HAS BEEN SPECIFICALLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL KBS'S LIABILITY FOR ANY DAMAGES TO YOU OR ANY OTHER PERSON EVER EXCEED THE LOWER OF SUGGESTED LIST PRICE OR ACTUAL PRICE PAID FOR THE LICENSE TO USE THE SOFTWARE, REGARDLESS OF THE FORM AND LEGAL THEORY OF THE CLAIM INCLUDING BREACH OF EXPRESS OR IMPLIED WARRANTIES, BREACH OF CONTRACT, MISREPRESENTATIONS, NEGLIGENCE, STRICT LIABILITY IN TORT, OR OTHERWISE ARISING OUT OF THIS SUBLICENSE AND LIMITED WARRANTY.

4. GOVERNING LAW AND GENERAL PROVISIONS

**4.1 Commonwealth of Virginia**
This Sublicense and Limited Warranty shall be construed, interpreted and governed by the laws of the Commonwealth of Virginia notwithstanding Virginia's conflict of law doctrine and any action hereunder shall be brought only in Virginia.

**4.2 Choice of Forum**

The parties agree that all litigation to continue or enforce this Agreement shall be brought in the United States District Court for the Eastern District of Virginia (Alexandria Division). The parties hereby consent to the exclusive jurisdiction of that court, and universally waive objection based on venue or inconvenient forum to litigation in that court.

**4.3 Severability, Contribution, and Modification**

If any provision is found void, invalid or unenforceable it will not affect the validity of the balance of this Sublicense and Limited Warranty which shall remain valid and enforceable according to its terms. If any remedy hereunder is determined to have failed of its essential purpose, all limitations of liability and exclusion of damages set forth herein shall remain in full force and effect. This Sublicense and Limited Warranty may only be modified in writing signed by You and a specifically authorized representative of KBS.

**4.4 Restricted Rights Legend**

Use, duplication or disclosure by the U.S. Government of the computer software and documentation in this package shall be subject to the restricted rights under DFARS 52.227-7013 applicable to commercial computer software. All rights not specifically granted in this statement are reserved by KBS.

**CPT Addendum**

1. This sublicense grants You the limited right, subject to the terms of this Addendum, to use content from the American Medical Association's ("AMA") ASCII or EBCDIC data file of Physicians Current Procedural Terminology published by the AMA in the English language as used in the United States, a coding work of nomenclature and codes for reporting of healthcare services ("CPT Codes") solely with the Epic Program Property that You have licensed from Epic as set forth in Exhibit 1 to Epic's License and Support Agreement with You (the "Agreement").

2. Your use of the CPT Codes under this sublicense is for non-production (e.g. training and testing) uses of the Program Property only. You agree that you will obtain a license directly from the AMA to use the CPT Codes with the Program Property for production purposes.

3. Your use of the CPT Codes under this sublicense is also limited to the number of users specified in the Agreement (see comments in Exhibit 1 for the licensed user level). If You wish to allow additional users to use the CPT Codes (beyond those specified in Exhibit 1 for non-production purposes), You may obtain a license for such additional users from Epic or the AMA.

4. You acknowledge and understand that Epic's right to obtain updated versions of the CPT Codes for non-production purposes is dependent upon Epic's continued contractual relationship with the AMA and that the price for such updated versions is subject to change. You further acknowledge and understand that You must obtain all updated versions of the CPT Codes for production uses with the Program Property directly from the AMA.

5. This sublicense is nontransferable, nonexclusive, and for the sole purpose of internal use of You in the English language within the United States and its territories.

6. You may not publish, distribute via the Internet or other public computer based information system, create derivative works (including translations), transfer, sell, lease, license, or otherwise make available to any unauthorized party the CPT Codes, or a copy or portion of the Editorial Content.

7. You may only make copies of the Program Property containing Epic-provided CPT Codes for back up or archival purposes. The CPT Codes are copyrighted by the AMA. CPT is a registered trademark of the AMA. All notices of the AMA's proprietary rights, including its trademark and copyright notices, must appear on all permitted copies.

8. You agree to ensure that anyone who has authorized access to the Program Property containing the CPT Codes complies with the terms of this Addendum.

9. **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE CPT CODES AS CONTAINED IN THE PROGRAM PROPERTY ARE PROVIDED BY THE AMA AND EPIC "AS IS" WITHOUT ANY WARRANTY WHATSOEVER. ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE DISCLAIMED BY THE AMA AND EPIC, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, ACCURACY, NONINFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, AND ANY IMPLIED WARRANTY AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PROGRAM PROPERTY OR THE CPT CODES OR AGAINST INFRINGEMENT. YOU ACKNOWLEDGE THAT NO EMPLOYEE OF EPIC OR ANY OTHER PARTY IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE CPT CODES. THE CPT CODES ARE PROVIDED WITHOUT ANY LIABILITY TO THE AMA OR EPIC. THE AMA AND EPIC SHALL NOT BE LIABLE, WITHOUT LIMITATION, FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES OR LOST PROFITS. THE AMA'S SOLE RESPONSIBILITY CONCERNING THE CPT CODES IS TO MAKE AVAILABLE TO EPIC RPLACEMENT COPIES OF THE CPT CODES IF THE CPT CODES ARE NOT INTACT. EPIC AND THE AMA DISCLAIM ANY LIABILITY FOR ANY**

