CHRIS BAKER, State Bar No. 181557
cbaker@bakerlp.com
DEBORAH SCHWARTZ, State Bar No. 208934
dschwartz@bakerlp.com
BAKER DOLINKO & SCHWARTZ, P.C.
220 Montgomery Street, Suite 1094
San Francisco, CA 94104
Telephone: (415) 810-9486

Attorneys for Plaintiff
ANDREA HULL

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED (CIVIL L.R. 79-5)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA HULL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>EPIC SYSTEMS CORPORATION, a Wisconsin corporation; BOOST, INC., a Wisconsin corporation,<br><br>Defendants. | Case No. 4:26-cv-07702-AMO<br><br>**DECLARATION OF ANDREA HULL IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: Thursday, January 7, 2027<br>Time: 2:00 p.m.<br>Courtroom: 5, 2nd Floor, 1301 Clay Street, Oakland<br>Judge: Hon. Araceli Martínez-Olguín<br><br>Action Filed: July 24, 2026<br>Trial Date: None set |

My name is Andrea Hull.

1. I am the plaintiff in this action. I have personal knowledge of the facts stated in this declaration.

## I. My Epic Employment

2. I worked for Epic Systems's family of companies, including Defendant Boost, Inc. (together, "Epic") for approximately eleven and a half years, from October 6, 2014 until March 2026. I communicated my resignation on March 9, 2026; Epic's records show my employment

ending effective March 10, 2026. This was the last day on which I performed tasks at Epic's instruction.

3. I joined Epic in Madison, Wisconsin in 2014, shortly after earning my law degree from the University of Wisconsin. I served as a Project Manager in Madison (from 2014–2016), leading enterprise testing for multi-hospital electronic health record ("EHR") implementations; as an Implementation Director in Madison (from 2016–2018); as a Boost Consultant in Denver (2018–2020), where I co-designed the enterprise training and operational-readiness program for an implementation serving more than 200,000 users; as a Contract Manager in Trondheim, Norway (Dec 2020-Jun 2021 from the US, Jun 2021–2022 in Norway); and as Epic's first international public-policy team member, based in Bristol, England (2022–2025), representing Epic before government stakeholders and trade associations in multiple countries. In 2025, I returned to the United States as a Boost consultant working from Concord, California, designing enterprise transformation and change-management programs for healthcare organizations.

4. "Boost" is Epic's customer consulting division. This division employs consultants who perform or support the work described below. You cannot be hired into this role, you must be approved to transfer from Epic or one of its subsidiaries. Generally, Boost consultants work remotely from anywhere in the continental United States, are staffed on Epic customer projects, and perform customer-side implementation or support work (e.g., system build, testing, training, and project and program management) alongside or instead of the customer's workforce. Many Boost assignments require at least 25% travel, while some require up to 100% travel for the duration of the project. Boost consultants work under the Epic umbrella, are subject to Epic's policies and procedures manual (known internally as the Redbook) and answer to Epic executives and Epic Human Resources. As referenced above, I worked as a Boost consultant twice: based in Denver from 2018 to 2020, and again from the Bay Area from July 2025 until I resigned March 2026. In both Boost roles my assignments were project leadership related.

5. My work for Epic has focused on leading implementations, designing training and operational-readiness programs, managing contracts and compliance, and working with health systems on how Epic's software fits their operations.

6. During my time with Epic, I worked with a number of health systems, including three that are based in California – City of Hope, UC Davis, and Optum. I worked on the City of Hope and UC Davis projects while living outside California, and I supported the organizations both onsite and virtually. I was accountable for the success of both the Radiant implementation and the Testing implementation for City of Hope for approximately two years. I advised UC Davis on their Radiant upgrade over several months.

## II. Epic's Market Dominance in California

7. Given my background, I am deeply familiar with Epic and its business. Epic is a privately-held Wisconsin company that licenses electronic health record and revenue cycle software solutions to hospitals, medical centers, academic institutions, payers, life science companies, physician groups, and other healthcare providers. Epic is, by far, the largest EHR provider, by patient volume, of these solutions in the world. In the United States, Epic holds a 57% market share of hospital beds while the second-place Oracle Health holds 20% market share.

