# EXHIBIT 2

# Boost, Inc.
# Employment Agreement

==========================

This document is a contract between you, a present or prospective employee of Boost, Inc. ("Boost"), and Boost.

Boost is a wholly-owned subsidiary of Epic Systems Corporation ("Epic"), and as such, is a member of the Epic group of affiliated entities (the "Epic Group", which consists of Epic and all its Affiliates ). The Epic Group is in the highly competitive business of creating and marketing computer software for the health care industry throughout the United States and elsewhere, as well as the provision of implementation services for that software. Boost is in the business, as a subcontractor to Epic or other Epic Group companies, of providing staff to fill, on an assignment-by-assignment basis, implementation team roles (typically on the customer-side) or to take on special projects related to customers' use of Epic software. Such assignments may relate to system build, testing, training, project and program management for initial implementation, continuous improvement, rollouts, upgrades and/or other initiatives. The provisions of this agreement are important in the Epic Group's efforts to maintain its competitive position and to provide quality products and services to its licensees and customers.

**1. Contract**

The provisions of this agreement are, in effect, promises you, the employee, make to Boost in consideration for entering or continuing in the employment of Boost. This agreement does not, however, include a promise of perpetual or continuing employment by Boost. All of Boost's employees are "at will" employees which means that the relationship is freely entered into by both parties and that either Boost or you, the employee, may terminate the relationship at any time, with or without cause, and with or without notice. While either you or Boost may terminate the employment relationship at any time, you are expected to provide adequate notice to Boost prior to resignation so that Boost has time to ensure proper transition of your job responsibilities. Adequate notice and the consequences of failing to provide adequate notice are described in Epic's policies and procedures book (i.e., the Redbook) as it is modified from time to time. In the event of termination of this employment by either you or Boost, and regardless of the reason, the provisions of paragraphs 2, 3, 4, 6, 7 and 8 of this agreement shall survive the termination of employment, i.e., shall remain in effect. No person, except for an officer of Boost or a designee thereof, has the authority to enter into an agreement for employment of you on other than an "at will" basis, and even an officer of Boost or designee thereof may only do so in writing signed by that officer or that officer's designee. You should not rely on any statement by anyone to the contrary.

By signing this agreement, you agree that you will devote your full business and professional time and energies to Epic and will neither accept nor conduct any other business or professional activities while employed by Epic. As a salaried employee, you generally will receive the same amount of salary each week, no matter the number of hours you work. We are working toward a mission of improving healthcare worldwide, and your salary is designed to compensate you for all hours you work each week with the understanding that most weeks will require more than 40 hours. You agree that your salary compensates you for this, and that no overtime is due or will be paid when you work in excess of 40 hours in a week.

The provisions of Epic's Redbook apply to your employment except to the extent any such provisions are superseded by Boost-specific policies, such as a Boost Redbook Addendum or benefits summaries or similar informative materials provided to you in connection with a move to Boost. Boost-specific policies, like the Redbook, are subject to modification from time to time.

**2. Confidentiality**

Trade Secret and Confidential Information. In order to conduct its business operations, the Epic Group must maintain in secret certain trade secrets and proprietary information. During this Agreement and thereafter, You agree to maintain in confidence these trade secrets and proprietary information and to use the information or secrets only as needed in your role for Boost and only for the proper business of Boost. These trade secrets and proprietary information include, by way of example, customer and prospect lists and identities; Epic Group sales strategies for existing and prospective customers; software, software systems or details of software including computer coding in any form, methods or operation, user interfaces, details of operation or functionality, details of reports, details of screens, structure and sequence of functionality and programs, software structural design such as programming points and the Epic pyramid, system deficiencies; programming techniques; user and program documentation; development history of any software system; internal discussions or strategies relating to competitors; information regarding discussions with consultants or information from consultants; financial information about the Epic Group, its employees or its current or prospective customers; identities and talents of specific Epic Group employees; company records; pricing information, pricing details and strategies; and other sensitive information relating to the business of the Epic Group which has been identified by the Epic Group as confidential. For purposes of clarity, similar information of third parties that is in the Epic Group's possession under an obligation of confidentiality also constitutes proprietary confidential information that you must maintain in confidence and use only in your role for Boost and only for the proper business of Boost.