**CONSEQUENCE DUE TO USE, MISUSE, OR INTERPRETATION OF INFORMATION CONTAINED OR NOT CONTAINED IN THE CPT CODES. THIS PROVISION SHALL SURVIVE TERMINATION OF THE AGREEMENT AND THIS CPT ADDENDUM.**

10. This sublicense will terminate if you are in default of Your obligations under this Addendum, and may be terminated upon written notice to You by Epic if You are in default of Your obligations under the Agreement.

11. The provisions of this sublicense shall be considered as severable, so that in the event a provision is determined to violate any law or is unenforceable the remainder of the provisions will remain in full force and effect.

12. U.S. Government Rights. This product includes CPT which is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable, which was developed exclusively at private expense by the American Medical Association, 515 North Lake St., Chicago, IL 60654. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (November 1995) and/or subject to the restrictions of DFARS 227.7202-1(a) (June 1995) and DFARS 227.7202-3(a) (June 1995), as applicable, for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (December 2007) and/or subject to the restricted rights provisions of FAR 52.227-14 (December 2007) and FAR 52.227-19 (December 2007), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal Procurements.

*If Your use of Epic Program Property includes the ability to access such Program Property containing the CPT Codes via the Internet, then the following shall also apply:*

13. You agree to use user registration technology, that is, application-level security as well as through the single-user password response security software for such Internet use of the Program Property containing the CPT Codes.

14. You will maintain appropriate procedures and technology to track the number of users and maintain server logs for audit purposes for three years following the year to which they pertain.

15. You agree to use firewall technology, such that the Program Property is behind a firewall that filters access and prevents unauthorized retrieval of Program Property containing the CPT Codes.

16. You agree to limit access to users of the CPT Codes to users in the United States.

**ACC-NCDR® Registry Communication Module Addendum**

The following provisions apply to Your use of the ACC-NCDR® Registry Communication Module.

I. DEFINITIONS.
All capitalized terms used in this Addendum and not defined herein but defined in the Agreement shall have the meanings assigned to such terms in the Agreement.

"ACCF" means the American College of Cardiology Foundation.

"ACC-NCDR® Benchmarks" means the aggregate information derived by an ACC-NCDR® Registry from data submitted to such ACC-NCDR® Registry.

"ACC-NCDR® Registry" means any one of the supported registries maintained by the ACCF to which You may submit pertinent data using the ACC-NCDR® Registry Communication Module.

"Application Specifications" means the requirements for the data submitted to an ACC-NCDR® Registry using the ACC-NCDR® Registry Communication Module.

"Participant" means an institution or practice (or a defined and consistent grouping within such an institution or practice) that is enrolled in one or more ACC-NCDR® Registries and eligible to submit pertinent data to such registry or registries.

II. LICENSE.

A. *Participant Requirement*. Each of Your or Your Affiliates' institutions or practices (or a defined and consistent grouping within such institutions or practices) (each a "Site") that accesses or uses the ACC-NCDR® Registry Communication Module must be a Participant in the ACC-NCDR® Registry or Registries to which such Site submits data, and You will limit access to the ACC-NCDR® Registry Communication Module only to such Sites. In addition, prior to Epic activating the license key for the ACC-NCDR® Registry Communication Module for use with the applicable ACC-NCDR® Registry, You will provide to Epic evidence satisfactory to Epic of such enrollment by those Sites in that ACC-NCDR® Registry to which such Sites will submit data using the ACC-NCDR® Registry Communication Module. If at any time during a Subscription Year (as defined below), any Site that accesses or uses the ACC-NCDR® Registry Communication Module is no longer a Participant or stops participating in an ACC-NCDR® Registry, You shall immediately provide Epic with written notice, and You shall, or shall permit Epic to, deactivate such Site's access to such ACC-NCDR® Registry.

B. *Benchmark Data*. You will not enter the ACC-NCDR® Benchmarks into the Program Property (including without limitation the ACC-NCDR® Registry Communication Module) for reporting purposes.

C. *Updates*. You understand that the ACCF specifies the Application Specifications. If the ACCF modifies the Application Specifications You will install any upgrades to the ACC-NCDR® Registry Communication Module Epic provides to You to address the changes to the Application Specifications prior to the time the ACCF requires Participants to utilize such updated specifications to submit data. You acknowledge that if You do not upgrade to an updated ACC-NCDR® Registry Communication Module You may not be able to submit data to ACC-NCDR® Registries.

D. *Ownership.* Epic does not own any right, title, or interest in the any data stored by or entered into the ACC-NCDR® Registry Communication Module.