8. Epic owns and hosts a record-exchange network called "Care Everywhere." This network allows a clinician at one Epic customer organization to query and retrieve a patient's records from another Epic customer organization. Because Care Everywhere operates between Epic customers, its value to any one customer increases as Epic's customer base grows. This is the well-known network effect, and it is a major selling point for Epic: a provider that uses Epic joins a wide, secure and trusted network of other providers that also use Epic. It is also a selling point for their network-based platform "Aura." Aura replaces traditional point-to-point connections for certain specialty labs, diagnostics, and devices. Instead of having to contract and set up individual interfaces with multiple companies that can take 12+ months, a health system can connect to Aura and, with minimal effort, turn on the integration within weeks. Abbott provides CGM data through Aura, having also agreed to Epic's Care Everywhere governing rules. Epic also licenses a patient-facing portal platform commonly known as "MyChart," through which patients can access their own records, communicate with their care team, schedule appointments, and so on. Epic's platform is built on a single, unified, global code base. This means that any product and feature that they develop naturally interoperates with the others. It

also means that development they do for one customer could be available for all other customers globally.

9. Epic is particularly dominant in California. I know from Epic, industry, and personal experience that the University of California's academic medical centers — UCSF Health, UC Davis Health, UCLA Health, UC San Diego Health, and UCI Health — all use Epic solutions. The San Francisco Department of Public Health (including Zuckerberg San Francisco General Hospital), Alameda Health System, Contra Costa Health, Santa Clara Valley Healthcare, and El Camino Health all use Epic. Riverside University Health System uses Epic. I also understand that, recently, the Los Angeles County Department of Health Services — the largest public health system in California — notified its Board of Supervisors that it intended to negotiate sole source contracts with Epic. As for the private sector, Epic's California customers include, at a minimum, Kaiser Permanente, Sutter Health, Stanford Health Care, John Muir, Adventist Health, City of Hope, Optum Health (Orange County, Beaver Medical) and Hoag Memorial Hospital.

10. Epic employs roughly 14,000 people. About 8,000 of them are implementation or technical staff. These staff work for customers, either remotely from their home state or elsewhere, or at the location of the customer. Epic's model is that its employees serve customer health systems – whether virtually or physically – wherever the customer is. As a result, Epic's employment restraints affect, not just Epic employees who reside in California, but also Epic employees who, like me prior to my move to California, worked with California customers both virtually and in person.

11. Every Epic customer is assigned Epic technical services staff who are that customer's continuing point of contact for the applications it licenses. From my years at Epic, I know that each California health system running Epic can have over one hundred such primary and secondary representatives assigned to it. In addition, any health system that is actively installing Epic has an implementation team assigned to it. Those employees travel to the customer's California sites on a regular basis — in my experience at least monthly — and

perform the balance of that customer's support remotely. This arrangement holds true regardless of whether the employee is a Boost consultant or holds certain other positions within Epic.

12. My understanding is that all Epic employees sign the same form agreements that Epic required me to sign, and they contain the same covenants. If an employee is approved to work with Epic International or Boost, they sign another standard form agreement with essentially the same covenants carrying forward.

**III. The Epic "Build" Process**

13. Epic's solutions are not an off-the-shelf app, like Microsoft Word, that a health system simply installs and runs. Epic sells and licenses a complete framework. It supplies a starting configuration, and the customer organization then builds on top of it the thousands of individual records and datasets, data, forms, and other information that make the system reflect how that particular organization works: E.g., its departments and locations; its providers and their clinic schedules; its visit types; its order sets and preference lists; its documentation templates and flowsheets; its laboratory test compendium; its medication formulary; its charge capture and billing rules; and its security classes (which govern which employee may see and do what).

14. Epic's solutions must also be connected to all the other related software and systems the organization runs. A health system's Epic system exchanges data continuously with laboratory instruments and laboratory information systems, radiology and imaging systems, pharmacy dispensing equipment, bedside monitors and other medical devices, registration and patient-identity systems, payer eligibility and claims systems, and third-party applications — including, in my current work at Abbott, a platform that share summary continuous glucose monitor metrics and PDF glucose reports. Those connections are built and maintained as interfaces and integrations.

15. All of this configuration work is typically called a "build."

16. No two Epic installations are alike. Two health systems running the same Epic release can present materially different workflows to their clinicians, because each made different build and workflow decisions. An implementation is therefore a large, multi-year program of

work requiring project leadership, testing discipline, training, and change management. This is the work I have done for more than a decade.