Customer Information and Personal Health Information. Because of the nature of the computer software systems created by the Epic Group and the need to maintain them, Epic Group employees may have access to the confidential and highly personal medical record or health information regarding the patients of the Epic Group's customers or regarding account holders of Lucy, Epic's web-based personal health record. Some of Epic's customers may be geographically close to your residence, and it is possible that Epic Group employees may have access to personal health information about persons with whom they are personally acquainted. It is a high priority of the Epic Group, including Boost, and an important company policy, that all such data regarding any patients of any customers and any Lucy account holders be maintained in the utmost confidence. Disclosure or use of any such information about any

patient of any customer of the Epic Group or about any Lucy account holder outside of your employment duties is absolutely forbidden and would be extremely injurious to Boost and the Epic Group, its customers, and the Epic Group's reputation in the health care community and would be a gross violation of personal confidential information. You not only agree to maintain such information in the utmost confidence and use the information only in your employment duties, you also are hereby given notice that violation of this covenant not only will result in immediate termination without notice or severance, but, furthermore, if you make any unauthorized disclosure of any confidential information regarding any patient or Lucy account holder or business data of any customer, you will expose yourself to the risk of legal liability for which you will not be defended by Boost or the Epic Group. To the extent permitted by law, we may seek indemnification by you.

========================

[1] An "Affiliate" means any person or organization that, directly or indirectly controls, is controlled by, or is under common control with Epic. For purposes of this definition only, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person or organization, whether through the ownership of shares, the holding of voting power, by contract or otherwise.

**3. Inventions & Work Product**

While an employee of Boost, you may be assigned to create works of authorship for the Epic Group such as computer programs, product documentation, advertising or promotional materials, or other forms of written, graphic, or creative work. All such works of authorship while you are employed by Boost (regardless of whether or not they were created during or outside of normal business hours) shall be considered works for hire of Boost under the federal copyright laws and the sole and complete property of Boost if (i) they are generated in conjunction with work assigned to you while you are employed by Boost, (ii) they are generated using or in the physical facilities of the Epic Group, or (iii) they are created, generated or copied onto any computer or portion thereof which is the property of the Epic Group.

While an employee of Boost you may also, in the course of your duties, make patentable inventions. You agree to promptly notify Boost of any such inventions and to execute any such documents as Boost may reasonably request so as to transfer title to such inventions to Boost or another Epic Group company and permit the filing and prosecution of any patent application in the U.S. or in foreign countries on such inventions.

**4. Covenant Not to Compete and Additional Restrictions**

Epic staff receive access to our intellectual property to help them succeed in their role at Epic. As a tech company, the Epic Group relies on protecting its intellectual property to support our ongoing success, the livelihood of our staff, and the success of our customers. You could harm the Epic Group, your co-workers, and as a result, the customers we serve if you share our intellectual property with competitors or others (whether it happens intentionally or unintentionally).

Additionally, Boost invests heavily in providing staff with specialized, ongoing training. Replacing staff who leave is a lengthy process.

Epic's customers rely on us to advance our software suite and provide the training and support they need to be successful, and we rely on our staff to meet those expectations. When customers and third parties we work with hire well-trained Epic staff, it puts the success of the other members of Epic's customer community at risk.

Therefore, if you have been certified in Epic software during your career at Boost or have ever been in a role that requires certification in Epic software, have had a login to an Epic customer production system or supporting infrastructure, are involved in sales of Epic software or services, or have used the title of director, vice president, officer, or similar title, then, during your employment with Boost, and for a period of one year after, the following separate restrictions below apply to you, unless you have a written exception from an Epic HR director.

(a) **Direct Competitors**. You will not be employed or engaged by, whether as an employee, officer, partner, director, consultant or otherwise, or have an ownership interest in (other than the ownership of less than 1 percent of a publicly-held company), any Direct Competitor of the Epic Group. "Direct Competitors" are those companies listed on attached Annex 1 as updated by the Epic Group from time to time. This provision shall not restrict you as to employment, assistance, ownership, or service in connection with products or services that do not serve substantially similar functions as the Epic Group's products or services.

(b) **New Business Enterprise or Area of Business**. You will not establish or aid others in establishing any new business enterprise or a new area of business for an existing business enterprise, in either case which would involve development, sale, or marketing of any product that overlaps with the Epic Group's.