III. TERM.

A. *Term and Subscription Fees*. The subscription year for the ACC-NCDR® Registry Communication Module is from January 1 to December 31 (a "Subscription Year"). For each Subscription Year, You will pay Epic the then-current annual subscription fee with respect to Your use of the ACC-NCDR® Registry Communication Module with the applicable ACC-NCDR® Registry. The initial annual subscription fee for use of the ACC-NCDR® Registry Communication Module with the applicable ACC-NCDR® Registry shall be prorated from the date Epic first activates the license key for the ACC-NCDR® Registry Communication Module for use with that ACC-NCDR® Registry to December 31 of that Subscription Year. In subsequent Subscription Years, the full annual subscription fee for such use will be due each January 31. Notwithstanding anything in the Agreement, subscription fees are subject to annual increases and increases due to increases in Your Licensed Volume. If Your Licensed Volume increases, any incremental annual subscription fees for the ACC-NCDR® Registry Communication Module will be due beginning as of the date the previous Licensed Volume was exceeded. If there is any change in the then-current annual subscription fee (other than for increases in Your Licensed Volume), Epic will provide You with written notice of such new fee on or before December 15 of the then current Subscription Year. Notwithstanding anything contained herein to the contrary, if at any time none of the Sites is a Participant or is participating in any ACC-NCDR® Registries, then You shall immediately provide Epic with written notice, Your license to the ACC-NCDR® Registry Communication Module shall immediately terminate, and You shall permit Epic to deactivate the ACC-NCDR® Registry Communication Module.

B. *Amendment to Addendum.* Epic reserves the right to amend this Addendum in order to comply with the contractual requirements of the ACCF related to Epic's licensing of the ACC-NCDR® Registry Communication Module. Epic will provide You with written notice of its intent to amend this Addendum and shall provide You with the proposed amendment by December 15 of the current Subscription Year.

C. *Right to Terminate.* Upon receipt of a notice under Section III.A. (regarding a change in the annual subscription fee) or under Section III.B. (regarding an amendment of this Addendum), You will have fifteen (15) days to provide Epic with written notice terminating Your use of the ACC-NCDR® Registry Communication Module if You are not willing to accept the change in the annual subscription fee or amendment(s) to the Addendum.

IV. NOTICE.

The ACC-NCDR® Registry Communication Module incorporates aspects of the ACCF Specifications, including data forms, formats, definitions, codes, and codebooks, file specifications, file transfer protocols, procedural guides, application specifications, and publications and reports developed by the ACCF in support of the operation of the ACC-NCDR® Registries which are the sole and exclusive property of the ACCF.

**PKWARE Addendum**

This PKWARE Addendum (this "Addendum") is a license granted by Epic to You for use of the SecureZIP Toolkit for Windows (together with any updates and new versions, which may be provided by Epic, the "PKWARE Licensed Software") solely in connection with the Program Property. Your use of the PKWARE Licensed Software is subject to the following license terms and conditions:

1. **License.** Subject to Your compliance with the terms of this Addendum, Epic grants to You and Your Affiliates a non-exclusive, non-transferable license to use the PKWARE Licensed Software solely in connection with the Program Property.

2. **Ownership.** This Addendum is a license and not a transfer of any ownership rights in the PKWARE Licensed Software. You may not alter or remove from the Program Property any attributions or copyright notice information pertaining to the PKWARE Licensed Software.

3. **Restrictions.** All of the limitations and restrictions on access or use of the Program Property under the Agreement shall also apply to the PKWARE Licensed Software. In addition, neither You nor any of Your Affiliates may (i) modify, alter, improve, decompile, disassemble or reverse engineer the PKWARE Licensed Software; (ii) access, or attempt to access, the PKWARE Licensed Software directly or in any manner other than as part of the Program Property; (iii) expose, or attempt to expose, any application programming interfaces or license keys to the PKWARE Licensed Software; or (iv) sell, sublicense, rent, lease or transfer the PKWARE Licensed Software to any third party except in connection with the Program Property.

4. **Warranties.** THE PKWARE LICENSED SOFTWARE IS PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND. ANY AND ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, ARE HEREBY DISCLAIMED, INCLUDING WARRANTIES OF MERCHANTABILITY, ACCURACY, FITNESS FOR A PARTICULAR PURPOSE AND TITLE, AND ANY IMPLIED WARRANTY AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PROGRAM PROPERTY OR AGAINST INFRINGEMENT. YOU ACKNOWLEDGE THAT NO EMPLOYEE OF EPIC OR ITS SUPPLIERS OR ANY OTHER PARTY IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR WARRANTY RELATING TO THE PKWARE LICENSED SOFTWARE THAT IS NOT IN THE AGREEMENT OR THIS ADDENDUM.

5. **Limitations.** In addition to any other limitations of liability in this Addendum, the limitations of Epic's liability that apply to the Program Property, including without limitation the Limitations of Liability sections of the Agreement, shall also apply to limit Epic's and its suppliers liability with respect to the PKWARE Licensed Software. For any claim relating to the PKWARE Licensed Software or any services relating thereto, Epic's and its licensor's cumulative liability to You shall not exceed the actual, direct damages incurred by You and shall not exceed a maximum of the fees paid for the PKWARE Licensed Software.