**IV. Epic's UserWeb Portal**

17. Epic controls the credential that gives a person working in my field access to the Epic framework. It is called UserWeb. An individual UserWeb account is required to register for or attend Epic's "XGM" and "UGM" conferences, to view most Epic material, to be able to access forums to engage with other customers, to reach Epic's technical and implementation documentation, and to view UGM and XGM session material after the fact. It is also the only way to stream their announcements shared with all customers. Epic is the only source of a UserWeb account.

18. UGM is Epic's Users' Group Meeting, the conference Epic holds each August at its campus in Verona, Wisconsin for personnel from the health systems and other organizations that license its software. It draws thousands of attendees from across the United States and abroad, and it is where Epic previews upcoming functionality. UGM primarily attracts those in Director or above roles at a health system. The sessions tend to focus on strategy and system-level customer outcomes. XGM is Epic's Experts Group Meeting, held in the spring, for users working in depth with particular Epic applications. XGM primarily brings those focused more on technical and tactical execution like lead analysts and managers. Both conferences are held at Epic's Verona campus, and Epic controls who may register and attend. Abbott sends attendees and exhibitors to both XGM and UGM, as these are the only two conferences each year in the country where you can learn from, network with, and engage with Epic-only members of the health care community.

19. I need UserWeb access for at least three things in my current work. First, conference registration and attendance: Epic's conferences are where health systems, device makers using Aura, and Epic itself meet, and my role at Abbott requires me to be there. My experience helps contextualize learnings shared by other customers to shape how Abbott approaches the opportunities and barriers health systems face in adopting best practices to transform care for persons living with diabetes. It is near impossible to do that when I cannot

interact with the customers there or view their presentations afetwards. Second, Epic's technical and implementation documentation: I need to see what documentation Epic has published about its workflows and functionality so that I can help Abbott strategize on different ways to engage with health systems about integrating our product with Epic. Without the documentation I cannot do that part of my job, and no one outside Epic can supply it. For Abbott to be commercially successful with their Epic integration, it needs to understand the different ways the EHR could be configured to support the clinical workflows necessary to achieve diabetes management transformation. Finally, Abbott's demo of the Epic Aura functionality is held within the UserWeb. Without access to it, which I lacked until September 28, 2026, I could not see it independently nor show the workflow to anyone.

**V. Epic Certifications**

20. Epic also controls who may be trained on its software and who may be certified in it. To my knowledge, an individual cannot enroll in Epic's certification program on his or her own. Epic requires that the individual be sponsored by an organization holding an active Epic contract (e.g., an Epic customer, an Epic-approved consulting partner, or Epic itself). Epic's training materials are kept on UserWeb, which is likewise reachable only through a sponsoring organization. A person without a sponsor cannot obtain the credential. To my knowledge, Epic requires customers to only allow system build access to people who are certified.

21. Epic further requires certified personnel to complete new version training and continuing education as Epic releases new versions of its software. If those requirements are not completed by Epic's deadline, my understanding is that the certification lapses and cannot be restored without retaking the examinations for the then-current version.

22. I have held Epic certifications in Radiant (the radiology module) and Cupid (the cardiology module). If I ever needed to restore my certifications, I could not do it on my own. I would need an organization with an active Epic contract to sponsor me, and I would need the UserWeb access that Epic denied me until September 28, 2026.

## VI. The Market for Epic Professionals in California

23. Because of my experience, skill set, industry knowledge, and training, I am well-suited for Epic program, implementation, and IT leadership roles at healthcare systems, at the consulting firms and systems integrators that serve them, and at device and life-science companies whose products connect to Epic. Postings for these sorts of jobs ask for Epic implementation experience, experience leading Epic analysts, project and program management, and change management — the work I have done for eleven years. One example of a job for which I am well-suited, which was posted in California in July and reposted in August was MarinHealth's "Provider Technology and Epic Training Manager," This role is "responsible for the strategic leadership, management, and continuous improvement of MarinHealth's Epic end-user training program." In the qualifications section, it required 5+ years of Epic end-user training experience, ability to lead and scale training programs. Among several of the preferred qualifications, it wanted "multiple Epic certifications" and "experience supporting Epic go-lives"

24. There is also a large California market for Epic build and configuration analysts. These job postings name specific Epic applications in the job title and require certification in that application, and the employers are Epic customers or Epic partners. One California posting requires an applicant to submit a screenshot of her certifications taken from Epic's UserWeb portal — the portal Epic has denied me.