(c) **Customer Contact**. You will not contact any customer or Active Prospective Customer of the Epic Group with whom

you have had contact during your last two (2) years of employment by Boost, for the purpose of either (i) attempting to sell them products or services competitive with the Epic Group, or (ii) attempting to dissuade them from doing or reducing the amount or types of their business with the Epic Group. An "Active Prospective Customer" means a prospective customer which has provided to the Epic Group a request for proposal, has a proposal from the Epic Group, or has contacted the Epic Group regarding the Epic Group's products or services within the last two (2) years of your employment with Boost.

(d) **Employment with Customers, Consultants and Cooperative Partners**. You will not:

- Be employed or engaged by, directly or indirectly including as a Consultant, any Epic Group customer or Active Prospective Customer in a role that involves Epic software.
- Be employed or engaged by a Consultant or Cooperative Partner as defined in Annex 2, if your work would involve healthcare software or services that overlap with Epic products or services.

The organizations listed on Annex 2 may change over time as Epic begins or ends collaboration with specific Consultants and Cooperative Partners.

**5. Return of Property**

By signing this agreement, you agree that you will, upon termination of employment with Boost (unless upon termination, you are immediately employed by Epic or one of its other Affiliates), surrender all of the following:

(1) written material or documentation regarding the Epic Group's software, programs, techniques, methodologies, procedures, policies, source code, listings, working papers, customer lists, financial information, and information related to the foregoing, including any responses to proposals, training material, sales material, manuals, and checklists.

(2) any physical embodiments of information that is proprietary to any Epic Group company, such as tapes, diskettes, photographs, slides, and so forth.

(3) any personal property of Boost or any other Epic Group company, such as hardware (PCs, modems, printers, etc.), software owned by any Epic Group company, books purchased by any Epic Group company, magazines purchased by any Epic Group company, subscriptions purchased by any Epic Group company, and other property of the Epic Group.

**6. Tobacco-Free Policy**

Tobacco use is not permitted anywhere on Epic Group property. This extends to all Epic Group buildings, grounds (parking lots, lawns, in cars) and includes all rental properties. Epic Group employees are not permitted to use tobacco at company events or during trips when in public places, including restaurants, the healthcare facility and grounds, etc. During such trips and events Epic Group employees should not be seen using tobacco, nor should they smell of smoke.

**7. Irreparable Harm**

You understand and acknowledge that Boost believes that breach of this agreement will result in irreparable and continuing damage to Boost and the Epic Group for which money damages may not provide adequate relief. You also understand that Epic is an intended third-party beneficiary of this agreement. Accordingly, if you breach this agreement, you agree that either or both Boost and Epic may seek and obtain injunctive relief to enforce the provisions of this agreement, and that nothing here shall prevent or inhibit Boost or Epic from seeking any other remedies available to it as well. Further, if Boost and/or Epic is successful in any action to enforce this agreement, you agree that Boost and/or Epic shall be entitled to recover its actual attorneys' fees and costs for such action.

**8. Miscellaneous**

By signing this agreement, you not only agree to its terms, but also warrant that you are not under any obligation, contractual or otherwise, which is in conflict with its terms.

This agreement is to be interpreted in accordance with the laws of the State of Wisconsin.

This agreement contains separate and distinct restrictive covenants. If any restriction or other provision of this agreement is found to be invalid or unenforceable as written, the agreement shall be construed, to the extent possible, so as to render that restriction or other provision enforceable, and if it cannot be so construed, its invalidity or unenforceability shall not affect the validity or enforceability of any other restrictions or provisions in this agreement.

This Agreement is effective as of you first date of employment with Boost, Inc.

**Employee**

Signed by:
Signed: Andrea Hull
CAE3E5D703DE4F4...
Name: Andrea Hull
Date: 06/19/2025

Jennifer Peterson
**Human Resources**

# Annex 1

## Direct Competitors of Epic

This Agreement only applies to the healthcare software and services activities at these companies.

Altera Digital Health/Veradigm/Allscripts
Amazon/Amazon Web Services
Apple
athenahealth/Virence/GE Healthcare
Cedar
Cognizant
eClinicalWorks
Google/Alphabet
Health Catalyst
InterSystems (TrakCare and HealthShare)
IQVA
LeanTaas
MEDITECH
Meta/Facebook
Microsoft
Moxe
NextGen Healthcare
Oracle Health
Palantir
Phreesia
Redox
Salesforce
TriNetX
Truveta

If you have worked outside the United States for Epic or any of its affiliated companies at any time during the prior 12 months (with the exception of short-term work supporting a go-live), the list also includes the following:

Cambio
CGI/Logica
Chipsoft
EMIS
Philips Healthcare
SAP (health or wellness activities)
System C
Telstra Health
Tieto
TPP/SystmOne

Epic may update this list from time to time. Please contactEmploymentAgreements@Epic.com for the most up-to-date list.