25. True and correct copies of California job postings for Epic program, leadership, and analyst positions, including the MarinHealth position referenced above, are attached to this declaration as Exhibit 1. The URL for each posting appears with it. I have personally viewed each of these postings.

## VII. The Restraints in Epic's Employment Agreements

26. Attached as Exhibit 8 is a true and correct copy of the Epic Systems Corporation Employment Agreement I signed on September 5, 2014. Attached as Exhibit 9 is a true and correct copy of the Boost, Inc. Employment Agreement I signed on March 30, 2018. Attached as Exhibit 10 is a true and correct copy of the International Assignment Agreement I signed on January 9, 2021 for my assignment to Norway. Attached as Exhibit 11 is a true and correct copy

of the updated Annex 1 and Annex 2, dated March 10, 2026, that Epic posted to my Eureka account when my employment ended.

27. Attached to this declaration as Exhibit 2 is the Boost Employment Agreement. I was required to sign this agreement as a condition of my employment. It is written for the benefit of the entire Epic Group and names Epic Systems Corporation as an intended third-party beneficiary entitled to enforce it. An exception to its covenant not to compete may be granted only by an Epic HR director.

28. I understand that Epic maintains a "7-3-1" waiver program under which Epic will, at its discretion, excuse the noncompete for a departing employee who has served at least seven years at Epic and at least three years at Boost, and who then remains for a year at the Epic customer that wishes to hire her. I personally know several people whose noncompetes were waived through the 7-3-1 program. I did not qualify for this waiver program, even though I had 11 years of tenure at Epic, including more than 3 years as Boost, because I did not work with Abbott Diabetes prior to my departure from Boost.

29. By memorandum dated June 13, 2025, Epic offered me a transfer to Boost. The memorandum stated that the offer was "based on your proposed move to San Francisco, CA with a Boost start date of 8/4/2025," and that my transfer compensation "isn't something we negotiate." A true and correct copy of the June 13, 2025 memorandum is attached as Exhibit 3.

30. On or around June 19, 2025, as a condition of the transfer, I signed by DocuSign a Boost, Inc. Employment Agreement, an Employee Data Confidentiality Policy, a Mutual Arbitration Agreement, and a Boost Technology Payment Agreement. Each bears my signature and the date June 19, 2025. I was not given the opportunity to negotiate any of these documents, and I was not represented by counsel. A true and correct copy of the complete DocuSign packet as I signed it is attached as <u>Exhibit 2</u>.

31. The Employment Agreement states that it "is effective as of you[r] first date of employment with Boost, Inc." The June 13, 2025 memorandum's reference to an August 4, 2025 start date was a projection based on my proposed move; the memorandum provides that my "first day in Boost is the first weekday to occur after [my] last working day in [my prior role]," and

contemplates that the date may change. I relocated from England on or about June 18 and ended my role with Epic International on or about June 27, 2025. I in fact began my Boost role on or about July 7, 2025, and at all times thereafter worked for Epic remotely from my home in Concord, California aside from several trips to support my Boost customer assignments.

32. It is my recollection that in early September 2025, Epic issued me a stock offer that was conditioned on my agreement to extend my noncompete period to two years. Within a short period, on or about September 16, Epic voided that offer and reissued it to California employees with certain noncompete terms and related appendices removed.

**VIII. My Job Search in Late 2025 and Early 2026**

33. Between approximately November 2025 and February 2026, while still employed by Epic, I searched for a new job. I understood from Epic's employment agreements, from what I knew of Epic's enforcement practices, and from what I knew of the hiring restrictions in Epic's customer contracts that employers running Epic were, as a practical matter, closed to me for a year after I left.

34. For that reason, I did not pursue Epic IT manager- and director-level positions at Bay Area health systems that run Epic, including Stanford Health Care, UCSF Health, John Muir Health, the San Francisco Department of Public Health, and Adventist Health. At the time, Adventist Health, in particular, was installing Epic and regularly posting positions suited to my experience. I also did not apply to Epic-affiliated consulting firms — Accenture, Deloitte, Optum, and KPMG — that had open positions matching my skills, because I understood that Epic-affiliated consultancies would not risk breaching their no-hire contracts with Epic. Moreover, Accenture, Deloitte, and Optum are named on Annex 2 to the Boost Employment Agreement.