**Annex 2**

**Epic Consultants and Cooperative Partners**

Consultants or Cooperative Partners are (i) any organization that has entered into a "Member Services", "Pal", "Partner", or similar cooperative agreement with Epic or its affiliates, and (ii) the following organizations:

Accenture
Chartis
Deloitte
Ensemble
Evergreen
Huron
IBM/Kyndryl
Impact Advisors
Nordic Consulting
Notable
Optimum Healthcare IT
Optum/Change Healthcare
Pivot Point Consulting
R1
Tech Mahindra
Tegria/Bluetree

This Agreement only applies to the healthcare software and services activities at the specific Consultant and/or Cooperative Partner and others in the same corporate group such as subsidiaries, joint ventures, and pending mergers and acquisitions.

Epic may update this list from time to time. Please contact EmploymentAgreements@Epic.com from the most up-to-date list.

# BOOST, INC. EMPLOYEE DATA CONFIDENTIALITY POLICY

Boost, Inc. ("Boost") is a wholly-owned subsidiary of Epic Systems Corporation ("Epic"), and as such, is a member of the Epic group of companies (the "Epic Group", which consists of Epic and all its Affiliates ). The Epic Group is in the highly competitive business of creating and marketing computer software for the health care industry throughout the United States and elsewhere, as well as the provision of implementation services for that software. Boost is in the business, as a subcontractor to Epic or other Epic Group companies, of providing staff to fill, on an assignment-by-assignment basis, various implementation team roles (typically on the customer-side) or to take on special projects related to customers' use of Epic software. Such assignments may relate to system build, testing, training, project and program management for initial implementation, continuous improvement, rollouts, upgrades and/or other initiatives. To perform the duties of the customer-side implementation team roles to which they may be assigned and also through their association with the Epic Group, employees of Boost may be in positions in which they have access to confidential data regarding the patients of Epic Group customers or regarding account holders of Lucy, Epic's web-based personal health record. It is a highest priority of Boost and of the entire Epic Group, and an important company policy, that all data regarding any patients of any customers and any Lucy account holders be kept in the utmost confidence. It is possible that an employee of Boost may have access to highly sensitive personal information about persons with whom they are personally acquainted. Any such information must be treated in utmost confidence, and as ordinary computer data, and must not be used for purposes other than that which is absolutely required for the fulfillment of the employee's obligations and duties at Boost. Disclosure or use of any confidential information about any patient of any customer or about any Lucy account holder outside of the employment duties of an employee by Boost is absolutely forbidden and would be extremely injurious to Boost, the Epic Group, its customers, and the Epic Group's reputation in the health care community. Therefore, by accepting or continuing in the employment of Boost each Boost employee personally agrees never to disclose such information to anyone other than (i) other employees of Boost or another Epic Group company who require such information in order to perform their job responsibilities, or (ii) those to whom it is required to disclose such information during the employee's normal conduct of professional employment responsibilities for Boost. As an employee of Boost, you agree and understand that you will in no way use such information other than in your employment obligations. You also understand that if this policy is violated, your status as an employee of Boost will be terminated immediately and without further notice. Furthermore, if you should wrongfully disclose any confidential information of any patient or Lucy account holder, you will expose yourself to the risk of liability for which you will not be defended by Boost or the Epic Group. To the extent permitted by law, we may seek indemnification by you.

By signing this below, you acknowledge that you have read and understood the intent and terms of this policy, and accept this policy as a condition of your accepting or continuing in employment with Boost.

**Employee**

Signed by:
Andrea Hull
CAE3E5D703DE4F4...