35. I pursued a job with Abbott because the market for my skills was very small once Epic health system customers and consulting partners are removed. Abbott, though, is a medical-device maker rather than a health system, its Epic integrations were limited, and I believed it was large enough to resist an unlawful noncompete asserted against a California employee. I hoped that Epic's restraints would not follow me to Abbott. I was wrong.

## IX. My Abbott Employment

### A. The EHR [Electronic Health Records] Implementation Manager Role

36. On February 20, 2026, Abbott Diabetes Care offered me the position of EHR Implementation Manager in Alameda, California. The duties and responsibilities of this role were to develop the strategy to scale the integration of Abbott's continuous glucose monitors with Epic's platforms, including Epic Aura, across more than 400 health systems. It involves interfacing with health systems to reduce integration friction and representing Abbott at industry conferences. It is work that advances the adoption of Epic-enabled solutions. During the hiring process, my now-manager Elango Nathan told me that they had been struggling for months to find someone that fit their Epic skill and experience needs and that my background jumped out immediately.

37. I started at Abbott on March 23, 2026. In my first week, Abbott added me to customer trips and industry conferences. Within weeks, my manager outlined routes for advancement.

38. I quickly realized that Abbott's relationship with Epic is essential to Abbott's EHR-connected products and it was unwilling or unable to take a stand for me when it came to Epic's employment restraints.

### B. Epic's Enforcement and My Loss of Professional Opportunities

39. As noted above, on March 10, 2026, I received an email from Epic's benefits department transmitting my departure documents, including a departure letter and a Departure FAQ, and directing me to "Complete this Form to acknowledge your understanding of the information and let us know if you have questions." I read the Departure FAQ and completed the form as directed. True and correct copies of that email, the departure letter, and the Departure FAQ as I received them are attached as Exhibit 12.

40. In late March 2026, I applied for an Epic UserWeb account in my own name, which my Abbott role requires for the reasons described above. On March 25, 2026, Epic's UserWeb Support wrote that "[o]ur records show your name matches that of a former Epic employee," and asked me to confirm whether I had ever been employed by Epic and, if so, the

date of my departure. On March 30, I replied that my departure date was March 9. On March 31, 2026, Epic's UserWeb Support denied my application, stating: "Since you departed Epic on 3/9/2026, you will need to wait 12 months before gaining access to the UserWeb. You can reach back out to us when your waiting period is up." A true and correct copy of this email exchange is attached as Exhibit 4.

41. I reported this to my Abbott manager, and I understand Abbott asked Epic to make an exception for me. Epic refused. On April 7, 2026, Barb Johnson, an Abbott program manager, relayed Epic's position to me by email: "We heard back from our Epic contact yesterday. We were informed that you cannot have User Web Access for 12 months and former Epic employees should not be working on Epic direct, related work for 12 months." A true and correct copy of this email is attached as Exhibit 5.

42. My Abbott manager Elango Nathan informed me that Jake Gamble, Epic's Implementation Director assigned to the Abbott account, had told Rob Shaw, my Abbott Director, in substance, "you should have told me when you saw her resume . . . I could have told you about all these considerations."

43. So, in my second week working for Abbott, Abbott pulled me from a planned trip to a health system. A planned engagement with a major health system in another state also proceeded without me. The accounts I was hired to support were handed to a colleague. I was also pulled from attending or exhibiting at XGM and advised to avoid talking to Epic health systems while I was supporting Abbott's booth at Becker's conference in Chicago.

44. On April 28, 2026, I emailed Epic's human resources department and asked for "the final Epic Employment Agreement that is applicable to me as a California resident," noting that California law "impact[s] pieces of the general Boost Employment Agreement." Jennifer Peterson of Epic HR replied the same day that my employment agreement "hasn't been modified" and that it is "available in Eureka." For good measure, she added: "One thing to keep in mind is that our customer contracts often include provisions related to hiring, which would still apply to those organizations." A true and correct copy of that exchange is attached as Exhibit 6.