Signed:
Name: Andrea Hull
Date: 06/19/2025
TLG: 20312

# MUTUAL ARBITRATION AGREEMENT
# Date: January 3, 2024

I. Agreement to Arbitrate. Epic Systems Corporation, together with its related and affiliated companies or successors, (collectively "Epic") and I agree to use binding arbitration, instead of going to court, for any "Covered Claims." Covered Claims are, unless expressly excluded below, any statutory or common law legal claims that arise or have arisen between Epic and me, asserted or unasserted, that relate to or arise out of my employment or the termination of my employment. Covered claims also include any claims described in the immediately preceding sentence that I may have against Epic's current or former directors, officers, managers, and employees. **I understand that acceptance of employment with Epic, or any entity related to or affiliated with Epic, is deemed to be acceptance of this Agreement to Arbitrate.**

**I understand and agree that arbitration is the only litigation forum for resolving Covered Claims, and that both Epic and I are waiving the right to a trial before a judge or jury in federal or state court in favor of arbitration.**

The arbitrator shall have the authority to award the same damages and other relief that would have been available in court pursuant to applicable law. The arbitrator shall follow the rules of law of the state which is the employee's principal place of work, any applicable Federal law, and the rules as stated in this agreement. The arbitrator shall have the authority to grant any remedy or relief that the arbitrator deems just and equitable and which is authorized by and consistent with applicable law, including applicable statutory or other limitations on damages.

II. Waiver of Class and Collective Claims. I also agree that Covered Claims will be arbitrated only on an individual basis, and that both Epic and I waive the right to participate in or receive money or any other relief from any class, collective, or representative proceeding. No party may bring a Covered Claim on behalf of other individuals, and any arbitrator hearing my Covered Claim may not: (i) participate in or facilitate notification of others of potential Covered Claims; (ii) arbitrate any form of a class, collective, or representative proceeding; or (iii) without the consent of all the parties, combine more than one individual's Covered Claim(s) into a single case.

III. At Will Employment Unchanged by this Agreement. Nothing in this agreement changes or in any manner modifies my relationship with Epic of employment-at-will.

IV. Claims not Covered by this Agreement. Covered Claims under this agreement do not include claims for employee benefits that are subject to dispute resolution procedures set forth in an applicable Epic ERISA plan. Also excluded from this agreement are any claims that cannot be required to be arbitrated as a matter of law. Covered Claims also do not include claims for workers' compensation or unemployment compensation. I also understand that I am not barred from filing a claim or charge with a governmental administrative agency that cannot be compelled to arbitration as a matter of law. I also understand that if a third party seeks to have Epic garnish my wages, I may be subject to third-party garnishment proceedings in court, even though such a dispute concerns my wages and therefore has some relationship to my employment. Nothing in this agreement prohibits me or Epic from seeking emergency or temporary injunctive relief in a court of law in accordance with applicable law (however, after the court has issued a ruling concerning the emergency or temporary injunctive relief, Epic and I are required to submit the dispute to arbitration pursuant to this agreement).

V. Right to Representation. Both Epic and I shall have the right to be represented by an attorney in arbitration. Neither side is entitled to its attorneys' fees except as provided for by applicable law.

VI. How to File for Arbitration. To file a demand for arbitration:

1. The party desiring to pursue a Covered Claim must prepare a written demand setting forth the Covered Claim(s).

2. The Employment Arbitration Rules & Mediation Procedures of the American Arbitration Association ("AAA") effective at the time of my filing will apply, except as modified below. The current version of the rules, as of this Version Date, can be found here: https://www.adr.org/Rules. These rules are modified by the terms of this agreement, including the following:

a. Initiation and Administration

(1) Epic will pay the arbitrator's fees and the arbitration filing and administrative fees provided, however, that if I initiate the arbitration, I will pay the lesser of the AAA's then current filing fee (which, as of this Version Date, is $300), or the then-current filing fee applicable in state court;

(2) Unless I regularly worked for Epic in a home location other than within Dane County, Wisconsin, the arbitration shall take place in the state of Wisconsin, Dane County, unless the parties mutually agree to an alternative location. Absent extraordinary circumstances, the arbitration hearing shall be conducted on Epic's Verona, Wisconsin campus.

(3) Epic and I will each have the opportunity to "rank" our preference for the appointed arbitrator from a list of nine proposed arbitrators, and the AAA will then appoint the arbitrator.

b. Discovery

(1) For discovery purposes only, the arbitrator, or the AAA, may consolidate similar claims filed by multiple individual employees, each on their own behalf, into a single proceeding and, when discovery has been completed, the arbitrator or AAA may no longer proceed in consolidated fashion;