45. Abbott continued to restrict my work, and the restrictions deepened over the following months. For example:

46. During the week of June 1, 2026, Abbott sent employees to Minneapolis for a joint Abbott–Epic workshop on implementation lessons learned — the subject of my role. Because of Epic's restraints, Abbott sent a peer instead of me.

47. My manager instructed me not to have any conversations with any health system that uses Epic at the American Diabetes Association's Scientific Sessions (scheduled for June 5–8, 2026). My manager also told me I would not, as previously planned, staff Abbott's booth for Epic-integration conversations. Because most large health systems use Epic, that instruction barred me from nearly all customer engagement. In the one customer interaction I was permitted — with a contact I already knew at a prominent Illinois health system — Abbott required me to bring a colleague to conduct the conversation while I was relegated primarily to notetaker.

48. I was told to sit out of a 6-hour Epic certification session that Epic led on July 22, 2026 at my team's retreat in Boston for Abbott's health-systems sales staff. I had by then spent more than a decade working on Epic implementations, and I was barred from an Epic training and certification session offered to my colleagues.

49. I filed the present action on July 24, 2026.

50. On July 31, 2026, I received an email from Vanessa Lory of Epic HR at my personal email address. Beneath Ms. Lory's message was an earlier email, dated September 30, 2025 and allegedly addressed by blind copy to "new California residents/soon-to-be residents," which stated that some, but not all, of Epic's "noncompete provisions are void and will not apply to you as long as you live in California," and that "[t]he rest of the provisions continue to apply." I have no recollection of receiving this September 30, 2025 email, if it was sent to me, and I have no copy of it from any date before July 31, 2026. It is, as noted above, contrary to Epic's April 28, 2026 email stating that all the non-compete provisions continued to apply.

51. Be that as it may, the July 31, 2026 email stated that the "referenced noncompete provisions that are (and remain) void and non-applicable while you live or lived in California include any provisions in agreements you may have with any of Epic's subsidiary companies,

including . . . Boost, Inc.," that "[t]his was always Epic's intention," and that "any provision establishing Wisconsin law as the law governing your Employment Agreement(s) with Epic or any subsidiary company will not apply while you live or lived in California." A true and correct copy of the July 31, 2026 email, with the September 30, 2025 email beneath it, is attached as Exhibit 7.

52. The employment restraints that this email does not address include: Section 4(c) of the Employment Agreement, which bars me from contacting Epic customers and prospective customers; Section 4(d), which bars me from being employed by an Epic customer or prospective customer in any role involving Epic software; Section 2 ("Confidentiality"); Section 5 ("Return of Property"); Section 7, which entitles Epic to its attorneys' fees but gives me no reciprocal right; the twelve-month waiting period Epic invoked to deny me a UserWeb account; and the hiring, no-hire, and "cooling off" provisions in Epic's contracts with its customers and partners, which Epic's human resources department told me in writing "would still apply."

53. Nothing about my situation at Abbott changed after I received this email during all of August and the first half of September. Because of Epic's restraints, Abbott reassigned me to work outside the Epic-integration function for which I was hired. Instead I have focused on general change management training for the health system sales team, payer conversations, internal tactical planning, marketing material support, and internal support for a new product launch.

54. On September 14, 2026, my manager told me that Epic's legal department had emailed him about me, with Abbott's legal department copied. He said he had asked Abbott Legal for clarification, and that he needed a list of the projects I have been working on to send to Abbott Legal. I provided him the list. I have not been shown this email from Epic Legal.

55. On September 18, 2026, my manager told me that he would be getting me involved in Epic-related conversations, because Epic had communicated to Abbott that it was "waiving" the hiring provisions in its contract with Abbott and would permit me to have UserWeb access. I applied for UserWeb access the same day. Epic finally approved my UserWeb account on September 28, 2026, ten days after I applied a second time and six months after it first

denied me. Apart from the October 1, 2026 email described in paragraph 66 below, I have received nothing in writing from Epic about any of this, and I have not seen what Epic sent Abbott. The advancement routes my manager outlined in my first weeks have been delayed by months or lost.