(2) Each party shall avoid broad or widespread collection, search, and production of documents, including electronically stored information ("ESI"). If compelling need is demonstrated by the requesting party, the production shall: (i) be narrowly tailored in scope; (ii) only come from sources that are reasonably accessible without undue burden or cost; (iii) be produced in a searchable format if ESI, and which is usable by the receiving party and convenient and economical for the producing party; and (iv) not require electronic metadata. Where the costs and burdens of the requested discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, and the importance of the discovery in resolving the issues, the arbitrator will deny such requests or order production on condition that the requesting party advance to the producing party the reasonable costs involved in making the production, subject to the allocation of costs in the final award;

(3) Each party shall be entitled to only one interrogatory limited to the identification of potential witnesses, in a form consistent with Rule 33 of the Federal Rules of Civil Procedure ("FRCP");

(4) Each party shall be entitled to only 25 requests for production of documents, in a form consistent with Rule 34 of the FRCP;

(5) Each party shall be entitled a maximum of two (2) eight-hour days of depositions of witnesses in a form consistent with Rule 30 of the FRCP;

(6) The arbitrator shall decide all disputes related to discovery and to the agreed limits on discovery and may allow additional discovery upon a showing of substantial need by either party or upon a showing of an inability to pursue or defend certain claims without such additional discovery;

c. Authority and Award

(1) The arbitrator must issue a decision in writing, setting forth in summary form the reasons for the arbitrator's determination and the legal basis therefor;

(2) The arbitrator's authority shall be limited to deciding the case submitted by the parties to the arbitration. Therefore, no decision by any arbitrator shall serve as precedent in other arbitrations except in a dispute between the same parties, in which case it could be used to preclude the same claim from being re-arbitrated.

VII. Settlement. I may settle any dispute with Epic at any time without involvement of the arbitrator.

VIII. Confidentiality. Arbitration proceedings are private and confidential, and the parties and the arbitrator shall be empowered to maintain the private and

confidential nature of the arbitration proceeding, testimony, hearing and award. The arbitrator must allow persons to attend the hearing who have a direct role or interest in the hearing, but shall have the authority to safeguard privacy and confidentiality such as by excluding non-essential persons from the hearing, and by issuing orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information. This confidentiality provision shall not restrain or prohibit a party from investigating, preparing for, or presenting or defending against Covered Claims, and does not apply to a judicial challenge to or enforcement of an award, or to disclosures required or authorized by law or judicial decision.

IX. Modifications and Amendments. Epic and I may enter into a revised agreement in writing with immediate effect if signed by both parties. In addition, I understand and agree that Epic may change or terminate this agreement after giving me 90 days written or electronic notice, but such change or termination will not apply to a pending claim, or to any claim that accrued or was known to me prior to the amendment, except as may be required by applicable law.

X. Enforceable By Intended Beneficiaries; Assignment. Epic's current or former directors, officers, managers and employees, are all intended beneficiaries of this agreement and, as such, may fully enforce the terms of this agreement. Epic may assign this agreement to any future related and affiliated company or successor.

XI. Savings Clause & Conformity Clause. If any provision of this agreement is determined to be unenforceable or in conflict with a mandatory provision of applicable law, it shall be construed to incorporate any mandatory provision, and/or the unenforceable or conflicting provision shall be automatically severed and the remainder of the agreement shall not be affected. Provided, however, that if the Waiver of Class and Collective Claims is found to be unenforceable, then any claim brought on a class, collective, or representative action basis must be filed in a court of competent jurisdiction, and such court shall be the exclusive forum for such claims.

XII. Controlling Law. I agree that this agreement is made pursuant to, and shall be governed under, the Federal Arbitration Act (the "FAA") and the laws of the State of Wisconsin to the extent not preempted by the FAA.

**Employee**

Signed by:
Andrea Hull
CAE3E5D703DE4F4...

Signed:
Name: Andrea Hull
Date: 06/19/2025
TLG: 20312

Jennifer Peterson
**Human Resources**

# BOOST TECHNOLOGY PAYMENT AGREEMENT

Boost is providing you with a one-time, $400 Boost Technology Payment. The purpose of this payment is to help you outfit your workspace as you see fit. By signing, you agree that if you leave Boost (other than for another position within the Epic corporate family) within eighteen (18) months of the later of (i) your first Boost assignment or (ii) the date you signed this Agreement, Boost may deduct from your final paycheck or otherwise collect from you the full amount of your Boost Technology Payment.

**Employee**

Signed by:
Signed: Andrea Hull
CAE3E5D703DE4F4...
Name: Andrea Hull
Date: 06/19/2025
TLG: 20312

Jennifer Peterson
**Human Resources**