**X.** [redacted]

[redacted]

58. [redacted]

**XI. The Restraints on My Former Co-Workers, and on Epic's Customers and Partners**

59. As stated above, every Epic employee signs the same type of agreements with employment restraints that I signed. These restraints forbid each of them, forever, from using or disclosing "financial information about the Epic Group, its employees," and the "identities and talents of specific Epic Group employees." They forbid each of them, for a year after leaving, from working for an Epic customer in any role involving Epic software, or for any listed consultant or partner. My 2014 and 2018 Epic agreements, which Epic has told me remain in force as written, also forbid each employee for two years from persuading any Epic employee to leave. These restraints on other people restrain me in ways my own agreement does not, and they will not end when my own restraints expire.

60. Referrals. In my experience, Epic implementation and leadership positions at health systems, consultancies, and device makers are filled mostly by referral: someone who has worked with the candidate on an Epic project recommends her or brings her over. The people who have worked with me on Epic projects are, almost without exception, current and former Epic employees. The current employees cannot bring me anywhere, because for a year after they leave they may not go anywhere I could go. The former employees who have reached an Epic customer or consultancy are there because a year has passed or because Epic consented, and in my experience they will not put their own standing with Epic at risk by recruiting a former Epic employee who is inside her waiting period.

61. References. The people who can describe the quality of my work are the same people, and Epic's confidentiality covenants forbid them from disclosing my "identit[y] and talents" or the "identities" and "business data" of the customers I worked with. Read as written, a former colleague may not tell a hiring manager what I am good at, or confirm what I did at City

of Hope or UC Davis. My eleven years at Epic can be vouched for only by Epic, the company enforcing these restraints against me.

62. Pay. The confidentiality covenant also forbids my former colleagues from telling me what Epic pays or what they themselves are paid now. I do not know what former Epic employees at health systems and consultancies are paid for Epic work, because the people who know are prohibited from telling me. I negotiated my compensation at Abbott without that information, and I will negotiate my next position without it.

63. Building a team. When Abbott hired me, my manager told me Abbott had struggled for months to find anyone with my Epic experience. The people who have that experience are at Epic, and the way a manager fills a team in this field is to bring in people she has worked with. I could not do that at Abbott, and I cannot do it at any Epic customer or partner: my former colleagues may not join an Epic customer for a year after they leave Epic, Epic told Abbott that former Epic employees should not do Epic work for twelve months, and my own agreements forbid me from persuading them to leave. In an implementation role, being the only person in the building who knows Epic limits what I can deliver, and therefore what I am worth to an employer.

64. The Market. Epic has roughly 14,000 employees, about 8,000 of them implementation and technical staff, and every one of them is under the same restraints. The consequence, which I have seen from both sides over eleven years, is that Epic's customers and consultancies cannot hire Epic-trained people when they need them, only when Epic's calendar or Epic's consent permits, and no group of Epic alumni can start a consultancy or build a product that "overlaps" with Epic's. The employers who would compete for someone with my experience are fewer than they would otherwise be, and those that exist pay for Epic skill in a market in which Epic controls the supply.

65. Enforcement. Abbott did not need a letter from Epic to remove me from Epic work; it needed only Epic's word to a program manager. In my experience that is how it works everywhere. Epic's customers assume that former Epic employees are off limits for a year, because every former Epic employee they have dealt with has behaved that way and because their

own contracts say so. Epic's Implementation Director told my Abbott director that Abbott "should have told me when you saw her resume." The restraints on everyone else are the reason the restraints on me enforce themselves.

**XII. Epic's October 1, 2026 Email**

66. On October 1, 2026, I received another email from Jennifer Peterson of Epic's human resources department, again at my personal email address. It states that Epic and its subsidiaries "hereby waive any restriction on you becoming employed by any Epic customer in California, by virtue of any no-hire, waiting period, or other provisions in any license agreement between Epic and such customers"; that if I seek employment with such a customer, "you may share a copy of this email with them"; that if the customer seeks UserWeb access for me, Epic "will not deny access on the grounds of any of these waived restrictions"; and that if the customer has questions, "please direct them to me." A true and correct copy of the email, as I received it, is attached as Exhibit 14. The email is addressed to me alone. It says nothing about Epic's consultants or cooperative partners, including Huron and Chartis; nothing about Epic customers outside California, including the health systems I work with from Concord; nothing about being engaged, rather than employed, by a customer; nothing about Section 2 or Section 4(c) of my agreement, or about the restraints on my former colleagues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 4, 2026.

Signed by:
[signature]
1282A625D944420...

Andrea Hull